**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: | ) | **Case No. 24-40065** |
| | ) | **Chapter 13** |
| | ) | |
| JOSE ENCARNACION, | ) | |
| | ) | |
| DEBTOR. | ) | |

**JESSICA REYES LAMBERT'S OPPOSITION TO DEBTOR'S MOTION TO CONVERT
CASE TO CHAPTER 13**

Jessica Reyes Lambert hereby opposes the Debtor's motion to convert his involuntary
Chapter 7 case to Chapter 13. In further support of her opposition, Ms. Lambert respectfully states
as follows:

**BACKGROUND**

1.    This is not a typical Chapter 7 case, and the Debtor is not an "honest but unfortunate"
individual.

2.    To the contrary, this *involuntary* Chapter 7 case apparently arises from the Debtor's
operation of a pre-bankruptcy Ponzi scheme. Specifically, according to the Massachusetts
Secretary of State, the Debtor through his corporation, Trinity Investments, "raised
approximately *$10 million* from investors since 2020[1]." The Secretary of State further alleges
that the Debtor's solicitation of these funds was in contravention of Massachusetts' securities
law.

3.    According to the Secretary of State, the Debtor's investors were told that their funds
would be used to develop and renovate real estate owned by Trinity. Instead, the Secretary of
State alleges that "through out the scheme, Encarnacion [the Debtor] used new investor funds to

---

[1] This allegation alone raises serious concerns that the Debtor is eligible for chapter 13 relief.

pay earlier investors [and] pay for personal travel both domestically and internationally, and spent on personal expenses including buying jewelry and attending concerts." A copy of the Secretary of State's pre-bankruptcy Administrative Complaint is attached hereto as Exhibit A.

4.     Notably, the Debtor did not serve the debtor with his motion to convert.

5.     Similarly, in October 2025, a few months prior to the commencement of this involuntary case, Ms. Lambert sued the Debtor and Trinity in Worcester Superior Court. In that litigation, Ms. Lambert alleges extensive fraudulent conduct by the Debtor and seeks, among other things, a declaration that she is the "sole true and lawful owner" of real property deeded to Trinity and imposition of a resulting and/or constructive trust on the property. A copy of Ms. Lambert's Complaint against the Debtor is attached hereto as Exhibit B.

6.     Notably, like the Secretary of State, the Debtor did not serve Ms. Lambert with his motion to convert.

## OPPOSITION

7.     Contrary to his representations, the purpose of the Debtor's motion is not to use his alleged real estate "investments" to "fund a plan with a 100% dividend to all creditors." The Debtor's (and Trinity's) real estate investments are subject to an array of mortgages and equitable liens as well as claims for fraud, recission and violations of the securities laws. Instead, the apparent purpose of the motion is to shield the Debtor and Trinity from scrutiny by the Court, the Chapter 7 trustee and creditors and allow the Debtor to retain as much of the proceeds of his fraudulent scheme as possible. Under the circumstances, Ms. Lambert opposes the Debtor's motion to convert. *Marrama v. Citizens Bank*, 549 U.S. 365 (2007) (debtor's ability to convert Chapter 7 case to Chapter 13 is not absolute and untethered.)

2

.

**WHEREFORE**, Ms. Lambert respectfully requests that the Court enter an order denying the

Debtor's motion to this involuntary Chapter 7 case to Chapter 13

Dated: April 7, 2026

Respectfully submitted,
**JESSICA REYES LAMBERT**
By their attorney,

/s/ Francis C. Morrissey
Francis C. Morrissey (BBO No. 567589)
Morrissey, Wilson & Zafiropoulos, LLP
45 Braintree Hill Office Park, Suite 304
Braintree, MA 02184
781.353.5501
fcm@mwzllp.com

**EXHIBIT A**

**SECRETARY OF STATE'S ADMINISTRATIVE COMPLAINT**

**COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF THE SECRETARY OF THE COMMONWEALTH**
**SECURITIES DIVISION**
**ONE ASHBURTON PLACE, ROOM 1701**
**BOSTON, MASSACHUSETTS 02108**

| | |
|---|---|
| IN THE MATTER OF:<br><br>JOSE ENCARNACION<br>AND TRINITY ESTATE INVESTMENTS &<br>DEVELOPMENT LLC,<br><br>RESPONDENTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Docket No. E-2025-0187 |

**ADMINISTRATIVE COMPLAINT**

## I.    PRELIMINARY STATEMENT

The Enforcement Section of the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the "Division") files this administrative complaint (the "Complaint") to commence an adjudicatory proceeding against Jose Encarnacion ("Encarnacion") and Trinity Estate Investments and Development LLC d/b/a Trinity Real Estate Investment Group ("Trinity Investments") (collectively "Respondents") for violations of the Massachusetts Uniform Securities Act, M.G.L. c. 110A (the "Act"), and the regulations promulgated thereunder at 950 CMR 10.00-14.413 (the "Regulations"). The Division alleges that Respondents engaged in acts and practices in violation of Sections 101, 201, and 301 of the Act by fraudulently misrepresenting the purpose and use of unregistered and non-exempt securities offered from and sold in Massachusetts.

The Division seeks an order: (1) finding as fact all allegations set forth in Sections IV through VI of this Complaint; (2) concluding that Respondents violated the Act and the Regulations as alleged in Section VII of this Complaint; (3) finding that all of the sanctions

1

and remedies detailed herein are necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of the Act; (4) requiring Respondents to permanently cease and desist from further acts and practices in violation of the Act and Regulations; (5) imposing an administrative fine on Respondents in such amount and upon such terms and conditions as the Director or Presiding Officer may determine; (6) requiring Respondents to provide a verified accounting of the use of all funds received from investors; (7) requiring Respondents to make rescission offers, including interest, to all investors in connection with the wrongdoing; (8) censuring Respondents; (9) permanently barring Respondents from registering in Massachusetts as, associating or affiliating with, or acting as a(n) broker-dealer, broker-dealer agent, investment adviser, investment adviser representative, Securities and Exchange Commission-registered investment adviser, an investment adviser exempted from registration, a person relying on an exclusion from the definition of investment adviser or broker-dealer in any capacity, issuer, issuer-agent, or as a partner, officer, director, or control person of any of the foregoing; (10) permanently barring Respondents from offering or selling securities from or within Massachusetts, and to persons in Massachusetts; and (11) taking any such further actions that may be necessary or appropriate in the public interest or for the protection of investors.

## II.   SUMMARY

On March 14, 2020, Encarnacion formed Trinity Investments, a Massachusetts limited liability company, to purchase, sell, and develop real estate. Beginning in June 2020, Encarnacion, through Trinity Investments, solicited investments both nationwide and internationally. Encarnacion raised funds primarily from immigrant communities, a

2

substantial portion coming from the Central African community. While soliciting investments, Encarnacion leveraged his position as Senior Pastor of Iglesia Cristiana De La Comunidad in Worcester, a church he operates, to raise funds.

Encarnacion told investors that the funds the invested would be used to develop and renovate real estate already owned by Trinity Investments. Encarnacion told investors that, through Trinity Investments, he would generate revenue from rental income or the sale of properties, and that he would use this revenue to pay interest and return principal to investors. Respondents raised approximately $10 million from investors since 2020— including over $2 million from Massachusetts investors alone.

In reality, Encarnacion used only a portion of the funds he raised to develop or renovate properties. Instead, while Trinity Investments fell further and further behind on the interest it owed to investors, Encarnacion continued to reach out to new investors. In doing so, Encarnacion took advantage of a network of affiliated religious institutions using his reputation as a pastor in an attempt to attract new investments. Throughout the scheme, Encarnacion used new investor's funds to pay earlier investors, pay for personal travel both domestically and internationally, and spent funds on personal expenses including buying jewelry and attending concerts.

3



\* Amounts are rounded. Investor
Returns includes payments to prior
investors using investor funds.

For example, in June 2022, Encarnacion represented to one investor that Trinity Investments would use their funds to renovate a property in Southbridge, Massachusetts, and they invested $60,000. In June 2023 Trinity Investments sold the Southbridge property for $220,000, receiving proceeds of $95,047.61. Encarnacion did not repay the investor from the proceeds of the home renovation project. Instead Encarnacion paid those funds to prior investors, made payments on mortgages for other properties, and paid personal expenses.

Neither Trinity Investments nor Encarnacion took any steps to register themselves as broker-dealers, broker-dealer agents, investment advisers, investment adviser representatives, or issuer agents in Massachusetts or elsewhere. Furthermore, Respondents did not register the promissory notes, or seek an exemption from registering their notes.

4

The Enforcement Section files this Complaint to prevent Respondents from continuing their fraud at the expense of investors, and to seek the return of any recoverable assets to defrauded investors.

### III.   JURISDICTION AND AUTHORITY

1.   The Division has jurisdiction over matters relating to securities pursuant to the Act and Regulations.

2.   The Division brings this action pursuant to the authority granted by Sections 407A, 412, and 414 of the Act, wherein the Division has the authority to conduct an adjudicatory proceeding to enforce the provisions of the Act and the Regulations.

3.   The Division files this Complaint in accordance with Section 10.06 of the Regulations.

4.   The Division's investigation is current and ongoing and may result in the filing of additional administrative complaints.

### IV.   RELEVANT TIME PERIOD

5.   Except as otherwise expressly stated, the acts and practices described herein occurred during the approximate time period of June 1, 2020, to the date of this Complaint (the "Relevant Time Period").

### V.   RESPONDENTS

6.   Trinity Estate Investments & Development, LLC d/b/a Trinity Real Estate Investment Group ("Trinity Investments") is a limited liability company organized under the laws of Massachusetts with a principal place of business at 108 Beacon Street, Worcester, Massachusetts.

5

7.      Jose Antonio Encarnacion ("Encarnacion") is an individual with a last known address in Worcester, Massachusetts. Until 2024, Encarnacion served as the sole manager of Trinity Investments. Encarnacion has never been registered in any capacity in the securities industry in Massachusetts.

## VI.   STATEMENT OF FACTS

### A. Encarnacion Formed Trinity Investments in Massachusetts to Conduct Real Estate Business

8.      Encarnacion filed a Certificate of Organization with the Secretary of the Commonwealth, Corporations Division for Trinity Investments on March 14, 2020.

9.      According to Trinity Investment's Certificate of Organization, Encarnacion formed Trinity Investments to purchase, sell, and develop real estate.

10.     Until 2024, Encarnacion served as the sole manager of Trinity Investments.

11.     Encarnacion acted as the general contractor on Trinity Investments' real estate development and renovation projects.

12.     Encarnacion used his personal network to arrange for subcontractors to perform development and renovation work.

### B. Encarnacion Operated Trinity Investments From the Church Where He Served As Pastor

13.     Iglesia Cristiana De La Comunidad ("Iglesia") was formed as a religious corporation in Massachusetts in 1996.

14.     Beginning on or about May 7, 2013 Encarnacion became President of Iglesia.

15.     Beginning on or about May 17, 2013, Iglesia operated out of 108 Beacon Street, Worcester, Massachusetts (the "Church Property"). Encarnacion conducted Trinity Investments' business from the Church Property.

16.     Between 2011 and 2023, Encarnacion was the sole pastor of Iglesia.

6

17.　　Currently, Encarnacion and his wife serve as co-pastors of Iglesia.

### C. Shortly after the Formation of Trinity Investments, Encarnacion Fraudulently Solicited Investments to Develop and Renovate Real Estate

18.　　Beginning on or about June 2020, Encarnacion, as manager of Trinity Investments, began soliciting investments.

19.　　Trinity Investments, with Encarnacion as its manager, raised funds through the issuance of promissory notes titled "Investment Verification Contracts" (the "Notes").

20.　　The Notes "certified" that the investor had invested a sum of money in a specific real estate project, and that, upon completion of the "project" the investor would be repaid their initial investment plus interest—in some instances with interest as high as 60%.

21.　　According to the terms of the Notes issued by Trinity Investments and sold by Encarnacion, interest was not annualized, but rather was to be paid in a single payment at maturity, regardless of the duration of the underlying contract.

22.　　Encarnacion, as manager of Trinity Investments, represented to investors that their funds would be used to fund development and renovation of properties already owned by Trinity Investments.

23.　　During the Relevant Time Period, Trinity Investments raised more than $10 million from at least 200 investors across the United States.

24.　　Trinity Investments raised at least $2.3 million from at least 50 Massachusetts investors.

25.　　In addition at least two investors outside of the United States, invested an additional $26,000.

7

**D. Encarnacion Primarily Obtained Investments from Immigrant Communities with Ties to Iglesia**

26. Investors primarily came from the Central African community residing in the United States.

27. Investors primarily came from a network of churches affiliated with Iglesia.

28. Encarnacion took advantage of his position of trust as pastor while soliciting investments.

29. According to the Notes issued by Trinity Investments, Encarnacion directed any questions to his church e-mail address.

30. Encarnacion signed the Notes as Reverend Jose Encarnacion.

**E. Trinity Investments and Encarnacion Falsely Represented the Use of Investors' Funds**

31. Instead of using investor funds to develop and renovate properties owned by Trinity Investments, Encarnacion fraudulently used funds received from investors to:

    a. pay personal expenses;

    b. purchase the right to renovate properties and receive a share of the profits from the property's sale;

    c. acquire the Church Property and make mortgage payments on the Church Property;

    d. make payments to prior investors; and

    e. make mortgage payments on property owned by Trinity Investments.

    **a. Encarnacion Immediately Began to Fraudulently Use Investor Funds for Personal Expenses, Including Travel Unrelated to the Business of Trinity Investments**

32. Encarnacion used Trinity Investments funds to travel extensively.

8

33.     Encarnacion spent more than $200,000 of Trinity Investments' funds on airline tickets and airport parking.

34.     Encarnacion spent more than $60,000 of Trinity Investments' funds on hotels and short-term rentals.

35.     Encarnacion spent nearly $30,000 on rental cars.

36.     Encarnacion spent more than $40,000 of Trinity Investments' funds on personal expenses while travelling.

### i. Domestic Travel

37.     On June 10, 2020, Trinity Investments received its first investment, totaling $7,000 from a Florida investor ("Investor One").

38.     Encarnacion deposited Investor One's investment into Trinity Investment's sole bank account, ending in 9919 (the "Trinity Bank Account").

39.     Encarnacion was, until July 2, 2022, the sole individual with access to and control of the Trinity Bank Account.

40.     Like all investors in Trinity Investments, Encarnacion told Investor One their funds would be used to renovate property already owned by Trinity Investments.

41.     Prior to this investment, the balance of the Trinity Bank Account was $73.26.

42.     On June 15, 2020, Trinity Investments received another investment, $10,000, from a New York investor ("Investor Two").

43.     Encarnacion commingled Investor Two's investment, as well as all subsequent investments, in the Trinity Bank Account.

44.     Like all investors in Trinity Investments, Encarnacion told Investor Two their funds would be used to renovate property already owned by Trinity Investments.

9

45. Over time, Investor Two and their family invested more than $200,000 with Trinity Investments.

46. On June 22, 2020 Encarnacion spent $446.09 of investor funds on travel, including airfare, a rental car, and an out-of-state hotel room.

47. On the same day, with no intermediate deposits, Encarnacion spent a further $602.54 on airfare.[1]

48. Upon information and belief, the purchase of airfare was unrelated to the business of Trinity Investments.

49. Encarnacion, as manager of Trinity Investments, is the owner of record of only properties located in Western Massachusetts, primarily in Worcester.

50. Trinity Investments is the owner of record of only properties located in Massachusetts.

51. Encarnacion never represented to any investor that he would use their funds to purchase, develop, or renovate any property outside Massachusetts.

52. Upon information and belief, all travel expenses Encarnacion charged to the Trinity Bank Account were personal in nature.

### ii. International Travel

#### 1. Iceland

53. In June 2021, Encarnacion spent more than $4,000 on airfare, hotels, and tours traveling to Iceland.

54. Trinity Investments had no business in Iceland, and Encarnacion's trip was a personal expense.

---

[1] In addition to the expenses detailed in this section, Encarnacion also withdrew $8,000 in cash from the Trinity Bank Account on June 15, 2020.

10

### 2. Egypt

55.     In July 2021, Encarnacion spent more than $8,000 of Trinity Investments' money traveling in Egypt, including more than $5,000 on jewelry, and more than $1,000 on a guided tour of the Luxor temple.

56.     Trinity Investments had no business in Egypt, and Encarnacion's trip was a personal expense.

### 3. Peru

57.     In July 2022, Encarnacion spent more than $1,100 travelling to Lima, Peru.

58.     Trinity Investments had no business in Peru, and Encarnacion's trip was a personal expense.

### 4. Guatemala

59.     On April 3, 2023, Encarnacion spent approximately $5,000 of Trinity Investments' funds to fly himself and family members to Guatemala City.

60.     Once in Guatemala, Encarnacion used investor funds to attend a concert with his family.

61.     Encarnacion has not refunded Trinity Investments for personal expenses charged to the business.

### b. Encarnacion Fraudulently Used Investor Funds to Purchase the Right to Renovate Properties and Receive a Share of Profits on Property Sales

62.     On July 31, 2020, the Trinity Bank Account had a negative balance.

63.     On August 4, 2020, Trinity Investments received a wire transfer of $20,000 from a company owned by Investor One.

64.     Encarnacion again told Investor One their funds would be used to renovate property already owned by Trinity Investments.

11

65.     After the August 4, 2020 wire transfer, the Trinity Bank Account balance was $19,938.40.

66.     On August 5, 2020, with no intermediate deposits, Encarnacion paid an individual from Sudbury, Massachusetts (the "Sudbury Resident") $16,750 to rehabilitate property owned by the Sudbury Resident and share in any profits generated on the sale of the properties after rehabilitations.

### c. Encarnacion Fraudulently Used Investor Funds to Acquire and Refinance the Church Property

67.     In July 2021, after Iglesia began to experience financial difficulties, Trinity Investments acquired the Church Property, funded by a loan from a Rhode Island mortgage company (the "RI Mortgagor").

68.     On July 14, 2021, Trinity Investments' sole bank account, ending in 9919 (the "Trinity Bank Account") had a balance of $151,736.38.

69.     On July 15, 2021, an investor from Worcester, Massachusetts ("Investor Three") wired $20,000 into the Trinity Bank Account.

70.     On July 16, 2021, a different investor from Worcester, Massachusetts ("Investor Four") wired $30,000 into the Trinity Bank Account.

71.     On July 19, 2021, a third investor from Missouri ("Investor Five") wired $40,000 into the Trinity Bank Account.

72.     On July 21, 2021, a fourth investor from Kentucky ("Investor Six") wired $12,000 into the Trinity Bank Account.

73.     These were the only deposits of funds into the Trinity Bank Account between July 14 and July 22, 2021.

12

74.     On July 22, 2021, Trinity Investments paid $201,245.51 through two certified checks to the real estate law firm involved in the transfer of the Church Property to Trinity Investments (the "July 22nd Payment").

75.     Encarnacion used the funds received from July 15, 2021 through July 21, 2021, to make the July 22nd Payment in connection with the acquisition and refinance of the Church Property.

76.     At no point did Encarnacion inform Investors Three through Six or any other investor that Encarnacion would use their funds to acquire and refinance the Church Property.

### d. Encarnacion Fraudulently Made Mortgage Payments on the Church Property Using Investor Funds

77.     On August 25, 2021, the Trinity Bank Account had a negative balance.

78.     On August 26, 2021, Trinity Investments received deposits into the Trinity Bank Account totaling $41,000 from Investor Two and a relative, as well as a $500 deposit from Encarnacion's personal bank account.

79.     On August 27, 2021, Trinity Investments received deposits into the Trinity Bank Account totaling $55,000 from two additional investors ("Investor Seven" and "Investor Eight").

80.     Encarnacion told these investors, like all investors in Trinity Investments, that their funds would be used to renovate property already owned by Trinity Investments.

81.     On September 1, 2021, with no further deposits to the Trinity Bank Account, Trinity Investments paid $4,940 to RI Mortgagor.

82.     But for the investor funds, Trinity Investments would not have had sufficient funds to make the mortgage payment.

13

83.    At no point did Encarnacion inform Investor Seven or Investor Eight or any other investor that Encarnacion would use their funds to make mortgage payments concerning the Church Property.

84.    Trinity Investments made monthly payments of $4,940 to RI Mortgagor, in some instances making a double payment later to make up for missing a month, through January 2023, and made one payment of $5,187 in February 2023.

85.    These payments totaled $94,132, including a $25 fee paid in March 2022.

86.    During this time, Trinity Investments charged Iglesia approximately $9,000 for use of the Church Property.

87.    Trinity Investments subsidized the remaining $85,132 paid to RI Mortgagor, using Investor Funds and other revenue owed to Trinity Investments' investors to enable Encarnacion to continue making mortgage payments concerning the Church Property.

### e. Encarnacion Fraudulently Used Investor Funds to Make Payments to Prior Investors

#### i. In September 2020 Encarnacion Used Funds From Two Investors to Pay Purported Investment Returns to a Third Investor[2]

88.    On September 14, 2020, the Trinity Bank Account had a balance of $22.26.

89.    The Trinity Bank Account received no deposits until September 24, 2020, when it received two deposits of $3,000 each from an investor who is pastor at a Bermuda church.

90.    The Trinity Bank Account received no further deposits until September 28, 2020, when it received $10,000 from another investor.

---

[2] In addition to the expenses detailed in this section, Encarnacion also withdrew $2,800 in cash on September 24, 2020.

91.    On September 30, 2020[3], Encarnacion, as manager of Trinity Investments, wired $10,000 to an investor, representing purported profits generated by Trinity Investments' property renovations.

> **ii.  Encarnacion Did Not Return the Proceeds of a Property Sale to the Investor Who Funded Its Renovation, Instead Paying Returns to Prior, Unrelated Investors.**

92.    In June 2022, Encarnacion represented to a resident of Appleton, Wisconsin ("Investor Nine") that Trinity Investments owned a property in Southbridge, Massachusetts (the "Southbridge Property"), and that Trinity Investments needed funds to renovate the property so it could be sold for a profit.

93.    Investor Nine invested a total of $60,000, including $56,250 by wire on June 29, 2022.

94.    Trinity Investments acquired the Southbridge Property on September 8, 2022, for $96,500.

95.    Also on September 8, 2022, Trinity Investments granted a mortgage secured by the Southbridge Property in exchange for the receipt of $138,000 from a resident of Natick, Massachusetts.

96.    On June 16, 2023, Trinity Investments sold the Southbridge Property for $220,000, and received proceeds of $95,047.61 on the sale.

97.    Encarnacion did not return any of the proceeds of this sale to Investor Nine.

98.    Instead Encarnacion used the proceeds to return funds to other investors, make mortgage payments, purchase airfare, rent cars, and pay personal expenses.

---

[3] From September 28 through 30, 2020, Encarnacion spent $228.00 on airfare, and $792.11 on Airbnbs.

### iii. In September 2022, Encarnacion Used Funds Invested by a Connecticut Resident to Pay Purported Returns to a Prior Investor

99. On September 14, 2022, the Trinity Bank Account had a balance of $3,010.12.

100. The following day, on September 15, 2022, Trinity Investments received an investment of $100,000 by wire into the Trinity Bank Account from a Connecticut resident.

101. Also on September 15, 2022, Encarnacion wired $47,000 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to a prior investor.

### iv. In April 2023, Encarnacion Used Funds From Five Investors to Pay Purported Returns to Six Prior Investors

102. On March 30, 2023, the Trinity Bank Account had a balance of $509.54.

103. On March 31, 2023, Trinity Investments received four deposits from three investors into the Trinity Bank account, totaling $120,000.

104. On April 3, 2023, Trinity Investments received a wire transfer in the amount of $10,000 from an investor. Encarnacion also deposited $500 cash into the Trinity Bank Account the same day.

105. Also on April 3, 2023, with no other intermediate deposits, Encarnacion wired $52,250 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to three prior investors.

106. On April 4, 2023, Trinity Investments received an investment of $30,000 from an investor, made by wire into the Trinity Bank Account.

107. On April 5, 2023, Trinity Investments received $3,000 from a tenant of a property Trinity Investments owns.

108. Also on April 5, 2023, Encarnacion wired $47,900 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to three prior investors.

16

### v. In July 2023, Encarnacion Used Funds Invested by an Oklahoma Resident to Pay Purported Returns to a Prior Investor

109.    On July 18, 2023, the starting balance of the Trinity Bank Account was $4,231.75.

110.    On July 18, 2023, the Trinity Bank Account received an investment of $50,000 from a resident of Oklahoma.

111.    On July 18, 2023, Encarnacion paid an approximately $2,500 credit card bill, made an approximately $7,000 mortgage payment, and wired $20,000 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to a prior investor.

### vi. Encarnacion Used Funds Invested in a Specified Property to Pay Mortgages on Other Properties, Pay Prior Investors, and Make Cash Withdrawals

112.    On July 19, 2023, Trinity Investments received a further investment of $50,000 by wire transfer from a resident of Cranston, Rhode Island ("Investor Ten").

113.    Investor Ten's wire indicated it was related to 302 Sumner Ave in Springfield, Massachusetts ("302 Sumner").

114.    Trinity Investments previously acquired 302 Sumner in June 2021 through an owner-financed arrangement[4].

115.    Also on July 19, 2023, Encarnacion wired $8,500 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to two prior investors.

116.    On July 20, 2023, with no intermediate deposits, Trinity Investments made mortgage payments of approximately $15,000, and Encarnacion withdrew $8,500 in cash from the Trinity Bank Account.

---

[4] In an owner financed deal, rather than purchasing the property from the owner and making mortgage payment to a bank, the purchaser makes monthly payments to the previous owner of the property.

117. None of the mortgage payments made on July 20, 2023, were made to the prior owners of 302 Sumner.

118. Trinity Investments next paid the prior owners on August 30, 2023.

119. On July 31, 2023, the Trinity Bank Account had a negative balance.

### vii. Encarnacion Used Funds Invested by a Kentucky Resident to Pay Returns to a Prior Investor

120. On July 28, 2023, the Trinity Bank Account had a beginning balance of $780.05.

121. Also on July 28, 2023, Trinity Investments received an investment by wire of $18,000 into the Trinity Bank Account from a resident of Louisville, Kentucky, and wired $15,000, purporting to be profits generated by Trinity Investments to Investor Three.

### viii. In March 2024, Encarnacion Used Funds Invested by a Resident of Worcester, Massachusetts, and Two Others, to Pay Purported Returns to Prior Investors

122. On March 6, 2024, the Trinity Bank Account had a balance of $4,773.20.

123. On March 8, 2024, Trinity Investments received an investment of $20,000 from a resident of Worcester, Massachusetts, deposited into the Trinity Bank Account.

124. Also on March 8, 2024, Trinity Investments received investments from two other individuals, totaling $47,000, by wire into the Trinity Bank Account.

125. On March 11, 2024, Trinity Investments received an investment of $20,000 by wire from another investor, and Encarnacion wired $25,500 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to a prior investor.

126. On March 12, 2024, Trinity Investments received three investments totaling $30,000 from two individuals by wire, and Encarnacion wired a total of $59,000 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to five prior investors.

18

### ix. In September 2024, Encarnacion Used Funds Invested by Two Individuals to Pay Purported Returns to Three Prior Investors

127. On September 6, 2024, the Trinity Bank Account had a negative beginning balance.

128. Also on September 6, 2024, Trinity Investments received two investments totaling $45,750 by wire from Investor Ten and another investor, and Encarnacion made payments totaling $31,000 from the Trinity Bank Account, purporting to be profits generated by Trinity Investments, to Investor Two's relative and two other investors.

### F. Neither Trinity Investments Nor Encarnacion Has Ever Registered Themselves or Their Notes in Massachusetts

129. Encarnacion has never been registered in any capacity in the securities industry in Massachusetts.

130. Trinity Investments has never registered its Notes with the Division.

131. Encarnacion has never registered Trinity Investments' Notes with the Division.

132. Trinity Investments has never registered with the Division as an issuer agent.

133. Encarnacion has never registered with the Division as an issuer agent.

134. Trinity Investments has never taken any steps to determine whether an exemption from registering the Notes under the Act exists.

135. Encarnacion has never taken any steps to determine whether an exemption from registering Trinity Investments' Notes under the Act exists.

## VII.  VIOLATIONS OF LAW

### Count I - Violations of M.G.L. c. 110A, § 101

136. Section 101 of the Act provides:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud,

19

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

M.G.L. c. 110A, § 101

137. The Division restates and incorporates the factual allegations set forth in Sections IV through VI above.

138. Respondents' acts and practices, as described above, constitute violations of M.G.L. c. 110A, § 101.

<strong>Count II – Violations of M.G.L. c. 110A, § 201</strong>

139. Section 201 of the Act provides in relevant part:

(a) It is unlawful for any person to transact business in this commonwealth as a broker-dealer or agent unless he is registered under this chapter.

(b) It is unlawful for any broker-dealer or issuer to employ an agent unless the agent is registered. The registration of an agent is not effective during any period when he is not associated with a particular broker-dealer registered under this chapter or a particular issuer. When an agent begins or terminates a connection with a broker-dealer or issuer, or begins or terminates those activities which make him an agent, the agent as well as the broker-dealer or issuer shall promptly notify the secretary.

M.G.L. c. 110A, § 201.

140. The Division restates and incorporates the factual allegations set forth in Sections IV through VI above.

141. Respondents' acts and practices, as described above, constitute violations of M.G.L. c. 110A, § 201.

20

**Count III – Violations of M.G.L. c. 110A, § 301**

142.    Section 301 of the Act provides:

It is unlawful for any person to offer or sell any security in the commonwealth unless:--

(1) the security is registered under this chapter;

(2) the security or transaction is exempted under section 402; or

(3) the security is a federal covered security.

M.G.L. c. 110A, § 301.

143.    The Division restates and incorporates the factual allegations set forth in Sections IV through VI above.

144.    Respondents' acts and practices, as described above, constitute violations of M.G.L. c. 110A, § 301.

## VIII.    STATUTORY BASIS FOR RELIEF

Section 407A of the Act provides, in pertinent part:

(a) If the secretary determines, after notice and opportunity for hearing, that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule or order issued thereunder, he may order such person to cease and desist from such unlawful act or practice and may take such affirmative action, including the imposition of an administrative fine, the issuance of an order for an accounting, disgorgement or rescission or any other such relief as in his judgment may be necessary to carry out the purposes of [the Act].

M.G.L. c. 110A, § 407A.

## IX.    PUBLIC INTEREST

For any and all of the reasons set forth above, the Division asserts that this "action is necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of [the Act]."

21

## X.   RELIEF REQUESTED

The Division requests that an order be entered:

A.   Finding as fact all allegations set forth in Sections IV through VI of the Complaint;

B.   Concluding that Respondents violated the Act and the Regulations as alleged in Section VII of this Complaint;

C.   Finding that all of the sanctions and remedies detailed herein are necessary or appropriate in the public interest or for the protection of investors and consistent with the purposes fairly intended by the policy and provisions of the Act;

D.   Requiring Respondents to permanently cease and desist from further acts and practices in violation of the Act and Regulations;

E.   Imposing administrative fines on Respondents in such amount and upon such terms and conditions as the Director or Presiding Officer may determine;

F.   Requiring Respondents to provide a verified accounting of the use of all funds received from investors;

G.   Requiring Respondents to make rescission offers, including interest, to all investors in connection with the wrongdoing;

H.   Censuring Respondent(s);

I.   Permanently barring Respondents from registering in Massachusetts as, associating or affiliating with, or acting as a(n) broker-dealer, broker-dealer agent, investment adviser, investment adviser representative, Securities and Exchange Commission-registered investment adviser, an investment adviser exempted from registration, a person relying on an exclusion from the definition of investment adviser or broker-

22

dealer in any capacity, issuer, issuer-agent, or as a partner, officer, director, or control person of any of the foregoing;

J.    Permanently barring Respondents from offering or selling securities from or within Massachusetts, and to persons in Massachusetts; and

K.    Taking any such further actions that may be necessary or appropriate in the public interest or for the protection of investors.

**MASSACHUSETTS SECURITIES DIVISION**
By and through its attorneys,

Alexander Theuman, Esq., CFE
Assistant Chief of Enforcement
Office of the Secretary of the Commonwealth
One Ashburton Place, Room 1701
Boston, Massachusetts 02108-1552
tel. (617) 727-3548
fax. (617) 248-0177

Dated: February 11, 2026

23

**EXHIBIT B**

**MS. LAMBERT'S VERIFIED COMPLAINT**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION NO.

|  |  |
|---|---|
| JESSICA REYES LAMBERT,<br><br>    Plaintiff,<br><br>v.<br><br>TRINITY ESTATE INVESTMENTS<br>& DEVELOPMENT, LLC,<br>JOSE ENCARNACION, and<br>WILMINGTON SAVINGS FUND<br>SOCIETY, FSB, as Owner Trustee of<br>OBX 2022-NQM9 Trust,<br><br>    Defendants,<br><br>and<br><br>CITIZENS BANK,<br><br>    Trustee Process Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **VERIFIED COMPLAINT**

Plaintiff Jessica Reyes Lambert ("Lambert" or "Plaintiff") brings this Verified Complaint

against Defendants Trinity Estate Investments & Development, LLC ("Trinity"), Jose

Encarnacion ("Encarnacion"), and Wilmington Savings Fund Society, FSB, as Owner Trustee of

OBX 2022-NQM9 Trust ("WSFS") (collectively, "Defendants"). Trinity purported to sell real

property to Lambert located at 6 Hancock Street in Worcester. Trinity agreed to provide seller

financing to Lambert to finance the purchase and represented that it would use Lambert's

monthly payments to satisfy the underlying mortgage. Trinity and Encarnacion did not do so,

and the lender, WSFS, is now foreclosing on the property where Lambert lives with her husband

and autistic son. WSFS has scheduled a foreclosure auction for November 3, 2025. Lambert brings this action to enjoin that foreclosure, which is improper because WSFS released the mortgage earlier this year, and also seeks a declaration that she is the sole lawful owner. Lambert also seeks to recoup her damages from Trinity and Encarnacion. Pursuant to G.L. c. 184, § 15, Plaintiff contemporaneously seeks an endorsement of a memorandum of lis pendens, as this Verified Complaint alleges claims which affect title to an interest in real property.

## PARTIES

1. Jessica Reyes Lambert is an individual residing at 6 Hancock Street in Worcester, Massachusetts.

2. On information and belief, Trinity Estate Investments & Development, LLC is a Massachusetts limited liability company with a principal place of business at 108 Beacon Street, Worcester, Massachusetts 01603.

3. On information and belief, Jose Encarnacion is an individual residing at 7 Lucian Street in Worcester, Massachusetts 01603.

4. On information and belief, Wilmington Savings Fund Society, FSB is a bank headquartered in Wilmington, Delaware.

5. Trustee Process Defendant Citizens Bank is a financial institution with locations throughout the Commonwealth of Massachusetts, including branches located at 940 W Boylston Street and 949 Grafton Street in Worcester. On information and belief, Defendants Trinity and Encarnacion utilize Citizens Bank for financial services. For example, Trinity deposited Lambert's $100,000 down payment into an account at Citizens Bank.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Defendants pursuant to G.L. c. 223A, §§ 2 & 3

because they are domiciled or conduct business in Massachusetts.

7.     This Court has jurisdiction over the Trustee Process Defendant because it also conducts business in Massachusetts.

8.     Venue is proper in this Court pursuant to G.L. c. 223, § 1 and G.L. c. 246, § 2 because the Trustee Process Defendant has places of business in Worcester County.

## FACTS

9.     Jose Encarnacion ("Encarnacion") is a pastor at Christian Community Church (the "Church") in Worcester.

10.     Encarnacion is also a Manager of Defendant Trinity Estate Investments & Development LLC ("Trinity"), a Massachusetts limited liability company formed in 2020.

11.     Lambert met Encarnacion in or about 2010 through a friend. She became involved in the Church in or about 2012 and also worked as Encarnacion's executive assistant. Lambert and Encarnacion developed a close friendship and vacationed together with their families.

12.     In addition, Encarnacion served as Lambert's pastor and close personal confidant and spiritual mentor for approximately eleven years, between 2012 and 2023. Lambert viewed Encarnacion and his wife (also a pastor) as her spiritual parents. They were a part of her everyday life and celebrated birthdays and holidays with her. They also traveled together on numerous missionary trips overseas. Encarnacion and his wife also served as marriage counselors to Lambert in connection with her prior marriage.

13.     Encarnacion often told Lambert that he would always take care of her and that she was a blessing in his life.

3

14.    Encarnacion had reason to know that Lambert was relying on his guidance as her pastor and close and trusted friend.

15.    In the spring of 2022, Encarnacion suggested to Lambert that she should purchase a property located at 6 Hancock Street in Worcester (the "Property"), which was for sale. Lambert was not experienced with purchasing real property.

16.    6 Hancock Street is part of a duplex – the other portion of the building has an address of 4 Hancock Street.

17.    Lambert, who had recently started a catering business, expressed concern that she did not have the credit necessary to obtain conventional financing for the purchase.  Encarnacion and Lambert then discussed the option for Encarnacion to provide the financing directly to Lambert.

18.    Ultimately, Encarnacion and Lambert agreed that Lambert would provide Trinity with $100,000 for the down payment to purchase the Property, that Trinity (which would initially put the Property in its name) would provide her with financing to enable her to finance the rest of the purchase price, that Trinity would initially renovate the Property and then transfer the Property to Lambert upon completion of renovations, and that the Property would be Lambert's and she would reside there as her home.

19.    Encarnacion also specifically promised and represented to Lambert, in an in-person conversation, that he would use the monthly payments Lambert made to him to pay the mortgage on the Property.

20.    On information and belief, Encarnacion did not intend to continue paying the Mortgage and preserve title to the Property for Lambert.

4

21.     In April 2022, Lambert paid Trinity $100,000 for the down payment for the Property.

22.     On June 16, 2022, Trinity purchased both 4 and 6 Hancock Street from Reva Laflin, via quitclaim deeds (see Book 67760, Page 368 in Worcester County Registry of Deeds for 6 Hancock Street and Book 67761, Page 3 for 4 Hancock Street).  The consideration recited on both deeds is $202,500.  True and correct copies of the deeds for 6 Hancock Street are attached hereto as **Exhibit A**.

23.     Trinity contemporaneously took out a 30-year mortgage on 4 and 6 Hancock Street from Patch Lending, LLC, in the amount of $162,000 (see Book 67760, Page 370 and Book 67761, Page 5 in Worcester County Registry of Deeds) (the "Mortgage").  True and correct copies of the Mortgage filings are attached hereto as **Exhibit B**.

24.     Although there are separate mortgage documents recorded for 4 and 6 Hancock, they both contain an identical description of the underlying promissory note: "'Note' means the promissory note signed by [Trinity] and dated June 15, 2022.  The Note states that [Trinity] owes Lender One Hundred Sixty Two Thousand and 00/100 Dollars . . . plus interest and other amounts secured by this Security Instrument.  [Trinity] has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2052."

25.     Based on the purchase price as compared to the mortgage amount, Trinity paid $40,500 as a down payment on the Property.

26.     All of the funds for that down payment came from Lambert.

27.     Lambert never intended, understood, or expected that Trinity would have any ownership interest in the Property.  Instead, she intended, understood, and expected that she was the sole true and lawful owner and that Trinity was holding title to the Property on her behalf.

5

28.     Trinity and Encarnacion knew and understood that Lambert was purchasing the Property and that she would be in control over how that Property would be used.  At no point in connection with the purchase of the Property or thereafter did Encarnacion ever state or indicate that he believed the Property was or would be his or Trinity's.

29.     In June 2022, Encarnacion prepared a Contract to Purchase Real Estate, reflecting Lambert as the buyer and referencing her $100,000 deposit.  A true and correct copy of that document is attached hereto as **Exhibit C**.

30.     Encarnacion also provided a letter to Lambert verifying the receipt of the $100,000 payment (which erroneously dated that payment as being made in June 2022 instead of April).  A true and correct copy of that letter is attached hereto as **Exhibit D**.

31.     In August 2022, Encarnacion prepared a purchase and sale agreement reflecting Lambert's purchase of the Property.  A true and correct copy of that draft purchase and sale agreement is attached hereto as **Exhibit E**.

32.     That document also reflected Lambert's payment of $100,000 as a deposit and Encarnacion's agreement to provide financing to Lambert (referred to in the document as a "purchase money loan").

33.     The August purchase and sale agreement draft further obligated Encarnacion to provide title to the Property "free from encumbrances" to Lambert and provided that the deed would be delivered to Lambert within two weeks of completion of renovations to the Property. Although the August draft references a lawyer for Lambert, that is an error.  Lambert was not represented by counsel in connection with the purchase of the Property.

6

34.     After purchasing the Property, Encarnacion renovated it both inside and outside. Lambert was very involved in the renovation process.  For example, she selected appliances and fixtures and requested installation of a Jacuzzi, which Encarnacion had installed.

35.     Renovations were finally completed in 2023, and Lambert, her husband, and her son (who has autism) moved into the Property in August 2023.

36.     Since moving into the Property, Lambert and her husband have continued to make improvements to it, including paying approximately $38,000 to make hardscaping improvements to the yard.  They also pay all of the utilities for the Property.

37.     Trinity never paid for any expenses or improvements to the Property once the initial renovations were complete.

38.     Following the Property purchase in 2022, Encarnacion repeatedly stated to Lambert and her husband that the Property was their house.

39.     On December 14, 2023, Trinity and Lambert signed an Owner Financing Mortgage Contract ("Financing Agreement") memorializing the financing Trinity had agreed to provide to Lambert.  A true and correct copy of that document is attached hereto as **Exhibit F**.

40.     The Financing Agreement confirmed that Lambert was the purchaser of the Property and that Trinity would finance the balance of the purchase price ($296,000).

41.     The Financing Agreement also confirmed that Lambert had made a "down payment" of $100,000, which had been deposited into Trinity's account at Citizens Bank.

42.     The Financing Agreement stated that Lambert was to pay Trinity a total of $2,419 per month ($2,189 as payment toward the mortgage and $230 as payment for municipal property taxes).

7

43. The Financing Agreement further stated that it was secured by the Property and that Trinity could initiate foreclosure proceedings if Lambert did not make monthly payments when due.

44. Also in December 2023, the parties signed a new version of the purchase and sale agreement (drafted by Encarnacion), which again reflected Lambert's $100,000 payment. A true and correct copy of that document is attached hereto as **Exhibit G**. In the December version of the purchase and sale agreement, Encarnacion had changed the time for delivery of the deed to be upon completion of payments under the Financing Agreement, the term of which was estimated to be between 10 and 15 years.

45. Lambert signed the document, but she was not represented by counsel in connection with doing so. Lambert received no consideration in exchange for purporting to agree to delay transfer of title for longer than a decade.

46. Trinity never filed any document with the Registry of Deeds reflecting its Financing Agreement with Lambert or her interest in the Property.

47. Lambert has paid Encarnacion $2,419 per month since August 2023. Lambert understood and expected that these payments were being used to pay the Mortgage, as Encarnacion had promised.

48. Each month since August 2023, Lambert hand delivered the check by dropping it off in Encarnacion's mailbox, and each month, he promptly cashed it. To date, Lambert has paid Encarnacion approximately $62,894, on top of the $100,000 she originally paid for the Property.

49. Lambert would not have agreed to make monthly payments to Trinity had she understood that Encarnacion did not intend to use those funds to pay the underlying Mortgage and that she would be at risk of losing the Property to foreclosure. She also would not have

8

agreed to invest tens of thousands of dollars into improving the Property had she known Encarnacion's true intentions.

50.    On June 14, 2024, Mortgage Electronic Registration Systems, Inc., as nominee for Patch Lending, LLC, assigned its Mortgage to Wilmington Savings Fund Society, FSB (as Owner Trustee of OBX 2022-NQM9 Trust) ("WSFS").

51.    On February 24, 2025, WSFS released the Mortgage. A true and correct copy of that Release is attached hereto as **Exhibit H**. The release states that it is a release of the Mortgage dated June 15, 2022, executed by Trinity, to Patch Lending, LLC and refers to Book 67761, Page 5 in the Registry of Deeds. The release, however, specifically lists only 4 Hancock as the property address, and, therefore, only appears in the Registry of Deeds records for 4 Hancock.

52.    On March 5, 2025, the Church executed a Confirmatory Deed of the property where the Church operates (108 Beacon Street in Worcester) to Trinity for $617,500. That same day, Trinity executed a quitclaim deed of the 108 Beacon Street property to Regional Environmental Council, Inc. for $1,300,000. Trinity, therefore, made at least $682,500 in profit from the sale of the Church property.

53.    On or about September 25, 2025, WSFS sent documents to the Property notifying Trinity that it was foreclosing on the Property and intended to sell it at public auction on November 3, 2025. A true and correct copy of the foreclosure notice is attached hereto as **Exhibit I**.

54.    The Notice of Sale claims that the Power of Sale comes from a mortgage given by Trinity on June 15, 2022 and recorded at Book 67761, Page 5. In other words, WSFS claims

9

an entitlement to foreclose based on a Mortgage that it had previously released in February of this year.

55. Lambert saw the foreclosure notice when it was delivered to the Property and was completely shocked to learn that Trinity had not been using her money to pay the Mortgage, as promised.

56. In short, Encarnacion induced Lambert into paying him $2,419 per month. He did so by promising and representing that the Property was really hers, that he would use her payments to keep the underlying Mortgage paid, and that she would receive the deed once she had paid him $296,000. These promises were plainly false, as he has not used her payments to keep the Mortgage paid, as evidenced by WSFS' foreclosure proceedings.

57. Since learning of the impending foreclosure, Lambert and her undersigned counsel have uncovered that Lambert is not the only person who has been defrauded by Encarnacion. Public records reveal that Encarnacion and Trinity are currently subject to multiple lawsuits filed in 2025, including the following:

    a. On or about July 14, 2025, Olivier Shema brought suit against Trinity and Encarnacion in Worcester Superior Court (Case No. 2585CV00933), alleging that he had a partnership agreement with Encarnacion and Trinity, that they had promised to pay him certain funds in connection with dissolution of the partnership, and that they had failed to do so. Shema brought claims for breach of contract and breach of fiduciary duty;

    b. On or about September 8, 2025, Jacqueline Batamuliza and Charlotte Furaha brought suit in North Carolina state court against Encarnacion and Trinity Real Estate Development, LLC, alleging that defendants had not repaid funds plaintiffs

10

had invested. They brought claims for breach of contract, quantum meruit, intentional and negligent misrepresentation, piercing the corporate veil, and unfair trade practices under North Carolina law. A true and correct copy of that complaint is attached hereto as **Exhibit J**;

c. On or about September 29, 2025, Forum Trucking and Logistics, LLC brought suit against Encarnacion and Trinity in Worcester Superior Court (Case No. 2585CV01299), alleging that it had invested with defendants and defendants failed to repay that investment, while making false promises of repayment. Forum brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Chapter 93A;

d. On or about October 16, 2025, Innocent Izabayo, Eric Ndagijimana, and Akilimali Nkwaya Placide brought suit against Encarnacion and Trinity in Worcester Superior Court (Case No. 2585CV01395), alleging that Encarnacion and Trinity had failed to repay funds plaintiffs had invested in defendants' real estate projects. They brought claims for breach of contract, fraudulent misrepresentation, conversion, and unjust enrichment.

## COUNT I
## DECLARATORY JUDGMENT
### (v. WSFS and Trinity)

58. Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

59. There is an actual controversy between Lambert and WSFS concerning whether WSFS has any right to foreclose on the Property, as it already released the Mortgage that it invokes as the source of its foreclosure right.

11

60.     Lambert seeks a declaratory judgment that WSFS has no right to foreclose on the Property because it already discharged the Mortgage and that WSFS is prohibited from taking any further action to foreclose on the Property.

**COUNT II**
**DECLARATORY JUDGMENT**
**(v. Trinity and WSFS)**

61.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

62.     There is an actual controversy between Lambert and Trinity concerning the nature and extent of Lambert's interest in the Property, as well as Lambert's entitlement to an immediate transfer of the deed to the Property to her name.

63.     Lambert seeks a declaratory judgment that: (i) she is the sole true and lawful owner of the Property and has been so since its purchase in 2022; (ii) Trinity has no ownership interest in the Property and has held the Property in constructive or resulting trust for Lambert since it purchased it in 2022; and (iii) Trinity must take all steps necessary to transfer title to the Property to Lambert.

**COUNT III**
**BREACH OF CONTRACT**
**(v. Trinity)**

64.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

65.     Encarnacion and Lambert agreed that Lambert would provide Trinity with $100,000 for the down payment to purchase the Property, that Trinity (which would initially put the Property in its name) would provide her with financing to enable her to finance the rest of the purchase price, that Trinity would initially renovate the Property and then transfer the Property to

12

Lambert upon completion of renovations, and that the Property would be Lambert's and she would reside there as her home.  Encarnacion also promised to use Lambert's monthly payments to cover the Mortgage on the Property.

66.     Trinity's failure to use Lambert's monthly payments to cover the underlying Mortgage and, therefore, its failure to preserve title to the Property for transfer to Lambert constitutes material breaches of contract.

67.     Lambert has performed all of her obligations required under the agreement with Trinity and is now excused from further performance as a result of Trinity's breach.

68.     As a result of Trinity's breaches, Lambert has sustained damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (v. Trinity)

69.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

70.     Lambert and Trinity are parties to contracts concerning Lambert's purchase of the Property and Trinity's issuance of financing to Lambert.

71.     The parties' contracts contained an implied covenant of good faith and fair dealing, which required the parties to act in good faith and not do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits of those contracts.

72.     Trinity failed to act in good faith by failing to use the monthly payments to cover the Mortgage as promised, thereby permitting the Property to fall into foreclosure.  Trinity has therefore failed to preserve title to the Property for transfer to Lambert.  Trinity's conduct has deprived Lambert of the fruits of her ownership agreement with Trinity.

13

73. Trinity's bad faith conduct has caused Lambert substantial damages in an amount to be determined at trial.

## COUNT V
## RESULTING TRUST AND CONSTRUCTIVE TRUST
### (v. Trinity)

74. Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

75. As set forth herein, Lambert provided $100,000 for a down payment in connection with purchasing the Property.

76. Lambert never intended, understood, or expected that Trinity would have any ownership interest in the Property. Instead, she intended, understood, and expected that she was the sole true and lawful owner and that Trinity was holding title to the Property on her behalf.

77. Trinity and Encarnacion knew and understood that Lambert was purchasing the Property and that she would be in control over how that Property would be used. At no point in connection with the purchase of the Property or thereafter did Encarnacion ever state or indicate that he believed the Property was or would be his or Trinity's.

78. Therefore, at the time that Trinity took title to the Property, a resulting trust arose in Lambert's favor and for her benefit.

79. As a result of the fraudulent conduct alleged herein, which was also a breach of Encarnacion's fiduciary duties to Lambert, Trinity holds the Property in a constructive trust for the benefit of Lambert. Such constructive trust arose as of the time of purchase of the Property and has continued to the present.

80. Lambert subsequently lived at the Property and paid $62,894 that was supposed to be applied by Trinity and Encarnacion to pay the underlying Mortgage and property taxes.

14

Lambert also paid other property expenses and paid approximately $38,000 to improve the Property. Trinity never paid for any expenses or improvements to the Property once the initial renovations were complete.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### (v. Encarnacion and Trinity)

81. Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

82. Encarnacion, as Lambert's pastor, had a relationship of trust and confidence with her for many years, and she frequently relied on him for spiritual and personal guidance.

83. Encarnacion had reason to know that Lambert was relying on his guidance as her pastor and close and trusted friend.

84. By his conduct described herein, including, without limitation, preying upon Lambert's trust by falsely promising to use payments to Trinity to cover the Mortgage on the Property and eventually transfer the deed to Lambert, in order to induce Lambert to pay him over $2,000 a month for years, Encarnacion has breached his fiduciary duty to Lambert.

85. Because Trinity holds the Property in a resulting trust for the sole benefit of Lambert, its role as trustee also gave rise to fiduciary duties, which it breached by failing to preserve title to the Property for Lambert and keep the Property from foreclosure.

86. As a result of Encarnacion's and Trinity's breaches of fiduciary duty, Lambert has suffered damages in an amount to be determined at trial.

87. In addition, Lambert is entitled to a constructive trust and/or other equitable relief that remedies the harm to her resulting from Encarnacion's and Trinity's breaches of fiduciary duty.

15

## COUNT VII
## FRAUDULENT INDUCEMENT/FRAUDULENT MISREPRESENTATION
### (v. Trinity and Encarnacion)

88.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

89.     Encarnacion misled Lambert regarding his intention to utilize her monthly payments to cover the cost of the Mortgage and eventually transfer the Property's deed to her.

90.     On information and belief, Encarnacion did not intend to continue paying the Mortgage and preserve title to the Property for Lambert.

91.     Lambert would not have agreed to make monthly payments to Trinity had she known that Trinity did not intend to use those funds to pay the underlying Mortgage and she would be at risk of losing the Property to foreclosure.

92.     Encarnacion misrepresented his intentions with respect to the Property so that Lambert would be induced to pay Trinity over $2,000 per month for years.

93.     Lambert reasonably relied on Encarnacion's representations and acted upon them to her detriment by paying Trinity $62,894 and covering the costs of other expenses and improvements associated with the Property.  Lambert would not have invested this money into the Property had she known that Encarnacion did not intend to continue paying the Mortgage.

94.     Lambert has been damaged by Encarnacion and Trinity's fraud in an amount to be determined at trial.

95.     In addition, as a result of Encarnacion's misrepresentations, Trinity holds the Property in constructive trust for the sole benefit of Lambert.

16

## COUNT VIII
## UNJUST ENRICHMENT
### (v. Trinity)

96.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

97.     By paying $100,000 for the purchase of the Property, paying $62,894 that was supposed to be used to pay the Mortgage, and subsequently paying for expenses and approximately $38,000 in improvements to the Property since then, Lambert has conferred benefits on Trinity that would be unfair and unjust for it to retain.

98.     For example, by effectively paying the Mortgage on the Property since August 2023, the equity in the Property has increased.  If Trinity is declared the owner of the Property, it would benefit from that increased equity despite having not paid the Mortgage payments itself.

99.     If the Court does not declare that Lambert is the sole lawful owner of the Property, then the Court must exercise equity by ordering Trinity to disgorge the value of the benefits it has retained.  In the alternative, this Court should order that Trinity holds the Property in constructive trust for the benefit of Lambert in an amount equal to its unjust enrichment.

## COUNT IX
## PROMISSORY ESTOPPEL
### (v. Trinity and Encarnacion)

100.    Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

101.    Encarnacion represented to Lambert that the Property was hers and that he would use her monthly payments to Trinity to pay the underlying Mortgage.

17

102.   Lambert reasonably and detrimentally relied on those representations by paying Trinity $100,000 as a down payment, by paying Trinity $62,894 in monthly payments, and by covering the costs of other expenses and improvements associated with the Property.

103.   Justice requires that the Court enforce Encarnacion's promise to apply Lambert's payments to the Mortgage or to otherwise order that Lambert be permitted to pay the Mortgage directly.

104.   Lambert has sustained damages as a result of Encarnacion's and Trinity's false representations in an amount to be determined at trial.

## COUNT X
## CONVERSION
### (v. Trinity)

105.   Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

106.   Trinity has exercised, and continues to exercise, dominion and control over Lambert's funds, which were paid to Trinity to be used for a specific purpose.

107.   Trinity has no right to utilize Lambert's money for an unauthorized purpose.

108.   As a result of Trinity's exercise of dominion and control over Lambert's property, Lambert has suffered damages in an amount to be determined at trial.

## COUNT XI
## QUIET TITLE
### (v. Trinity)

109.   Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

18

110.   As set forth in more detail herein, there is a dispute concerning title to the Property.  Lambert is the sole owner of the Property, but public records do not reflect her interest.

111.   Lambert is the rightful owner of the Property and is entitled to judgment quieting title to the Property and confirming that she owns it.

**COUNT XII**
**TRUSTEE PROCESS ATTACHMENT AGAINST CITIZENS BANK**

112.   Lambert repeats and realleges the foregoing allegations as if fully set forth herein.

113.   Lambert has a reasonable likelihood of recovering a judgment on her claims, including interest and costs, in an amount equal or greater than the amount of the attachment sought.

114.   On information and belief, Encarnacion and Trinity do not have liability insurance which would cover the judgment Lambert is likely to obtain in this action.

115.   Pursuant to G.L. c. 246, § 1, no bond should be required from Lambert because her claim arises out of written agreements.

116.   If the trustee process attachment prayed for herein is not granted, there is a strong likelihood that Encarnacion and Trinity will not have the funds necessary to satisfy the judgment that Lambert is likely to recover in this action.

117.   Under these circumstances, Lambert does not have an adequate remedy at law.

118.   This Court should issue an order of attachment against all of Encarnacion's and Trinity's assets held by Citizens Bank, wherever located, in the amount of $150,000.

**WHEREFORE,** Jessica Reyes Lambert prays that the Court:

A.   Order the issuance of a trustee process summons and attachment of funds held by

19

Citizens Bank, on behalf of Trinity and Encarnacion, in an amount of at least $150,000;

B. Enter a temporary restraining order: (i) prohibiting WSFS from taking any further action to foreclose on the Property; and (ii) prohibiting Encarnacion and Trinity from transferring any funds out of their bank accounts outside of the ordinary course, including their account(s) at Citizens Bank, prior to a hearing and decision on Lambert's Motion for Attachment (if it is not granted *ex parte*);

C. Enter preliminary injunctive relief ordering WSFS to refrain from taking any further action to foreclose on the Property while this lawsuit is pending;

D. Issue a Memorandum of Lis Pendens with respect to the Property;

E. Enter judgment in her favor on all counts of the Verified Complaint and award her damages in an amount to be determined at trial;

F. Issue a declaration that WSFS has no right to foreclose on the Property because it already discharged the Mortgage and that WSFS is prohibited from taking any further action to foreclose on the Property;

G. Issue a declaration that: (i) Lambert is the sole true and lawful owner of the Property and has been so since its purchase; (ii) Trinity has no interest in the Property and has held the Property in trust for Lambert since its purchase; and (iii) Trinity must take all steps necessary to transfer title to the Property to Lambert;

H. In the alternative, if this Court does not declare that Lambert is the sole true and lawful owner of the Property, issue an order compelling Trinity to disgorge the value of the benefits it has retained, or, alternatively, order that Trinity holds the Property in constructive trust for the benefit of Lambert in an amount equal to its unjust enrichment; and

I. Grant her such other and further relief as is just or appropriate.

20

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

JESSICA REYES LAMBERT,

By her attorneys,

*/s/ Stephanie R. Parker*
David B. Mack (BBO # 631108)
dmack@ocmlaw.net
Stephanie R. Parker (BBO # 687610)
sparker@ocmlaw.net
O'Connor Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, Massachusetts 01803
Tel. 781-359-9037

Dated: October 24, 2025

## Verification

I hereby certify, under the penalties of perjury, that I have read the above Complaint and that I believe that the facts stated therein are true and that no material facts have been omitted therefrom.

*/s/ Jessica Reyes Lambert*
Jessica Reyes Lambert

Dated: October 24, 2025

Signed with approval by:

*/s/ Stephanie R. Parker*
Stephanie R. Parker (BBO # 687610)

21