# EXHIBIT G



**O'Connor Carnathan & Mack**

10 Burlington Mall Road, Ste. 301
Burlington, MA 01803
www.ocmlaw.net

Stephanie R. Parker
Direct Line: 781-359-9037
sparker@ocmlaw.net

October 24, 2025

*Via Overnight Delivery, Signature Required*

Wilmington Savings Fund Society, FSB
Controller's Office
500 Delaware Ave.
Wilmington DE 19801

    Re:    **Jessica Reyes Lambert v. Trinity Estate Investments & Development, LLC, et al.; C.A. No. 2585CV01457**

Dear Sir or Madam:

    This firm represents Jessica Reyes Lambert in a civil action recently filed against Wilmington Savings Fund Society, FSB, as Owner Trustee of OBX 2022-NQM9 Trust, in Worcester Superior Court in Massachusetts. In connection with that action, Mrs. Lambert seeks a Preliminary Injunction, a Trustee Process Attachment, and a Memorandum of Lis Pendens. Copies of all papers filed by Mrs. Lambert with the court are enclosed herewith, as well as a copy of the summons and tracking order issued by the court in the above-referenced action.

    The court has set a hearing on Mrs. Lambert's Motions for Preliminary Injunction, Trustee Process Attachment, and Memorandum of Lis Pendens on Thursday, October 30, 2025 at 2:00 P.M. The hearing on the Motions will be held in person at Worcester County Superior Court, 225 Main Street, Worcester, MA 01608 in Courtroom 25 (4th FL). Notice of the hearing issued by the court is also enclosed herewith.

                    Very truly yours,

                    */s/ Stephanie R. Parker*

                    Stephanie R. Parker

Encl.

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION NO.

JESSICA REYES LAMBERT, )
)
Plaintiff, )
)
)
v. )
)
TRINITY ESTATE INVESTMENTS )
& DEVELOPMENT, LLC, )
JOSE ENCARNACION, and )
WILMINGTON SAVINGS FUND )
SOCIETY, FSB, as Owner Trustee of )
OBX 2022-NQM9 Trust, )
)
Defendants, )
)
and )
)
CITIZENS BANK, )
)
Trustee Process Defendant. )
)

## VERIFIED COMPLAINT

Plaintiff Jessica Reyes Lambert ("Lambert" or "Plaintiff") brings this Verified Complaint

against Defendants Trinity Estate Investments & Development, LLC ("Trinity"), Jose

Encarnacion ("Encarnacion"), and Wilmington Savings Fund Society, FSB, as Owner Trustee of

OBX 2022-NQM9 Trust ("WSFS") (collectively, "Defendants").  Trinity purported to sell real

property to Lambert located at 6 Hancock Street in Worcester.  Trinity agreed to provide seller

financing to Lambert to finance the purchase and represented that it would use Lambert's

monthly payments to satisfy the underlying mortgage.  Trinity and Encarnacion did not do so,

and the lender, WSFS, is now foreclosing on the property where Lambert lives with her husband

and autistic son. WSFS has scheduled a foreclosure auction for November 3, 2025. Lambert brings this action to enjoin that foreclosure, which is improper because WSFS released the mortgage earlier this year, and also seeks a declaration that she is the sole lawful owner. Lambert also seeks to recoup her damages from Trinity and Encarnacion. Pursuant to G.L. c. 184, § 15, Plaintiff contemporaneously seeks an endorsement of a memorandum of lis pendens, as this Verified Complaint alleges claims which affect title to an interest in real property.

## PARTIES

1. Jessica Reyes Lambert is an individual residing at 6 Hancock Street in Worcester, Massachusetts.

2. On information and belief, Trinity Estate Investments & Development, LLC is a Massachusetts limited liability company with a principal place of business at 108 Beacon Street, Worcester, Massachusetts 01603.

3. On information and belief, Jose Encarnacion is an individual residing at 7 Lucian Street in Worcester, Massachusetts 01603.

4. On information and belief, Wilmington Savings Fund Society, FSB is a bank headquartered in Wilmington, Delaware.

5. Trustee Process Defendant Citizens Bank is a financial institution with locations throughout the Commonwealth of Massachusetts, including branches located at 940 W Boylston Street and 949 Grafton Street in Worcester. On information and belief, Defendants Trinity and Encarnacion utilize Citizens Bank for financial services. For example, Trinity deposited Lambert's $100,000 down payment into an account at Citizens Bank.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Defendants pursuant to G.L. c. 223A, §§ 2 & 3

because they are domiciled or conduct business in Massachusetts.

7. This Court has jurisdiction over the Trustee Process Defendant because it also conducts business in Massachusetts.

8. Venue is proper in this Court pursuant to G.L. c. 223, § 1 and G.L. c. 246, § 2 because the Trustee Process Defendant has places of business in Worcester County.

## FACTS

9. Jose Encarnacion ("Encarnacion") is a pastor at Christian Community Church (the "Church") in Worcester.

10. Encarnacion is also a Manager of Defendant Trinity Estate Investments & Development LLC ("Trinity"), a Massachusetts limited liability company formed in 2020.

11. Lambert met Encarnacion in or about 2010 through a friend. She became involved in the Church in or about 2012 and also worked as Encarnacion's executive assistant. Lambert and Encarnacion developed a close friendship and vacationed together with their families.

12. In addition, Encarnacion served as Lambert's pastor and close personal confidant and spiritual mentor for approximately eleven years, between 2012 and 2023. Lambert viewed Encarnacion and his wife (also a pastor) as her spiritual parents. They were a part of her everyday life and celebrated birthdays and holidays with her. They also traveled together on numerous missionary trips overseas. Encarnacion and his wife also served as marriage counselors to Lambert in connection with her prior marriage.

13. Encarnacion often told Lambert that he would always take care of her and that she was a blessing in his life.

14. Encarnacion had reason to know that Lambert was relying on his guidance as her pastor and close and trusted friend.

15. In the spring of 2022, Encarnacion suggested to Lambert that she should purchase a property located at 6 Hancock Street in Worcester (the "Property"), which was for sale. Lambert was not experienced with purchasing real property.

16. 6 Hancock Street is part of a duplex – the other portion of the building has an address of 4 Hancock Street.

17. Lambert, who had recently started a catering business, expressed concern that she did not have the credit necessary to obtain conventional financing for the purchase. Encarnacion and Lambert then discussed the option for Encarnacion to provide the financing directly to Lambert.

18. Ultimately, Encarnacion and Lambert agreed that Lambert would provide Trinity with $100,000 for the down payment to purchase the Property, that Trinity (which would initially put the Property in its name) would provide her with financing to enable her to finance the rest of the purchase price, that Trinity would initially renovate the Property and then transfer the Property to Lambert upon completion of renovations, and that the Property would be Lambert's and she would reside there as her home.

19. Encarnacion also specifically promised and represented to Lambert, in an in-person conversation, that he would use the monthly payments Lambert made to him to pay the mortgage on the Property.

20. On information and belief, Encarnacion did not intend to continue paying the Mortgage and preserve title to the Property for Lambert.

21.   In April 2022, Lambert paid Trinity $100,000 for the down payment for the Property.

22.   On June 16, 2022, Trinity purchased both 4 and 6 Hancock Street from Reva Laflin, via quitclaim deeds (see Book 67760, Page 368 in Worcester County Registry of Deeds for 6 Hancock Street and Book 67761, Page 3 for 4 Hancock Street). The consideration recited on both deeds is $202,500. True and correct copies of the deeds for 6 Hancock Street are attached hereto as **Exhibit A**.

23.   Trinity contemporaneously took out a 30-year mortgage on 4 and 6 Hancock Street from Patch Lending, LLC, in the amount of $162,000 (see Book 67760, Page 370 and Book 67761, Page 5 in Worcester County Registry of Deeds) (the "Mortgage"). True and correct copies of the Mortgage filings are attached hereto as **Exhibit B**.

24.   Although there are separate mortgage documents recorded for 4 and 6 Hancock, they both contain an identical description of the underlying promissory note: "'Note' means the promissory note signed by [Trinity] and dated June 15, 2022. The Note states that [Trinity] owes Lender One Hundred Sixty Two Thousand and 00/100 Dollars . . . plus interest and other amounts secured by this Security Instrument. [Trinity] has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2052."

25.   Based on the purchase price as compared to the mortgage amount, Trinity paid $40,500 as a down payment on the Property.

26.   All of the funds for that down payment came from Lambert.

27.   Lambert never intended, understood, or expected that Trinity would have any ownership interest in the Property. Instead, she intended, understood, and expected that she was the sole true and lawful owner and that Trinity was holding title to the Property on her behalf.

28.     Trinity and Encarnacion knew and understood that Lambert was purchasing the Property and that she would be in control over how that Property would be used.  At no point in connection with the purchase of the Property or thereafter did Encarnacion ever state or indicate that he believed the Property was or would be his or Trinity's.

29.     In June 2022, Encarnacion prepared a Contract to Purchase Real Estate, reflecting Lambert as the buyer and referencing her $100,000 deposit.  A true and correct copy of that document is attached hereto as **Exhibit C**.

30.     Encarnacion also provided a letter to Lambert verifying the receipt of the $100,000 payment (which erroneously dated that payment as being made in June 2022 instead of April).  A true and correct copy of that letter is attached hereto as **Exhibit D**.

31.     In August 2022, Encarnacion prepared a purchase and sale agreement reflecting Lambert's purchase of the Property.  A true and correct copy of that draft purchase and sale agreement is attached hereto as **Exhibit E**.

32.     That document also reflected Lambert's payment of $100,000 as a deposit and Encarnacion's agreement to provide financing to Lambert (referred to in the document as a "purchase money loan").

33.     The August purchase and sale agreement draft further obligated Encarnacion to provide title to the Property "free from encumbrances" to Lambert and provided that the deed would be delivered to Lambert within two weeks of completion of renovations to the Property. Although the August draft references a lawyer for Lambert, that is an error.  Lambert was not represented by counsel in connection with the purchase of the Property.

6

34.     After purchasing the Property, Encarnacion renovated it both inside and outside. Lambert was very involved in the renovation process.  For example, she selected appliances and fixtures and requested installation of a Jacuzzi, which Encarnacion had installed.

35.     Renovations were finally completed in 2023, and Lambert, her husband, and her son (who has autism) moved into the Property in August 2023.

36.     Since moving into the Property, Lambert and her husband have continued to make improvements to it, including paying approximately $38,000 to make hardscaping improvements to the yard.  They also pay all of the utilities for the Property.

37.     Trinity never paid for any expenses or improvements to the Property once the initial renovations were complete.

38.     Following the Property purchase in 2022, Encarnacion repeatedly stated to Lambert and her husband that the Property was their house.

39.     On December 14, 2023, Trinity and Lambert signed an Owner Financing Mortgage Contract ("Financing Agreement") memorializing the financing Trinity had agreed to provide to Lambert.  A true and correct copy of that document is attached hereto as **Exhibit F**.

40.     The Financing Agreement confirmed that Lambert was the purchaser of the Property and that Trinity would finance the balance of the purchase price ($296,000).

41.     The Financing Agreement also confirmed that Lambert had made a "down payment" of $100,000, which had been deposited into Trinity's account at Citizens Bank.

42.     The Financing Agreement stated that Lambert was to pay Trinity a total of $2,419 per month ($2,189 as payment toward the mortgage and $230 as payment for municipal property taxes).

43. The Financing Agreement further stated that it was secured by the Property and that Trinity could initiate foreclosure proceedings if Lambert did not make monthly payments when due.

44. Also in December 2023, the parties signed a new version of the purchase and sale agreement (drafted by Encarnacion), which again reflected Lambert's $100,000 payment. A true and correct copy of that document is attached hereto as **Exhibit G**. In the December version of the purchase and sale agreement, Encarnacion had changed the time for delivery of the deed to be upon completion of payments under the Financing Agreement, the term of which was estimated to be between 10 and 15 years.

45. Lambert signed the document, but she was not represented by counsel in connection with doing so. Lambert received no consideration in exchange for purporting to agree to delay transfer of title for longer than a decade.

46. Trinity never filed any document with the Registry of Deeds reflecting its Financing Agreement with Lambert or her interest in the Property.

47. Lambert has paid Encarnacion $2,419 per month since August 2023. Lambert understood and expected that these payments were being used to pay the Mortgage, as Encarnacion had promised.

48. Each month since August 2023, Lambert hand delivered the check by dropping it off in Encarnacion's mailbox, and each month, he promptly cashed it. To date, Lambert has paid Encarnacion approximately $62,894, on top of the $100,000 she originally paid for the Property.

49. Lambert would not have agreed to make monthly payments to Trinity had she understood that Encarnacion did not intend to use those funds to pay the underlying Mortgage and that she would be at risk of losing the Property to foreclosure. She also would not have

8

agreed to invest tens of thousands of dollars into improving the Property had she known Encarnacion's true intentions.

50.     On June 14, 2024, Mortgage Electronic Registration Systems, Inc., as nominee for Patch Lending, LLC, assigned its Mortgage to Wilmington Savings Fund Society, FSB (as Owner Trustee of OBX 2022-NQM9 Trust) ("WSFS").

51.     On February 24, 2025, WSFS released the Mortgage. A true and correct copy of that Release is attached hereto as **Exhibit H**. The release states that it is a release of the Mortgage dated June 15, 2022, executed by Trinity, to Patch Lending, LLC and refers to Book 67761, Page 5 in the Registry of Deeds. The release, however, specifically lists only 4 Hancock as the property address, and, therefore, only appears in the Registry of Deeds records for 4 Hancock.

52.     On March 5, 2025, the Church executed a Confirmatory Deed of the property where the Church operates (108 Beacon Street in Worcester) to Trinity for $617,500. That same day, Trinity executed a quitclaim deed of the 108 Beacon Street property to Regional Environmental Council, Inc. for $1,300,000. Trinity, therefore, made at least $682,500 in profit from the sale of the Church property.

53.     On or about September 25, 2025, WSFS sent documents to the Property notifying Trinity that it was foreclosing on the Property and intended to sell it at public auction on November 3, 2025. A true and correct copy of the foreclosure notice is attached hereto as **Exhibit I**.

54.     The Notice of Sale claims that the Power of Sale comes from a mortgage given by Trinity on June 15, 2022 and recorded at Book 67761, Page 5. In other words, WSFS claims

an entitlement to foreclose based on a Mortgage that it had previously released in February of this year.

55.     Lambert saw the foreclosure notice when it was delivered to the Property and was completely shocked to learn that Trinity had not been using her money to pay the Mortgage, as promised.

56.     In short, Encarnacion induced Lambert into paying him $2,419 per month.  He did so by promising and representing that the Property was really hers, that he would use her payments to keep the underlying Mortgage paid, and that she would receive the deed once she had paid him $296,000.  These promises were plainly false, as he has not used her payments to keep the Mortgage paid, as evidenced by WSFS' foreclosure proceedings.

57.     Since learning of the impending foreclosure, Lambert and her undersigned counsel have uncovered that Lambert is not the only person who has been defrauded by Encarnacion.  Public records reveal that Encarnacion and Trinity are currently subject to multiple lawsuits filed in 2025, including the following:

a.  On or about July 14, 2025, Olivier Shema brought suit against Trinity and Encarnacion in Worcester Superior Court (Case No. 2585CV00933), alleging that he had a partnership agreement with Encarnacion and Trinity, that they had promised to pay him certain funds in connection with dissolution of the partnership, and that they had failed to do so.  Shema brought claims for breach of contract and breach of fiduciary duty;

b.  On or about September 8, 2025, Jacqueline Batamuliza and Charlotte Furaha brought suit in North Carolina state court against Encarnacion and Trinity Real Estate Development, LLC, alleging that defendants had not repaid funds plaintiffs

10

had invested. They brought claims for breach of contract, quantum meruit, intentional and negligent misrepresentation, piercing the corporate veil, and unfair trade practices under North Carolina law. A true and correct copy of that complaint is attached hereto as **Exhibit J**;

c. On or about September 29, 2025, Forum Trucking and Logistics, LLC brought suit against Encarnacion and Trinity in Worcester Superior Court (Case No. 2585CV01299), alleging that it had invested with defendants and defendants failed to repay that investment, while making false promises of repayment. Forum brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Chapter 93A;

d. On or about October 16, 2025, Innocent Izabayo, Eric Ndagijimana, and Akilimali Nkwaya Placide brought suit against Encarnacion and Trinity in Worcester Superior Court (Case No. 2585CV01395), alleging that Encarnacion and Trinity had failed to repay funds plaintiffs had invested in defendants' real estate projects. They brought claims for breach of contract, fraudulent misrepresentation, conversion, and unjust enrichment.

## COUNT I
## DECLARATORY JUDGMENT
### (v. WSFS and Trinity)

58. Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

59. There is an actual controversy between Lambert and WSFS concerning whether WSFS has any right to foreclose on the Property, as it already released the Mortgage that it invokes as the source of its foreclosure right.

60.     Lambert seeks a declaratory judgment that WSFS has no right to foreclose on the

Property because it already discharged the Mortgage and that WSFS is prohibited from taking

any further action to foreclose on the Property.

**COUNT II**
**DECLARATORY JUDGMENT**
**(v. Trinity and WSFS)**

61.     Lambert repeats and incorporates by reference the allegations from each of the

foregoing paragraphs as if fully set forth herein.

62.     There is an actual controversy between Lambert and Trinity concerning the nature

and extent of Lambert's interest in the Property, as well as Lambert's entitlement to an

immediate transfer of the deed to the Property to her name.

63.     Lambert seeks a declaratory judgment that: (i) she is the sole true and lawful

owner of the Property and has been so since its purchase in 2022; (ii) Trinity has no ownership

interest in the Property and has held the Property in constructive or resulting trust for Lambert

since it purchased it in 2022; and (iii) Trinity must take all steps necessary to transfer title to the

Property to Lambert.

**COUNT III**
**BREACH OF CONTRACT**
**(v. Trinity)**

64.     Lambert repeats and incorporates by reference the allegations from each of the

foregoing paragraphs as if fully set forth herein.

65.     Encarnacion and Lambert agreed that Lambert would provide Trinity with

$100,000 for the down payment to purchase the Property, that Trinity (which would initially put

the Property in its name) would provide her with financing to enable her to finance the rest of the

purchase price, that Trinity would initially renovate the Property and then transfer the Property to

12

Lambert upon completion of renovations, and that the Property would be Lambert's and she would reside there as her home. Encarnacion also promised to use Lambert's monthly payments to cover the Mortgage on the Property.

66.    Trinity's failure to use Lambert's monthly payments to cover the underlying Mortgage and, therefore, its failure to preserve title to the Property for transfer to Lambert constitutes material breaches of contract.

67.    Lambert has performed all of her obligations required under the agreement with Trinity and is now excused from further performance as a result of Trinity's breach.

68.    As a result of Trinity's breaches, Lambert has sustained damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (v. Trinity)

69.    Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

70.    Lambert and Trinity are parties to contracts concerning Lambert's purchase of the Property and Trinity's issuance of financing to Lambert.

71.    The parties' contracts contained an implied covenant of good faith and fair dealing, which required the parties to act in good faith and not do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits of those contracts.

72.    Trinity failed to act in good faith by failing to use the monthly payments to cover the Mortgage as promised, thereby permitting the Property to fall into foreclosure. Trinity has therefore failed to preserve title to the Property for transfer to Lambert. Trinity's conduct has deprived Lambert of the fruits of her ownership agreement with Trinity.

13

73.    Trinity's bad faith conduct has caused Lambert substantial damages in an amount to be determined at trial.

**COUNT V**
**RESULTING TRUST AND CONSTRUCTIVE TRUST**
**(v. Trinity)**

74.    Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

75.    As set forth herein, Lambert provided $100,000 for a down payment in connection with purchasing the Property.

76.    Lambert never intended, understood, or expected that Trinity would have any ownership interest in the Property.  Instead, she intended, understood, and expected that she was the sole true and lawful owner and that Trinity was holding title to the Property on her behalf.

77.    Trinity and Encarnacion knew and understood that Lambert was purchasing the Property and that she would be in control over how that Property would be used.  At no point in connection with the purchase of the Property or thereafter did Encarnacion ever state or indicate that he believed the Property was or would be his or Trinity's.

78.    Therefore, at the time that Trinity took title to the Property, a resulting trust arose in Lambert's favor and for her benefit.

79.    As a result of the fraudulent conduct alleged herein, which was also a breach of Encarnacion's fiduciary duties to Lambert, Trinity holds the Property in a constructive trust for the benefit of Lambert.  Such constructive trust arose as of the time of purchase of the Property and has continued to the present.

80.    Lambert subsequently lived at the Property and paid $62,894 that was supposed to be applied by Trinity and Encarnacion to pay the underlying Mortgage and property taxes.

14

Lambert also paid other property expenses and paid approximately $38,000 to improve the Property. Trinity never paid for any expenses or improvements to the Property once the initial renovations were complete.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### (v. Encarnacion and Trinity)

81.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

82.     Encarnacion, as Lambert's pastor, had a relationship of trust and confidence with her for many years, and she frequently relied on him for spiritual and personal guidance.

83.     Encarnacion had reason to know that Lambert was relying on his guidance as her pastor and close and trusted friend.

84.     By his conduct described herein, including, without limitation, preying upon Lambert's trust by falsely promising to use payments to Trinity to cover the Mortgage on the Property and eventually transfer the deed to Lambert, in order to induce Lambert to pay him over $2,000 a month for years, Encarnacion has breached his fiduciary duty to Lambert.

85.     Because Trinity holds the Property in a resulting trust for the sole benefit of Lambert, its role as trustee also gave rise to fiduciary duties, which it breached by failing to preserve title to the Property for Lambert and keep the Property from foreclosure.

86.     As a result of Encarnacion's and Trinity's breaches of fiduciary duty, Lambert has suffered damages in an amount to be determined at trial.

87.     In addition, Lambert is entitled to a constructive trust and/or other equitable relief that remedies the harm to her resulting from Encarnacion's and Trinity's breaches of fiduciary duty.

15

## COUNT VII
## FRAUDULENT INDUCEMENT/FRAUDULENT MISREPRESENTATION
### (v. Trinity and Encarnacion)

88.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

89.     Encarnacion misled Lambert regarding his intention to utilize her monthly payments to cover the cost of the Mortgage and eventually transfer the Property's deed to her.

90.     On information and belief, Encarnacion did not intend to continue paying the Mortgage and preserve title to the Property for Lambert.

91.     Lambert would not have agreed to make monthly payments to Trinity had she known that Trinity did not intend to use those funds to pay the underlying Mortgage and she would be at risk of losing the Property to foreclosure.

92.     Encarnacion misrepresented his intentions with respect to the Property so that Lambert would be induced to pay Trinity over $2,000 per month for years.

93.     Lambert reasonably relied on Encarnacion's representations and acted upon them to her detriment by paying Trinity $62,894 and covering the costs of other expenses and improvements associated with the Property.  Lambert would not have invested this money into the Property had she known that Encarnacion did not intend to continue paying the Mortgage.

94.     Lambert has been damaged by Encarnacion and Trinity's fraud in an amount to be determined at trial.

95.     In addition, as a result of Encarnacion's misrepresentations, Trinity holds the Property in constructive trust for the sole benefit of Lambert.

## COUNT VIII
## UNJUST ENRICHMENT
### (v. Trinity)

96.     Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

97.     By paying $100,000 for the purchase of the Property, paying $62,894 that was supposed to be used to pay the Mortgage, and subsequently paying for expenses and approximately $38,000 in improvements to the Property since then, Lambert has conferred benefits on Trinity that would be unfair and unjust for it to retain.

98.     For example, by effectively paying the Mortgage on the Property since August 2023, the equity in the Property has increased.  If Trinity is declared the owner of the Property, it would benefit from that increased equity despite having not paid the Mortgage payments itself.

99.     If the Court does not declare that Lambert is the sole lawful owner of the Property, then the Court must exercise equity by ordering Trinity to disgorge the value of the benefits it has retained.  In the alternative, this Court should order that Trinity holds the Property in constructive trust for the benefit of Lambert in an amount equal to its unjust enrichment.

## COUNT IX
## PROMISSORY ESTOPPEL
### (v. Trinity and Encarnacion)

100.    Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

101.    Encarnacion represented to Lambert that the Property was hers and that he would use her monthly payments to Trinity to pay the underlying Mortgage.

17

102.   Lambert reasonably and detrimentally relied on those representations by paying Trinity $100,000 as a down payment, by paying Trinity $62,894 in monthly payments, and by covering the costs of other expenses and improvements associated with the Property.

103.   Justice requires that the Court enforce Encarnacion's promise to apply Lambert's payments to the Mortgage or to otherwise order that Lambert be permitted to pay the Mortgage directly.

104.   Lambert has sustained damages as a result of Encarnacion's and Trinity's false representations in an amount to be determined at trial.

**COUNT X**
**CONVERSION**
**(v. Trinity)**

105.   Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

106.   Trinity has exercised, and continues to exercise, dominion and control over Lambert's funds, which were paid to Trinity to be used for a specific purpose.

107.   Trinity has no right to utilize Lambert's money for an unauthorized purpose.

108.   As a result of Trinity's exercise of dominion and control over Lambert's property, Lambert has suffered damages in an amount to be determined at trial.

**COUNT XI**
**QUIET TITLE**
**(v. Trinity)**

109.   Lambert repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

18

110.   As set forth in more detail herein, there is a dispute concerning title to the Property.  Lambert is the sole owner of the Property, but public records do not reflect her interest.

111.   Lambert is the rightful owner of the Property and is entitled to judgment quieting title to the Property and confirming that she owns it.

## COUNT XII
### TRUSTEE PROCESS ATTACHMENT AGAINST CITIZENS BANK

112.   Lambert repeats and realleges the foregoing allegations as if fully set forth herein.

113.   Lambert has a reasonable likelihood of recovering a judgment on her claims, including interest and costs, in an amount equal or greater than the amount of the attachment sought.

114.   On information and belief, Encarnacion and Trinity do not have liability insurance which would cover the judgment Lambert is likely to obtain in this action.

115.   Pursuant to G.L. c. 246, § 1, no bond should be required from Lambert because her claim arises out of written agreements.

116.   If the trustee process attachment prayed for herein is not granted, there is a strong likelihood that Encarnacion and Trinity will not have the funds necessary to satisfy the judgment that Lambert is likely to recover in this action.

117.   Under these circumstances, Lambert does not have an adequate remedy at law.

118.   This Court should issue an order of attachment against all of Encarnacion's and Trinity's assets held by Citizens Bank, wherever located, in the amount of $150,000.

**WHEREFORE,** Jessica Reyes Lambert prays that the Court:

A.   Order the issuance of a trustee process summons and attachment of funds held by

19

Citizens Bank, on behalf of Trinity and Encarnacion, in an amount of at least $150,000;

B.      Enter a temporary restraining order: (i) prohibiting WSFS from taking any further action to foreclose on the Property; and (ii) prohibiting Encarnacion and Trinity from transferring any funds out of their bank accounts outside of the ordinary course, including their account(s) at Citizens Bank, prior to a hearing and decision on Lambert's Motion for Attachment (if it is not granted *ex parte*);

C.      Enter preliminary injunctive relief ordering WSFS to refrain from taking any further action to foreclose on the Property while this lawsuit is pending;

D.      Issue a Memorandum of Lis Pendens with respect to the Property;

E.      Enter judgment in her favor on all counts of the Verified Complaint and award her damages in an amount to be determined at trial;

F.      Issue a declaration that WSFS has no right to foreclose on the Property because it already discharged the Mortgage and that WSFS is prohibited from taking any further action to foreclose on the Property;

G.      Issue a declaration that: (i) Lambert is the sole true and lawful owner of the Property and has been so since its purchase; (ii) Trinity has no interest in the Property and has held the Property in trust for Lambert since its purchase; and (iii) Trinity must take all steps necessary to transfer title to the Property to Lambert;

H.      In the alternative, if this Court does not declare that Lambert is the sole true and lawful owner of the Property, issue an order compelling Trinity to disgorge the value of the benefits it has retained, or, alternatively, order that Trinity holds the Property in constructive trust for the benefit of Lambert in an amount equal to its unjust enrichment; and

I.      Grant her such other and further relief as is just or appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

JESSICA REYES LAMBERT,

By her attorneys,

*/s/ Stephanie R. Parker*
David B. Mack (BBO # 631108)
dmack@ocmlaw.net
Stephanie R. Parker (BBO # 687610)
sparker@ocmlaw.net
O'Connor Carnathan and Mack LLC
10 Burlington Mall Road, Suite 301
Burlington, Massachusetts 01803
Tel. 781-359-9037

Dated: October 24, 2025

## Verification

I hereby certify, under the penalties of perjury, that I have read the above Complaint and that I believe that the facts stated therein are true and that no material facts have been omitted therefrom.

*/s/ Jessica Reyes Lambert*
Jessica Reyes Lambert

Dated:  October 24, 2025

Signed with approval by:

*/s/ Stephanie R. Parker*
Stephanie R. Parker (BBO # 687610)

21

# EXHIBIT A

Bk: 67760 Pg: 368
Page: 1 of 2  06/16/2022 01:33 PM  WD

MASSACHUSETTS EXCISE TAX
Worcester District ROD #20 001
Date: 06/16/2022 01:33 PM
Ctrl# 238713 09633 Doc# 00065745
Fee: $923.40 Cons: $202,500.00

## QUITCLAIM DEED

*6 Hancock Street, Worcester, Massachusetts*

I, Reva Laflin, being unmarried, for consideration paid and in full consideration of Two Hundred Two Thousand Five Hundred and 00/100 ($202,500.00) Dollars, grant to Trinity Estate Investments & Development LLC of 108 Beacon Street, Worcester, Worcester County, Commonwealth of Massachusetts, with quitclaim covenants:

A certain tract or parcel of land with the buildings thereon situated in Worcester, in the County of Worcester, Massachusetts on the southerly side of Hancock Street bounded and described as follows:

BEGINNING at a point on the southerly line of said Hancock Street, two hundred and fifty-six (256) feet easterly from the easterly line of Main Street at a corner of land conveyed by Lyman Drury to George W. Brady by deed dated May 12, 1879, and recorded in the Worcester District Registry of Deeds, Book 1055, Page 31;

THENCE southwesterly by land now or formerly of said Brady and measuring ninety-five (95) feet more or less to land now or formerly of one Alton;

THENCE northeasterly by said last named line through the center of the partition wall of said double house produced to the southerly line said Hancock Street

THENCE southeasterly by the southerly line of said Hancock Street to the point of beginning, or however otherwise said premises may be bounded, measured or described.

Said premises are conveyed subject to and with the benefit of easements and restrictions of record, if any, insofar as the same may now be in force and applicable.

For Grantor's Title see Foreclosure Deed recorded with the Worcester County (Worcester District) Registry of Deeds, in Book 42326, Page 301.

Being the same premises conveyed to Reva Laflin, by deed of Bank of New York as Trustee for the Certificateholders CWABS, Inc. Asset Backed Certificates, Series 2006-21, dated November 20, 2008, and recorded with Worcester County Registry of Deeds in Book 42326 Page 301.

The Grantor, being duly sworn, does, under oath, hereby release any and all homestead rights, if any exist, and confirm under the pains and penalties of perjury that there are no other persons entitled to such rights.

Witness my hand and seal this this 9th day of April, 2022

_____
Reva Laflin


## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

Worcester, ss

On this this 9th day of April, 2022 before me, the undersigned notary public, appeared **Reva Laflin** personally known to me to be the person whose name is signed on the foregoing document, and acknowledged to me that she signed it voluntarily for its stated purpose.

_____
Ralph W. Sargent, Jr., Notary Public
My Commission Expires: 01-19-2029

ATTEST: WORC. Kathryn A. Toomey. Register



Bk: 67761 Pg: 3
Page: 1 of 2 06/16/2022 01:33 PM  WD

MASSACHUSETTS EXCISE TAX
Worcester District ROD #20 001
Date:  06/16/2022 01:33 PM
Ctrl# 238714 11929  Doc# 00065748
Fee: $923.40  Cons: $202,500.00

## QUITCLAIM DEED

I, Reva Laflin, being unmarried, for consideration paid and in full consideration of Two Hundred Two Thousand Five Hundred and 00/100 ($202,500.00) Dollars, grant to Trinity Estate Investments & Development LLC of 108 Beacon Street, Worcester, Worcester County, Commonwealth of Massachusetts, with quitclaim covenants:

The land in Worcester, on the southerly side of Hancock Street, bounded and described as follows:

BEGINNING at a point on the southerly line of said Hancock Street, one hundred and ninety (190) feet southerly from the easterly line of Main Street at a corner of land conveyed by George W. Brady and Henry H. Stratton by deed dated May 19, 1879, recorded with the Worcester District Registry of Deeds, Book 1055, Page 32;

THENCE southeasterly by the southerly line of said Hancock Street to a point in a line drawn through the center of the partition of the double house upon the lot hereby conveyed and the lot adjoining it on the east and produced to said Hancock Street, and being the point where said line so produced meets the southerly line of said Hancock Street;

THENCE by said last named line through the center of the partition wall of said double house produced to land now or formerly of one Altor, ninety-five (95) feet more or less;

THENCE westerly by land now or formerly of one Altor to the easterly line of said land conveyed as aforesaid by said Brady to said Stratton;

THENCE northeasterly by said easterly line of land conveyed as aforesaid by said Brady to said Stratton and measuring ninety-five (95) feet more or less to the point of beginning, or however otherwise said premises may be bounded, measured or described.

Being the same premises conveyed to Reva Laflin, by deed of Robert G. Curtis and Mavonne C. Curtis, dated February 15, 2005, and recorded with Worcester County Registry of Deeds in Book 43759 Page 326.

The Grantor, being duly sworn, does, under oath, hereby release any and all homestead rights, if any exist, and confirm under the pains and penalties of perjury that there are no other persons entitled to such rights.

4 Hancock Street, Worcester, Massachusetts

Witness my hand and seal this this 9th day of April, 2022

_____
Reva Laflin


## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

Worcester, ss

On this this 9th day of April, 2022 before me, the undersigned notary public, appeared **Reva Laflin** personally known to me to be the person whose name is signed on the foregoing document, and acknowledged to me that she signed it voluntarily for its stated purpose.

_____
Ralph W. Sargent, Jr., Notary Public
My Commission Expires: 01-19-2029

# EXHIBIT B

After Recording Return To:

Patch Lending, LLC
15000 Ventura Blvd. #300
Sherman Oaks, CA 91403
Attention: Closing Department



Bk: 67760 Pg: 370
Page: 1 of 30   06/16/2022 01:33 PM   WD

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE MIN: 101655708394920229

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in other sections of this Security Instrument. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated June 15, 2022, together with all Riders to this document.

(B)    "Borrower" is TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC, a Massachusetts Limited Liability Company. Borrower is the mortgagor under this Security Instrument.

(C)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)    "Lender" is Patch Lending, LLC. Lender is a Limited Liability Company organized and existing under the laws of Delaware. Lender's address is 15000 Ventura Blvd. #300, Sherman Oaks, CA 91403. Lender is the mortgagee under this Security Instrument.

(E)    "Note" means the promissory note signed by Borrower and dated June 15, 2022. The Note states that Borrower owes Lender One Hundred Sixty Two Thousand and 00/100 Dollars (U.S. $162,000.00) (the "Initial Principal Amount") plus interest and other amounts secured by this Security Instrument. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2052.

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                    *(page 1 of 22 pages)*

☐ Condominium Rider      ☐ Planned Unit Development Rider

☒ Entity Borrower Rider      ☒ Vacant Property Rider

☐ Other(s) [specify] _____

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Escrow Items"** means those items that are described in Section 3.

**(L)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(P)** **"Loan Documents"** means this Security Instrument, the Note, all Riders and all certificates and other documents given by Borrower in connection with the Loan and any Guaranty given in connection with the Loan.

**(Q)** **"Guarantor"** means any person or entity that guaranties Borrower's obligations under the Loan Documents.

**(R)** **"Note Holder"** means the Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under the Loan Documents. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **City of Worcester:**

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 2 of 22 pages)*

which currently has the address of **6 Hancock Street, Worcester, MA, 01610** ("**Property Address**"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.

Without limitation, the property shall include the following items now or hereafter attached to the Property to the extent they are fixtures: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, including replacements and additions thereto.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. Dollars by auto-debited Automated Clearing House (ACH) payment in accordance with the written instructions provided by Lender to Borrower from time to time, unless a different payment method is approved in writing by Lender.

Payments are deemed received by Lender when cleared funds are irrevocably delivered to Lender's account or if payment by check or money order is approved in writing by Lender, when such check or money order is received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                            *(page 3 of 22 pages)*

payments are accepted. Lender need not pay interest on any unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements under the Loan Documents.

**2. Application of Payments or Proceeds.** Notwithstanding anything to the contrary in any other Loan Document, except as otherwise described in this Section 2, funds delivered to Note Holder in connection with any payment or prepayment shall be applied in the following order of priority: (a) first interest then due and payable, which shall include all interest accrued and unpaid on the principal amount of any prepayment through the date of such prepayment; (b) second, to any principal amount of the Loan due and payable; (c) third, amounts due under Section 3 of this Security Instrument; (d) fourth, to any amounts (other than amounts described in any other clause of this paragraph) then due and payable under the Loan Documents, including late charges; (e) fifth, any Prepayment Premium, as that term is defined on the Principal Loan Terms page of the Note, due and payable on the principal amount of any prepayment, including any costs and expenses of Note Holder in connection with such prepayment; and (f) sixth, to the remaining principal balance of the Loan. Prepayments of principal shall be applied to the scheduled installments of principal on the Loan in reverse chronological order. Notwithstanding the foregoing, during the continuance of any default under any Loan Document, any payment of principal, interest and other amounts payable under the Loan Documents from whatever source (including rents collected by Note Holder from tenants and proceeds from the foreclosure sale of the Property) may be applied by Note Holder among principal, interest and other amounts payable in such order, priority and proportions as Note Holder determines.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.

**SLP SECURITY INSTRUMENT – MASSACHUSETTS**
**WD0920**

*(page 4 of 22 pages)*

Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount sufficient to permit Lender to apply the Funds to the payment of Escrow Items. The amount of Funds Lender may collect in any calendar month shall not exceed an amount sufficient to pay all applicable Escrow Items by the 30th day prior to the date such Escrow Items become due, assuming equal subsequent monthly collections of Funds. If at any time Lender determines that the Funds will not be sufficient to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a deficiency exists and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to make up the deficiency. If at any time Lender determines that the Funds held by Lender plus subsequent monthly collections of Funds will exceed the amount necessary to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a surplus exists (or will occur) and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to eliminate the surplus. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in a banking institution selected by Lender. Lender shall apply the Funds to pay Escrow Items prior to the date any Escrow Items become delinquent. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for property taxes not yet due and payable) unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement or (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded. If Lender determines that any part of the Property is subject to a lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for

property taxes not yet due and payable), Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4. In addition, Lender may require Borrower to deposit funds with Lender an amount determined by Lender as security for the release of the lien. Lender shall not be required to pay Borrower any interest or earnings on such funds. If Borrower fails to obtain a full release of the lien, Lender may apply such funds towards the payment of the obligation securing the lien. Upon payment in full of the obligation secured by the lien or payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any remaining portion of such funds held by Lender.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property and Rent Loss Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels), on the terms and for the periods that Lender requires and shall otherwise be satisfactory to Lender. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Borrower shall maintain insurance against rent loss in such amounts, with such maximum deductibles and for such periods required by Lender. Currently, Lender's rental loss insurance requirements include business income or rental loss insurance, written on an "Actual Loss Sustained Basis" (i) with loss payable to Lender; (ii) covering all risks required to be covered by the insurance provided for in the property insurance policy required by Lender and (iii) in an amount equal to one hundred percent (100%) of the aggregate projected gross income less non-continuing expense from the operation of the Property for a period of at least six (6) months after the date of the casualty.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                    *(page 6 of 22 pages)*

All insurance policies and renewals of insurance policies required by the Loan Documents shall be (i) in the form and with the terms required by Lender; (ii) in such amounts, with such maximum deductibles and for such periods required by Lender; and (iii) issued by insurance companies satisfactory to Lender. Borrower acknowledges that Lender's insurance requirements may change from time to time.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Lender shall determine whether insurance proceeds shall be applied (i) to restoration or repair of the Property or (ii) to the sums secured by this Security Instrument. If Lender determines to apply insurance proceeds to the restoration or repair of the Property, then during such restoration or repair. Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If Lender determines to apply insurance proceeds to the sums secured by this Security Instrument, such insurance proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Operation of the Property.** Borrower at all times shall continuously (i) engage in the businesses of ownership, leasing, maintenance, management and operation of the Property, (ii)

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                    *(page 7 of 22 pages)*



operate the Property as a residential rental property, and (iii) own or lease all equipment, fixtures and personal property that are necessary to operate the Property. Borrower represents, warrants and covenants that (A) the purpose of the Loan is for business and/or commercial purposes only, (B) the Loan is not for personal, family or household use, (C) the Property is not used nor will be leased to or occupied by (1) Borrower, (2) any affiliate of Borrower, (3) any holder of a direct or indirect equity interest in Borrower or any such affiliate, (4) any officer, director, executive employee or manager of any person or entity described in the foregoing clauses (1) – (3) or (5) any family member (including spouse, siblings, ancestors and lineal descendants) of any person or entity described in the foregoing clauses (1) – (4) (the persons and entities referred to in the foregoing clauses (1) – (5) are collectively referred to herein as "**Prohibited Persons**") and (D) the Property is an investment to be held for future appreciation and income and will be a rental property. Borrower shall not (I) convert any individual dwelling units or common areas to commercial use, or convert any common area or commercial use to individual dwelling units, (II) initiate or acquiesce in a change in the zoning classification of the Property, (III) establish any condominium or cooperative regime with respect to the Property or (IV) subdivide the Property, in each case unless Lender has agreed thereto in writing.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower represents that the Property is in a good, safe and habitable condition and repair, and free of and clear of any material damage or waste. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower shall not make (or permit any tenant to make) any structural alterations to the Property (including, without limitation, any alterations to the roof of the Property) that would reasonably be expected to have a material adverse effect on the use, leasing, operation, value or marketability of the Property (a "**Material Adverse Effect**"). Borrower shall not abandon the Property nor take any action that would reasonably be expected to invalidate any insurance coverage required by the Loan Documents (and Borrower shall promptly correct any such actions of which Borrower becomes aware).

Lender or its agent may make reasonable entries upon and inspections of the Property. Subject to the rights of tenants, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Accuracy of Information.** Borrower shall be in default if, (a) during the Loan application process, Borrower, any Guarantor or any persons or entities acting at the direction of Borrower or any Guarantor or with Borrower's or any Guarantor's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan or (b) any certification,

JAS

representation or warranty made by Borrower or any Guarantor in any Loan Document is false, incorrect or misleading in any material respect. Material representations include, but are not limited to, representations concerning the operation of the Property as a rental property and the occupancy of the Property by Prohibited Persons.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien on the Property; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and

Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, Lender shall determine whether Miscellaneous Proceeds shall be applied (i) to restoration or repair of the Property or (ii) to the sums secured by this Security Instrument. If Lender determines to apply Miscellaneous Proceeds to the restoration or repair of the Property, then during such restoration or repair, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 10 of 22 pages)*

Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. If Lender determines to apply Miscellaneous Proceeds to the sums secured by this Security Instrument, such Miscellaneous Proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

For purposes of determining the fair market value of the Property pursuant this Section 11, value shall be given only to "real property, permanent structures and the components of permanent structures" within the meaning of Treas. Reg. § 1.856-3(d) and no value shall be given to any other property no matter how labeled under local law.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                          *(page 11 of 22 pages)*

amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection, valuation fees, servicing fees and special servicing fees, costs and expenses. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument, the Note and the other Loan Documents must be in writing, which may include electronic mail. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail to Borrower's physical address or when actually delivered to Borrower's notice address if sent electronic mail or by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be Borrower's physical address and email address set forth in the Note unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                          *(page 12 of 22 pages)*

mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any direct or indirect legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any direct or indirect Interest in the Property is sold or transferred (or if Borrower is not a natural person and a direct or indirect beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. No Right to Reinstate.** Borrower hereby waives any and all rights of reinstatement to the fullest extent permitted by Applicable Law.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer and the address to which payments should be made. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Acceleration; Remedies. If a default under any Loan Document occurs, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument and may foreclose this Security Instrument and invoke any other remedies described in this Security Instrument and any remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to, all fees and expenses incurred in connection with the foreclosure of this Security Instrument, the cost of taking control of and managing the Property and collecting the Rents, which fees and expenses may include, but are not limited to, attorney's fees, receiver's fees, trustee's fees, liquidator's fees, conservator's fees, premiums on receiver's or other bonds, costs of inspection of the Property, costs of valuation of the Property, property management fees, repair and maintenance costs and other expenses incurred in connection with the Property, all special servicing fees of Lender's servicer and reasonable compensation for the services of Lender, its agents and employees incurred in connection with any default under the**

Loan Documents. To the extent permitted by Applicable Law, Borrower hereby waives presentment, demand, protest or notice of any kind whatsoever. The Loan shall be accelerated and shall become immediately due and payable automatically upon the occurrence of any default described in clause (e) of Section 26.

Without limiting the generality of the foregoing, upon and at all times following the occurrence of any default under the Loan Documents Lender shall have all rights and remedies available to it pursuant to the Loan Documents, and pursuant to Applicable Law, and Lender may take any action that Lender elects to protect and enforce its rights against Borrower or any Guarantor and in and to the Property and other collateral for the Loan, including but not limited to the following actions (in each case, to the extent permitted by Applicable Law): (a) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any Applicable Law, in which case the Property, or any interest therein, may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner as Lender shall elect in its sole discretion; (b) institute proceedings for the partial foreclosure of this Security Instrument for the portion of the debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the debt, unimpaired and without loss of priority; (c) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (d) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (e) exercise any or all of Lender's rights and remedies under Section 28 and (f) apply any Funds or other amounts then deposited or held in escrow or otherwise by or on behalf of Lender pursuant to this Security Instrument or any other Loan Document to the payment of the principal, interest and other amounts due and payable in any order determined by Lender in its sole discretion.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Each of the rights, powers and remedies of Lender under the Loan Documents and Applicable Law and at equity shall be cumulative and not exclusive of any other such right, power or remedy. Lender's rights, powers and remedies may be pursued independently, singly, successively, together or otherwise, at such times and from time to time and as often and in such order as Lender may determine, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting any of the other such rights, powers and remedies of Lender. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                                          *(page 15 of 22 pages)*

**24. Additional Representations, Warranties and Covenants.** Borrower represents, warrants and covenants to Lender as follows:

(a) **Compliance with Laws, Etc.** The Property and the ownership, leasing, management, maintenance and operation of the Property are in compliance, in all material respects, with Applicable Law, including without limitation laws pertaining to zoning, construction of improvements on the Property, fair housing, and requirements for equal opportunity, anti-discrimination. Borrower shall cause the Property and the ownership, leasing, management, maintenance and operation of the Property to comply, in all material respects, with Applicable Laws. The Property has not been purchased with proceeds of any illegal activity. There has not been committed by Borrower or by any other person or entity in occupancy of or involved with the operation, use or leasing of the Property any act or omission affording any governmental authority the right of forfeiture as against the Property or any part thereof. To Borrower's knowledge, there is no evidence of any illegal activities on the Property and Borrower shall take reasonable measures to prevent any illegal activities from occurring at the Property. Borrower is not in default or violation of and shall comply with any order, writ, injunction, decree or demand of any court or other governmental authority applicable to Borrower or the Property.

(b) **Licenses and Permits.** Borrower maintains in full force and effect all certifications, permits, licenses, consents, authorizations and approvals required for the legal leasing, use, occupancy and operation of the Property as a residential rental property (collectively, "**Permits**"). Borrower has not failed to comply, in any material respect, with any term or condition of any such Permit. Borrower shall keep in full force and effect and shall comply all such Permits in all material respects.

(c) **Compliance with Agreements and Property Documents.** The Property is not subject to, and Borrower shall not agree or consent to, any agreement, instrument or restriction which would reasonably be expected to have a Material Adverse Effect. Borrower is not in default, in any material respect, in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument relating to the Property and binding on Borrower or the Property, including without limitation any reciprocal easement agreement, declaration of covenants, conditions and restrictions and any condominium or home owner's association governing documents, rules and regulations (collectively, "**Property Documents**"). Borrower shall continue to observe and perform, in all material respects, each and every term to be observed or performed by Borrower pursuant to the terms of each Property Document. Borrower shall enforce in a commercially reasonable manner the performance and observance of each Property Document, shall do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder and cause the Property to be operated in accordance therewith in all material respects.

(d) **Leases.** The Property or, if the Property consists or more than one rental unit, each such rental unit, is subject to a written lease that (i) has a rental rate and terms consistent with existing local market rates and terms, (ii) is in compliance with all Applicable Law in all material respects and includes all disclosures required by Applicable Law and (iii) covers 100% of the square footage of the applicable Property, or a rental unit therein, as applicable (an "**Eligible Lease**"). Borrower has delivered to Lender copies of each lease for the Property, each such lease is in full force and effect and not in default in any material respect and there are no oral agreements relating to any such lease. Borrower is the lessor under each Eligible Lease. Borrower shall not enter into any lease (including any renewal or extension of any existing lease) for the Property or a rental unit

therein that is not an Eligible Lease. Borrower shall not grant to any tenant an option or other right to purchase an Interest in the Property, whether in the lease or another document or instrument.

(e)     **Tenants.** Each Eligible Lease for the Property, or a rental unit therein, is with a bona fide third-party lessee who satisfies each of the following criteria (an "**Eligible Tenant**"): (i) Borrower has verified, based on bona fide written documentation, that the tenant has sufficient financial resources to satisfy its obligations under such lease, (ii) the tenant is not subject to an ongoing bankruptcy or other insolvency proceeding as such date of initial screening of the tenant prior to its execution of the lease (or if not so initially screened, as of the date hereof) and (iii) the tenant is not a Prohibited Person. No person or entity (other than Borrower) has any possessory interest in the Property or any rental unit therein or right to occupy the same except for Eligible Tenants under and pursuant to Eligible Leases. Borrower shall not enter into any lease (including any renewal or extension of any existing lease) for the Property or a rental unit therein or permit the occupancy of the Property or any unit therein by any person or entity that is not an Eligible Tenant.

(f)     **Security Deposits.** Borrower maintains or causes to be maintained and shall continue to maintain or cause to be maintained security deposits for the Property in accordance with Applicable Law in all material respects. Upon Lender's written request during a default or upon any foreclosure of the Property or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Loan; provided, that to the extent any security deposits are forfeited by the applicable tenant pursuant to the terms of the applicable lease, Lender may apply such amounts against Borrower's obligations under the Loan Documents.

(g)     **Property Taxes, Insurance, Etc.** Borrower is not delinquent and shall remain, at all times, current in the payment of any taxes, assessments, charges, fines, impositions, Community Association Dues, Fees, and Assessments or insurance premiums attributable to the Property.

(h)     **Utilities and Public Access.** The Property has, and Borrower shall take all steps necessary to ensure that the Property continues to have rights of access to public ways and is served by electricity, water, sewer or septic system and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property, and all roads necessary for the use of the Property for its intended purposes have been completed and dedicated to public use and accepted by the applicable governmental authorities.

(i)     **Ownership.** Borrower owns fee simple title to the Property and the Property is not subject to any ground lease. Borrower has not granted to any person any option or other right to purchase an Interest in the Property.

(j)     **Litigation.** Except as disclosed in writing to Lender, there are no orders, injunctions, decrees, judgments, actions, suits or proceedings (including proceedings regarding fair housing, anti-discrimination, or equal opportunity) at law or in equity by or before any court or other governmental authority pending or, to Borrower's knowledge, threatened, against or affecting Borrower, any Guarantor or the Property. All information with respect to the same that has been provided to Lender by Borrower is true and complete in all material respects.

(k)     **Bankruptcy.** Neither Borrower nor any Guarantor is (i) the subject of or a party to any pending bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation; (ii) preparing or intending to be the subject of any such proceeding or

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                  *(page 17 of 22 pages)*

dissolution or liquidation; (iii) the subject of any judgment unsatisfied of record or docketed in any court; or (iv) insolvent.

(l)    **Further Assurances.** Promptly following request by Lender, Borrower shall, at its sole cost and expense: (i) execute and deliver, or cause to be executed and delivered, such documents, instruments, certificates, assignments and other writings, and do such other acts as Lender may request, to correct any defects or omissions in the Loan Documents, and to grant, evidence, preserve, perfect and protect the Property and Lender's liens thereupon and the priority thereof; and (ii) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time.

(m)    **No Joint Assessment.** Borrower shall not suffer, permit or initiate the joint assessment of the Property with (i) any other real property constituting a tax lot separate from the Property, or (ii) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes and assessments payable in respect of the Property or any penalties, interest or fees with respect thereto which may be levied against any such real or personal property shall be assessed or levied or charged to the Property.

**25. Information Requirements.** Borrower shall furnish or cause to be furnished to Lender the following reports, notices and other documents:

(a)    **Reporting on Adverse Effects.** Within seven (7) days after Borrower obtains knowledge of the occurrence of any event or circumstance that has or would reasonably be expected to have a Material Adverse Effect, written notice thereof that includes the details of such event or circumstance and the action that Borrower is taking or proposes to take with respect thereto.

(b)    **Default.** Within seven (7) days after Borrower obtains knowledge of any default under the Loan Documents, written notice setting forth the details of such default and the action that Borrower is taking or proposes to take to cure such default.

(c)    **Property Taxes, Community Association Charges and Insurance.** Within seven (7) days of Lender's request therefor, copies of (a) any bills, statements or invoices for taxes, assessments, charges, fines, impositions, Community Association Dues, Fees, and Assessments or insurance premiums attributable to the Property and (b) evidence satisfactory to Lender of payment of any of the foregoing.

(d)    **Leases.** Within seven (7) days after written request by Lender, copies of leases to the Property.

(e)    **Other Information.** As soon as reasonably practicable after request by Lender, furnish or cause to be furnished to Lender in such manner and in such detail as may be reasonably requested by Lender, such evidence of compliance with the Loan Documents and such additional information, documents, records or reports as may be reasonably requested with respect to the Property or the conditions or operations, financial or otherwise, of Borrower and any Guarantor, including, without limitation, a periodic rent roll.

**26. Additional Defaults.** In addition to the other defaults specified in the Loan Documents, the occurrence of any one or more of the following shall constitute a default under the Loan Documents:

(a)    any failure by Borrower to pay when due principal or interest on the Loan or any Funds and such failure shall continue for ten (10) days;

(b)     any failure by Borrower or any Guarantor to pay when due any amount (other than as set forth in the foregoing clause (a)) required to be paid by it under any Loan Document and such failure shall continue for fifteen (15) days;

(c)     if Borrower or any Guarantor fails to perform any of its non-monetary obligations under any Loan Document and such failure shall continue for thirty (30) days;

(d)     any failure by Borrower to maintain the insurance coverage required by Lender;

(e)     if any proceeding for bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation shall commence with respect to Borrower or any Guarantor;

(f)     if any Loan Document or any lien granted thereunder shall (except in accordance with its terms or pursuant to Lender's written consent), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the parties thereto;

(g)     the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in, or the value or operation of, the Property; or

(h)     if Borrower or any of its affiliates breaches or defaults under any note, instrument or agreement relating to a loan owned by Note Holder, then such breach or default shall be a default under the Loan Documents.

**27. Debt Secured.** The debt secured by this Security Instrument shall include the entire unpaid principal amount of the Note plus (a) accrued but unpaid interest at the rate specified in the Note, including interest charged at the Default Rate specified in the Note, (b) any additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on the Property including, but not limited to, payments on prior liens and repairs to the Property, (c) late charges, (d) prepayment fees and premiums, (e) taxes, charges or assessments which may be imposed upon the Property, (f) premiums on insurance policies covering the Property, (g) costs, fees and expenses incurred in enforcing the lien of this Security Instrument or the performance of Borrower's obligations hereunder or under the other Loan Documents, including, but not limited to, the expenses of any litigation to prosecute or defend the rights and liens created by this Security Instrument or any of Borrower's obligations hereunder or under the other Loan Documents, all fees and expenses incurred in connection with the foreclosure of this Security Instrument, the cost of taking control of and managing the Property and collecting the Rents, including amounts described in Section 22, (h) any amount, costs or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, (i) interest at the Default Rate specified in the Note on any judgment obtained by Lender and (j) all other amounts due from Borrower under this Security Instrument, the Note or any other Loan Document.

**28.     Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     **Collateral Assignment of Leases.** In addition to the Property described in the grant of security above, the following items are added to the Property description, and shall also constitute the Property covered by this Security Instrument: all leases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any person or entity is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every modification, amendment or other agreement relating to such leases or other

agreements entered into in connection with such leases or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (collectively, the "**Leases**"), together with any extension, renewal or replacement of same, and all right, title and interest of Borrower, its successors and assigns, therein and thereunder, together with all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases, to perform all other necessary or appropriate acts with respect to such Leases as agent and attorney-in-fact for Borrower, and the right to make all waivers and agreements, to give and receive all notices, consents and releases, to take such action upon the happening of a default under any lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of any Lease or by any law, and to do any and all other things whatsoever which Borrower is or may become entitled to do under any such Leases, and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the rents to the payment and performance of the obligations under the Loan Documents. If Lender gives notice of default to Borrower, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to take the foregoing actions and enter into the foregoing modifications, extensions, terminations and leases on behalf of Borrower if Borrower fails to do so within five (5) days of written demand by Lender.

(b)      **Assignment of Rents.** Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all the rents and revenues ("**Rents**") paid or accruing, of the Property, regardless of to whom the Rents of the Property are payable. Borrower shall not otherwise assign, transfer or encumber in any manner the Leases or the Rents or any portion thereof. Notwithstanding the foregoing, Borrower shall have a license to collect and use the Rents as the same become due and payable and to exercise all rights of the landlord under or with respect to the Leases, until Lender has given Borrower notice of default, at which time the license granted in this Section 28(b) shall be automatically revoked. Borrower shall not collect any Rents more than thirty (30) days in advance of the date the same become due. The assignment in this Section 28(b) shall constitute an absolute and present assignment of the Rents, and not an assignment for security, and the existence or exercise of Borrower's conditional license to collect the Rents shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Lender of any of its rights or remedies under this Section 28(b) shall not be deemed or construed to make Lender a mortgagee-in-possession.

(c)      **Appointment of a Receiver, Etc.** If Lender gives notice of default to Borrower, to the extent permitted by Applicable Law, Lender shall be entitled to have a receiver, trustee, liquidator or conservator of the Property appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security for the debt and without regard to the solvency of Borrower, any Guarantor or indemnitor with respect to the debt or any Person otherwise liable for the payment of the debt or any part thereof, it being agreed that Lender shall be entitled to appointment of such receiver, trustee, liquidator or conservator as a matter of right.

(d)      **Collection of Rents.** If Lender gives notice of default to Borrower: (i) all Rents received by Borrower (whether in cash or by check or other electronic means) shall be held by

Borrower as trustee for the benefit of Lender only, and Borrower shall deliver all such rents to Lender within five (5) days of receipt thereof for application to the sums secured by this Security Instrument and (ii) Lender shall be entitled to contact each Tenant of the Property and demand payment of, collect and receive all of the Rents of the Property. Lender, Lender's agents or any receiver, trustee, liquidator or conservator of the Property shall be liable to account for only those Rents actually received.

(e)   **Lender Expenses.** If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any unreimbursed funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(f)   **No Prior Assignment.** Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this Section 28.

(g)   **Possession, Control and Maintenance of the Property.** To the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, to the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator may do so at any time after a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by this Security Instrument are paid in full.

(h)   **Application of Amounts Collected.** Lender or a judicially appointed receiver, trustee, liquidator or conservator may apply Rents and all other amounts collected with respect to the Property, including amounts collected in connection with the exercise of remedies pursuant to Section 22, to the payment of principal, interest and other amounts due under the Loan Documents as provided in Section 2.

**29. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of courtesy and dower in the Property.

[Signature Page Follows]

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                   *(page 21 of 22 pages)*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
a(n) Massachusetts Limited Liability Company

By: _____

Name: Anizael Jimenez-Morales
Title: Member

**BORROWER ACKNOWLEDGES THAT THE PURPOSE OF THE LOAN CONTEMPLATED HEREBY IS FOR BUSINESS AND/OR COMMERCIAL PURPOSES ONLY AND THE LOAN IS NOT FOR PERSONAL, FAMILY OR HOUSEHOLD USE.**

Borrower's Initials: _____

**BORROWER FURTHER ACKNOWLEDGES THAT THIS SECURITY INSTRUMENT PROHIBITS THE LEASING OF THE PROPERTY TO AND OCCUPANCY BY (1) BORROWER, (2) ANY AFFILIATE OF BORROWER, (3) ANY HOLDER OF A DIRECT OR INDIRECT EQUITY INTEREST IN BORROWER OR ANY SUCH AFFILIATE, (4) ANY OFFICER, DIRECTOR, EXECUTIVE EMPLOYEE OR MANAGER OF ANY PERSON OR ENTITY DESCRIBED IN THE FOREGOING CLAUSES (1) – (3) OR (5) ANY FAMILY MEMBER (INCLUDING SPOUSE, SIBLINGS, ANCESTORS AND LINEAL DESCENDANTS) OF ANY PERSON OR ENTITY DESCRIBED IN THE FOREGOING CLAUSES (1) – (4).**

Borrower's Initials: _____

_____ [Space Below This Line For Acknowledgment] _____

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 22 of 22 pages)*

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _Massachusetts_

County of _Worcester_ )

On _June 15, 2022_ before me, _Jaclyn Packard_ , personally appeared
_Anizael Jiminez-Morales_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _MA_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____ (Seal)

JACLYN S. PACKARD
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires Mar. 16, 2023

**SLP SECURITY INSTRUMENT – MASSACHUSETTS**
**WD0920**

*(page 23 of 22 pages)*

## Exhibit A

A certain tract or parcel of land with the
buildings thereon situated in Worcester, in
the County of Worcester, Massachusetts on the southerly
side of Hancock Street bounded and
described as follows:

BEGINNING at a point on the southerly line of said
Hancock Street, two hundred and fifty-six
(256) feet easterly from the easterly line of Main
Street at a comer of land conveyed by Lyman
Drury to George W. Brady by deed dated May 12, I 879, and
recorded in the Worcester District
Registry of Deeds, Book 1055, Page 31;

THENCE southwesterly by land now or formerly of said Brady
and measuring ninety-five (95) feet more or
less to land now or formerly of one Alton;

THENCE northwesterly by land formerly of Alton to a
point in a line drawn through the center of
the partition wall of the double house upon the lot
hereby conveyed and the lot adjoining
it on the west and produced to the line of land now or
formerly of said Alton, and being the
point where said line so produced meets the bounds of said
land now or formerly of said Alton;

THENCE northeasterly by said last named line through
the center of the partition wall of said double
house produced to the southerly line said Hancock Street;

THENCE southeasterly by the southerly line of said Hancock
Street to the point of beginning, or
however otherwise said premises may be bounded, measured
or described.

Said premises are conveyed subject to and with the benefit
of easements and restrictions of
record, if any, insofar as the same may now be in
force and applicable.

## SFR ENTITY BORROWER RIDER

This Entity Borrower Rider (this "Entity Rider") is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed by the undersigned (the "Borrower") in favor of Patch Lending, LLC, ("Lender") dated the same date as the date hereof (the "Security Instrument") relating to the propert(ies) located at the address(es) set forth on the signature page hereto (the "Property"). This Entity Rider, together with the Security Instrument and the related the Note and all other riders, certificates and ancillary documents given by Borrower in connection with the Loan and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

1. Representations and Warranties. Borrower represents and warrants to Lender as follows:

(a) Organization. Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is organized and the state in which the Property is located.

(b) Authority. Borrower has all necessary power and authority to (i) own the Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under the Loan Documents and (ii) to execute, deliver and perform its obligations under the Loan Documents to which it is a party. The execution, delivery and performance of the Loan Documents by Borrower will not contravene or conflict with Borrower's organizational documents.

(c) Consents. Any consent, approval, authorization, order, registration or qualification of or with any governmental authority or other person or entity that is required for the execution, delivery and performance of the Loan Documents by Borrower has been obtained and is in full force and effect.

(d) Enforceability. The Loan Documents to which Borrower is a party have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e) Certain Regulatory Matters. Borrower and each Person who owns a 10% or greater direct or indirect beneficial interest in Borrower (each, a "Relevant Party") is in compliance in all material respects with the following (the "Regulatory Requirements"): (i) all applicable United States and other export control laws, including those administered by the United States Department of Commerce and the United States Department of State, (ii) all applicable United States and other laws relating to unsanctioned foreign boycotts; and (iii) all applicable United States and other economic sanctions, anti-terrorism, anti-money laundering and related measures, including those administered by the United States Department of the Treasury, the United States Department of Commerce and the United States Department of State and including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws. In addition, no Relevant Party is a person or entity owned or controlled by, or acting for or on behalf of, countries targeted by the United States Department of the Treasury under economic sanctions, or a person or entity designated by the United States Department of the Treasury under sanctions programs that are not country-specific, or otherwise a blocked person identified as such by the United States Department of the Treasury or by officials operating other economic sanctions. Each Relevant Party has obtained all United States and other government approvals, permits or licenses that are required under the Regulatory Requirements to fulfill any of their respective pending commitments or obligations.

2. Covenants. Borrower covenants to Lender as follows:
(a) Preservation of Entity Existence. Borrower shall (i) comply with its organizational documents, (ii) maintain its existence, rights, franchises and privileges in its state of organization, (iii) qualify and remain in good standing in each other jurisdiction where the same is required under applicable law and (iv) not engage in or consent to any dissolution, liquidation or consolidation or merger with or into any other entity or otherwise terminate its existence.
(b) Regulatory Requirements. Borrower shall comply in all material respects with all Regulatory Requirements.

SLP SFR Entity Rider
WD0920

19

3. Meaning of "beneficial interest in Borrower". For sake of clarity, the phrase "beneficial interest in Borrower" as used in the Security Instrument and the Note includes, without limitation all direct and indirect equity interests in Borrower, regardless of the number of tiers of ownership.

[signature page follows]

BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained this Entity Rider.

**Borrower:**
**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
**a(n) Massachusetts Limited Liability Company**

By: _____
Name: Anizael Jimenez-Morales
Title: Member

Date: _O6 / 15 / _____, 20_22_

Property Address:

6 Hancock Street, Worcester, MA 01610

Borrower's Notice Address:

_____

_____

_____

Email: _____

SLP SFR Entity Rider
WD0920

21

## VACANT PROPERTY RIDER

This Vacant Property Rider (this "VP Rider") is made on the date set forth on the signature page hereto, and is incorporated into and shall be deemed to amend and supplement the Note by the undersigned (the "Borrower") in favor of Patch Lending, LLC ("Lender"), dated the same date as the date hereof (the "Note"). This VP Rider, together with the Note and the related Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), all other riders, all other certificates and all ancillary documents given by Borrower and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

This VP Rider is an integral part of the Note and the other Loan Documents. In the event of any conflict or inconsistency between this VP Rider and the Note or the other Loan Documents, the terms of this VP Rider shall control.

ARTICLE 7 Acknowledgement Regarding Vacancy. Borrower hereby represents and acknowledges that, as of the date hereof, the properties set forth on Exhibit A hereto (each a "Vacant Property") are not occupied by an Eligible Tenant pursuant to an Eligible Lease.

ARTICLE 8 Interest Rate Increase. Borrower agrees that if the Leasing Conditions (as defined below) are not satisfied for all Vacant Properties by the date that is ninety (90) days from date of the Note, then an additional two percent (2.0%) *per annum* shall thereafter be added to the interest rate that would otherwise be in effect under the Note (the "Interest Rate Step Up"). The Interest Rate Step Up will cease when the Leasing Conditions are satisfied for all Vacant Properties.

ARTICLE 9 Leasing Conditions. The "Leasing Conditions" means the following:

(a) Borrower shall have entered into an Eligible Lease for each Vacant Property with an Eligible Tenant and delivered to Lender a fully-executed copy of such Eligible Lease; and

(b) Borrower shall have delivered to Lender written evidence of payment of (i) the first month rent under such Eligible Lease or (ii) for an Eligible Lease with an initial term of less than six (6) months, three months of rent under such Eligible Lease. Written evidence of payment must be satisfactory to Lender and may include one or more cancelled checks that have cleared the applicable tenant's bank account or bank records showing receipt by Borrower of an Automated Clearing House (ACH) payment from the applicable tenant.

[Signature Page Follows]

SLP Vacant Property Rider
WD0920

1

***BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained this VP Rider.***

**Borrower:**
**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
**a(n) Massachusetts Limited Liability Company**

By: _____
Name: **Anizael Jimenez-Morales**
Title: **Member**

Date: **06/15** _____, 20**22**

Property Address:

6 Hancock Street, Worcester, MA 01610

Borrower's Notice Address:

_____

_____

_____

Email: _____

SLP Vacant Property Rider
WD0920

2

## EXHIBIT A

## VACANT PROPERTY ADDRESS(ES)



SLP Vacant Property Rider
WD0920

3

ATTEST: WORC. Kathryn A. Toomey Register

After Recording Return To:

Patch Lending, LLC
15000 Ventura Blvd. #300
Sherman Oaks, CA 91403
Attention: Closing Department



Bk: G7761 Pg: 5
Page: 1 of 30  06/16/2022 01:33 PM  WD

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE MIN: 101655708389820228

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in other sections of this Security Instrument. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "**Security Instrument**" means this document, which is dated June 15, 2022, together with all Riders to this document.

(B)     "**Borrower**" is **TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC, a Massachusetts Limited Liability Company**. Borrower is the mortgagor under this Security Instrument.

(C)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)     "**Lender**" is Patch Lending, LLC. Lender is a Limited Liability Company organized and existing under the laws of Delaware. Lender's address is 15000 Ventura Blvd. #300, Sherman Oaks, CA 91403. Lender is the mortgagee under this Security Instrument.

(E)     "**Note**" means the promissory note signed by Borrower and dated **June 15, 2022**. The Note states that Borrower owes Lender **One Hundred Sixty Two Thousand and 00/100 Dollars** (U.S. $162,000.00) (the "**Initial Principal Amount**") plus interest and other amounts secured by this Security Instrument. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2052.

(F)     "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)     "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)     "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                          *(page 1 of 22 pages)*

☐ Condominium Rider      ☐ Planned Unit Development Rider

☒ Entity Borrower Rider      ☒ Vacant Property Rider

☐ Other(s) [specify] _____

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Escrow Items"** means those items that are described in Section 3.

**(L)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(P)** **"Loan Documents"** means this Security Instrument, the Note, all Riders and all certificates and other documents given by Borrower in connection with the Loan and any Guaranty given in connection with the Loan.

**(Q)** **"Guarantor"** means any person or entity that guaranties Borrower's obligations under the Loan Documents.

**(R)** **"Note Holder"** means the Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under the Loan Documents. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **City of Worcester:**



which currently has the address of **4 Hancock Street, Worcester, MA, 01610** ("**Property Address**"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.

Without limitation, the property shall include the following items now or hereafter attached to the Property to the extent they are fixtures: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, including replacements and additions thereto.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. Dollars by auto-debited Automated Clearing House (ACH) payment in accordance with the written instructions provided by Lender to Borrower from time to time, unless a different payment method is approved in writing by Lender.

Payments are deemed received by Lender when cleared funds are irrevocably delivered to Lender's account or if payment by check or money order is approved in writing by Lender, when such check or money order is received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such

**SLP SECURITY INSTRUMENT – MASSACHUSETTS**
WD0920                                                                                    *(page 3 of 22 pages)*

payments are accepted. Lender need not pay interest on any unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements under the Loan Documents.

**2. Application of Payments or Proceeds.** Notwithstanding anything to the contrary in any other Loan Document, except as otherwise described in this Section 2, funds delivered to Note Holder in connection with any payment or prepayment shall be applied in the following order of priority: (a) first interest then due and payable, which shall include all interest accrued and unpaid on the principal amount of any prepayment through the date of such prepayment; (b) second, to any principal amount of the Loan due and payable; (c) third, amounts due under Section 3 of this Security Instrument; (d) fourth, to any amounts (other than amounts described in any other clause of this paragraph) then due and payable under the Loan Documents, including late charges; (e) fifth, any Prepayment Premium, as that term is defined on the Principal Loan Terms page of the Note, due and payable on the principal amount of any prepayment, including any costs and expenses of Note Holder in connection with such prepayment; and (f) sixth, to the remaining principal balance of the Loan. Prepayments of principal shall be applied to the scheduled installments of principal on the Loan in reverse chronological order. Notwithstanding the foregoing, during the continuance of any default under any Loan Document, any payment of principal, interest and other amounts payable under the Loan Documents from whatever source (including rents collected by Note Holder from tenants and proceeds from the foreclosure sale of the Property) may be applied by Note Holder among principal, interest and other amounts payable in such order, priority and proportions as Note Holder determines.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.

**SLP SECURITY INSTRUMENT – MASSACHUSETTS**
WD0920                                                                                                    *(page 4 of 22 pages)*

Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount sufficient to permit Lender to apply the Funds to the payment of Escrow Items. The amount of Funds Lender may collect in any calendar month shall not exceed an amount sufficient to pay all applicable Escrow Items by the 30th day prior to the date such Escrow Items become due, assuming equal subsequent monthly collections of Funds. If at any time Lender determines that the Funds will not be sufficient to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a deficiency exists and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to make up the deficiency. If at any time Lender determines that the Funds held by Lender plus subsequent monthly collections of Funds will exceed the amount necessary to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a surplus exists (or will occur) and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to eliminate the surplus. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in a banking institution selected by Lender. Lender shall apply the Funds to pay Escrow Items prior to the date any Escrow Items become delinquent. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for property taxes not yet due and payable) unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement or (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded. If Lender determines that any part of the Property is subject to a lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                  *(page 5 of 22 pages)*

property taxes not yet due and payable), Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4. In addition, Lender may require Borrower to deposit funds with Lender an amount determined by Lender as security for the release of the lien. Lender shall not be required to pay Borrower any interest or earnings on such funds. If Borrower fails to obtain a full release of the lien, Lender may apply such funds towards the payment of the obligation securing the lien. Upon payment in full of the obligation secured by the lien or payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any remaining portion of such funds held by Lender.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property and Rent Loss Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels), on the terms and for the periods that Lender requires and shall otherwise be satisfactory to Lender. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Borrower shall maintain insurance against rent loss in such amounts, with such maximum deductibles and for such periods required by Lender. Currently, Lender's rental loss insurance requirements include business income or rental loss insurance, written on an "Actual Loss Sustained Basis" (i) with loss payable to Lender; (ii) covering all risks required to be covered by the insurance provided for in the property insurance policy required by Lender and (iii) in an amount equal to one hundred percent (100%) of the aggregate projected gross income less non-continuing expense from the operation of the Property for a period of at least six (6) months after the date of the casualty.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies and renewals of insurance policies required by the Loan Documents shall be (i) in the form and with the terms required by Lender; (ii) in such amounts, with such maximum deductibles and for such periods required by Lender; and (iii) issued by insurance companies satisfactory to Lender. Borrower acknowledges that Lender's insurance requirements may change from time to time.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Lender shall determine whether insurance proceeds shall be applied (i) to restoration or repair of the Property or (ii) to the sums secured by this Security Instrument. If Lender determines to apply insurance proceeds to the restoration or repair of the Property, then during such restoration or repair. Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If Lender determines to apply insurance proceeds to the sums secured by this Security Instrument, such insurance proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Operation of the Property.** Borrower at all times shall continuously (i) engage in the businesses of ownership, leasing, maintenance, management and operation of the Property, (ii)

operate the Property as a residential rental property, and (iii) own or lease all equipment, fixtures and personal property that are necessary to operate the Property. Borrower represents, warrants and covenants that (A) the purpose of the Loan is for business and/or commercial purposes only, (B) the Loan is not for personal, family or household use, (C) the Property is not used nor will be leased to or occupied by (1) Borrower, (2) any affiliate of Borrower, (3) any holder of a direct or indirect equity interest in Borrower or any such affiliate, (4) any officer, director, executive employee or manager of any person or entity described in the foregoing clauses (1) – (3) or (5) any family member (including spouse, siblings, ancestors and lineal descendants) of any person or entity described in the foregoing clauses (1) – (4) (the persons and entities referred to in the foregoing clauses (1) – (5) are collectively referred to herein as "**Prohibited Persons**") and (D) the Property is an investment to be held for future appreciation and income and will be a rental property. Borrower shall not (I) convert any individual dwelling units or common areas to commercial use, or convert any common area or commercial use to individual dwelling units, (II) initiate or acquiesce in a change in the zoning classification of the Property, (III) establish any condominium or cooperative regime with respect to the Property or (IV) subdivide the Property, in each case unless Lender has agreed thereto in writing.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower represents that the Property is in a good, safe and habitable condition and repair, and free of and clear of any material damage or waste. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower shall not make (or permit any tenant to make) any structural alterations to the Property (including, without limitation, any alterations to the roof of the Property) that would reasonably be expected to have a material adverse effect on the use, leasing, operation, value or marketability of the Property (a "**Material Adverse Effect**"). Borrower shall not abandon the Property nor take any action that would reasonably be expected to invalidate any insurance coverage required by the Loan Documents (and Borrower shall promptly correct any such actions of which Borrower becomes aware).

Lender or its agent may make reasonable entries upon and inspections of the Property. Subject to the rights of tenants, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Accuracy of Information.**   Borrower shall be in default if, (a) during the Loan application process, Borrower, any Guarantor or any persons or entities acting at the direction of Borrower or any Guarantor or with Borrower's or any Guarantor's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan or (b) any certification,

representation or warranty made by Borrower or any Guarantor in any Loan Document is false, incorrect or misleading in any material respect. Material representations include, but are not limited to, representations concerning the operation of the Property as a rental property and the occupancy of the Property by Prohibited Persons.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien on the Property; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and

Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, Lender shall determine whether Miscellaneous Proceeds shall be applied (i) to restoration or repair of the Property or (ii) to the sums secured by this Security Instrument. If Lender determines to apply Miscellaneous Proceeds to the restoration or repair of the Property, then during such restoration or repair, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920 *(page 10 of 22 pages)*

Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. If Lender determines to apply Miscellaneous Proceeds to the sums secured by this Security Instrument, such Miscellaneous Proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

For purposes of determining the fair market value of the Property pursuant this Section 11, value shall be given only to "real property, permanent structures and the components of permanent structures" within the meaning of Treas. Reg. § 1.856-3(d) and no value shall be given to any other property no matter how labeled under local law.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                          *(page 11 of 22 pages)*

amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

 **13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

 Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

 **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection, valuation fees, servicing fees and special servicing fees, costs and expenses. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

 If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

 **15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument, the Note and the other Loan Documents must be in writing, which may include electronic mail. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail to Borrower's physical address or when actually delivered to Borrower's notice address if sent electronic mail or by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be Borrower's physical address and email address set forth in the Note unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by

mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any direct or indirect legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any direct or indirect Interest in the Property is sold or transferred (or if Borrower is not a natural person and a direct or indirect beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. No Right to Reinstate.** Borrower hereby waives any and all rights of reinstatement to the fullest extent permitted by Applicable Law.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer and the address to which payments should be made. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920   *(page 13 of 22 pages)*

other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Acceleration; Remedies. If a default under any Loan Document occurs, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument and may foreclose this Security Instrument and invoke any other remedies described in this Security Instrument and any remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to, all fees and expenses incurred in connection with the foreclosure of this Security Instrument, the cost of taking control of and managing the Property and collecting the Rents, which fees and expenses may include, but are not limited to, attorney's fees, receiver's fees, trustee's fees, liquidator's fees, conservator's fees, premiums on receiver's or other bonds, costs of inspection of the Property, costs of valuation of the Property, property management fees, repair and maintenance costs and other expenses incurred in connection with the Property, all special servicing fees of Lender's servicer and reasonable compensation for the services of Lender, its agents and employees incurred in connection with any default under the**

Loan Documents. To the extent permitted by Applicable Law, Borrower hereby waives presentment, demand, protest or notice of any kind whatsoever. The Loan shall be accelerated and shall become immediately due and payable automatically upon the occurrence of any default described in clause (e) of Section 26.

Without limiting the generality of the foregoing, upon and at all times following the occurrence of any default under the Loan Documents Lender shall have all rights and remedies available to it pursuant to the Loan Documents, and pursuant to Applicable Law, and Lender may take any action that Lender elects to protect and enforce its rights against Borrower or any Guarantor and in and to the Property and other collateral for the Loan, including but not limited to the following actions (in each case, to the extent permitted by Applicable Law): (a) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any Applicable Law, in which case the Property, or any interest therein, may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner as Lender shall elect in its sole discretion; (b) institute proceedings for the partial foreclosure of this Security Instrument for the portion of the debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the debt, unimpaired and without loss of priority; (c) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (d) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (e) exercise any or all of Lender's rights and remedies under Section 28 and (f) apply any Funds or other amounts then deposited or held in escrow or otherwise by or on behalf of Lender pursuant to this Security Instrument or any other Loan Document to the payment of the principal, interest and other amounts due and payable in any order determined by Lender in its sole discretion.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Each of the rights, powers and remedies of Lender under the Loan Documents and Applicable Law and at equity shall be cumulative and not exclusive of any other such right, power or remedy. Lender's rights, powers and remedies may be pursued independently, singly, successively, together or otherwise, at such times and from time to time and as often and in such order as Lender may determine, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting any of the other such rights, powers and remedies of Lender. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Additional Representations, Warranties and Covenants.** Borrower represents, warrants and covenants to Lender as follows:

(a) **Compliance with Laws, Etc.** The Property and the ownership, leasing, management, maintenance and operation of the Property are in compliance, in all material respects, with Applicable Law, including without limitation laws pertaining to zoning, construction of improvements on the Property, fair housing, and requirements for equal opportunity, anti-discrimination. Borrower shall cause the Property and the ownership, leasing, management, maintenance and operation of the Property to comply, in all material respects, with Applicable Laws. The Property has not been purchased with proceeds of any illegal activity. There has not been committed by Borrower or by any other person or entity in occupancy of or involved with the operation, use or leasing of the Property any act or omission affording any governmental authority the right of forfeiture as against the Property or any part thereof. To Borrower's knowledge, there is no evidence of any illegal activities on the Property and Borrower shall take reasonable measures to prevent any illegal activities from occurring at the Property. Borrower is not in default or violation of and shall comply with any order, writ, injunction, decree or demand of any court or other governmental authority applicable to Borrower or the Property.

(b) **Licenses and Permits.** Borrower maintains in full force and effect all certifications, permits, licenses, consents, authorizations and approvals required for the legal leasing, use, occupancy and operation of the Property as a residential rental property (collectively, "**Permits**"). Borrower has not failed to comply, in any material respect, with any term or condition of any such Permit. Borrower shall keep in full force and effect and shall comply all such Permits in all material respects.

(c) **Compliance with Agreements and Property Documents.** The Property is not subject to, and Borrower shall not agree or consent to, any agreement, instrument or restriction which would reasonably be expected to have a Material Adverse Effect. Borrower is not in default, in any material respect, in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument relating to the Property and binding on Borrower or the Property, including without limitation any reciprocal easement agreement, declaration of covenants, conditions and restrictions and any condominium or home owner's association governing documents, rules and regulations (collectively, "**Property Documents**"). Borrower shall continue to observe and perform, in all material respects, each and every term to be observed or performed by Borrower pursuant to the terms of each Property Document. Borrower shall enforce in a commercially reasonable manner the performance and observance of each Property Document, shall do all things reasonably necessary to preserve and to keep unimpaired its material rights thereunder and cause the Property to be operated in accordance therewith in all material respects.

(d) **Leases.** The Property or, if the Property consists or more than one rental unit, each such rental unit, is subject to a written lease that (i) has a rental rate and terms consistent with existing local market rates and terms, (ii) is in compliance with all Applicable Law in all material respects and includes all disclosures required by Applicable Law and (iii) covers 100% of the square footage of the applicable Property, or a rental unit therein, as applicable (an "**Eligible Lease**"). Borrower has delivered to Lender copies of each lease for the Property, each such lease is in full force and effect and not in default in any material respect and there are no oral agreements relating to any such lease. Borrower is the lessor under each Eligible Lease. Borrower shall not enter into any lease (including any renewal or extension of any existing lease) for the Property or a rental unit

therein that is not an Eligible Lease. Borrower shall not grant to any tenant an option or other right to purchase an Interest in the Property, whether in the lease or another document or instrument.

(e)     **Tenants.** Each Eligible Lease for the Property, or a rental unit therein, is with a bona fide third-party lessee who satisfies each of the following criteria (an "**Eligible Tenant**"): (i) Borrower has verified, based on bona fide written documentation, that the tenant has sufficient financial resources to satisfy its obligations under such lease, (ii) the tenant is not subject to an ongoing bankruptcy or other insolvency proceeding as such date of initial screening of the tenant prior to its execution of the lease (or if not so initially screened, as of the date hereof) and (iii) the tenant is not a Prohibited Person. No person or entity (other than Borrower) has any possessory interest in the Property or any rental unit therein or right to occupy the same except for Eligible Tenants under and pursuant to Eligible Leases. Borrower shall not enter into any lease (including any renewal or extension of any existing lease) for the Property or a rental unit therein or permit the occupancy of the Property or any unit therein by any person or entity that is not an Eligible Tenant.

(f)     **Security Deposits.** Borrower maintains or causes to be maintained and shall continue to maintain or cause to be maintained security deposits for the Property in accordance with Applicable Law in all material respects. Upon Lender's written request during a default or upon any foreclosure of the Property or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Loan; provided, that to the extent any security deposits are forfeited by the applicable tenant pursuant to the terms of the applicable lease, Lender may apply such amounts against Borrower's obligations under the Loan Documents.

(g)     **Property Taxes, Insurance, Etc.** Borrower is not delinquent and shall remain, at all times, current in the payment of any taxes, assessments, charges, fines, impositions, Community Association Dues, Fees, and Assessments or insurance premiums attributable to the Property.

(h)     **Utilities and Public Access.** The Property has, and Borrower shall take all steps necessary to ensure that the Property continues to have rights of access to public ways and is served by electricity, water, sewer or septic system and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property, and all roads necessary for the use of the Property for its intended purposes have been completed and dedicated to public use and accepted by the applicable governmental authorities.

(i)     **Ownership.** Borrower owns fee simple title to the Property and the Property is not subject to any ground lease. Borrower has not granted to any person any option or other right to purchase an Interest in the Property.

(j)     **Litigation.** Except as disclosed in writing to Lender, there are no orders, injunctions, decrees, judgments, actions, suits or proceedings (including proceedings regarding fair housing, anti-discrimination, or equal opportunity) at law or in equity by or before any court or other governmental authority pending or, to Borrower's knowledge, threatened, against or affecting Borrower, any Guarantor or the Property. All information with respect to the same that has been provided to Lender by Borrower is true and complete in all material respects.

(k)     **Bankruptcy.** Neither Borrower nor any Guarantor is (i) the subject of or a party to any pending bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation; (ii) preparing or intending to be the subject of any such proceeding or

**SLP SECURITY INSTRUMENT – MASSACHUSETTS**
WD0920                                                                                                  *(page 17 of 22 pages)*

dissolution or liquidation; (iii) the subject of any judgment unsatisfied of record or docketed in any court; or (iv) insolvent.

(l) **Further Assurances.** Promptly following request by Lender, Borrower shall, at its sole cost and expense: (i) execute and deliver, or cause to be executed and delivered, such documents, instruments, certificates, assignments and other writings, and do such other acts as Lender may request, to correct any defects or omissions in the Loan Documents, and to grant, evidence, preserve, perfect and protect the Property and Lender's liens thereupon and the priority thereof; and (ii) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time.

(m) **No Joint Assessment.** Borrower shall not suffer, permit or initiate the joint assessment of the Property with (i) any other real property constituting a tax lot separate from the Property, or (ii) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes and assessments payable in respect of the Property or any penalties, interest or fees with respect thereto which may be levied against any such real or personal property shall be assessed or levied or charged to the Property.

**25. Information Requirements.** Borrower shall furnish or cause to be furnished to Lender the following reports, notices and other documents:

(a) **Reporting on Adverse Effects.** Within seven (7) days after Borrower obtains knowledge of the occurrence of any event or circumstance that has or would reasonably be expected to have a Material Adverse Effect, written notice thereof that includes the details of such event or circumstance and the action that Borrower is taking or proposes to take with respect thereto.

(b) **Default.** Within seven (7) days after Borrower obtains knowledge of any default under the Loan Documents, written notice setting forth the details of such default and the action that Borrower is taking or proposes to take to cure such default.

(c) **Property Taxes, Community Association Charges and Insurance.** Within seven (7) days of Lender's request therefor, copies of (a) any bills, statements or invoices for taxes, assessments, charges, fines, impositions, Community Association Dues, Fees, and Assessments or insurance premiums attributable to the Property and (b) evidence satisfactory to Lender of payment of any of the foregoing.

(d) **Leases.** Within seven (7) days after written request by Lender, copies of leases to the Property.

(e) **Other Information.** As soon as reasonably practicable after request by Lender, furnish or cause to be furnished to Lender in such manner and in such detail as may be reasonably requested by Lender, such evidence of compliance with the Loan Documents and such additional information, documents, records or reports as may be reasonably requested with respect to the Property or the conditions or operations, financial or otherwise, of Borrower and any Guarantor, including, without limitation, a periodic rent roll.

**26. Additional Defaults.** In addition to the other defaults specified in the Loan Documents, the occurrence of any one or more of the following shall constitute a default under the Loan Documents:

(a) any failure by Borrower to pay when due principal or interest on the Loan or any Funds and such failure shall continue for ten (10) days;

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 18 of 22 pages)*

(b)     any failure by Borrower or any Guarantor to pay when due any amount (other than as set forth in the foregoing clause (a)) required to be paid by it under any Loan Document and such failure shall continue for fifteen (15) days;

(c)     if Borrower or any Guarantor fails to perform any of its non-monetary obligations under any Loan Document and such failure shall continue for thirty (30) days;

(d)     any failure by Borrower to maintain the insurance coverage required by Lender;

(e)     if any proceeding for bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation shall commence with respect to Borrower or any Guarantor;

(f)     if any Loan Document or any lien granted thereunder shall (except in accordance with its terms or pursuant to Lender's written consent), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the parties thereto;

(g)     the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in, or the value or operation of, the Property; or

(h)     if Borrower or any of its affiliates breaches or defaults under any note, instrument or agreement relating to a loan owned by Note Holder, then such breach or default shall be a default under the Loan Documents.

**27. Debt Secured.** The debt secured by this Security Instrument shall include the entire unpaid principal amount of the Note plus (a) accrued but unpaid interest at the rate specified in the Note, including interest charged at the Default Rate specified in the Note, (b) any additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on the Property including, but not limited to, payments on prior liens and repairs to the Property, (c) late charges, (d) prepayment fees and premiums, (e) taxes, charges or assessments which may be imposed upon the Property, (f) premiums on insurance policies covering the Property, (g) costs, fees and expenses incurred in enforcing the lien of this Security Instrument or the performance of Borrower's obligations hereunder or under the other Loan Documents, including, but not limited to, the expenses of any litigation to prosecute or defend the rights and liens created by this Security Instrument or any of Borrower's obligations hereunder or under the other Loan Documents, all fees and expenses incurred in connection with the foreclosure of this Security Instrument, the cost of taking control of and managing the Property and collecting the Rents, including amounts described in Section 22, (h) any amount, costs or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, (i) interest at the Default Rate specified in the Note on any judgment obtained by Lender and (j) all other amounts due from Borrower under this Security Instrument, the Note or any other Loan Document.

**28.     Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     **Collateral Assignment of Leases.** In addition to the Property described in the grant of security above, the following items are added to the Property description, and shall also constitute the Property covered by this Security Instrument: all leases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any person or entity is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every modification, amendment or other agreement relating to such leases or other

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                                              *(page 19 of 22 pages)*

agreements entered into in connection with such leases or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (collectively, the "**Leases**"), together with any extension, renewal or replacement of same, and all right, title and interest of Borrower, its successors and assigns, therein and thereunder, together with all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases, to perform all other necessary or appropriate acts with respect to such Leases as agent and attorney-in-fact for Borrower, and the right to make all waivers and agreements, to give and receive all notices, consents and releases, to take such action upon the happening of a default under any lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of any Lease or by any law, and to do any and all other things whatsoever which Borrower is or may become entitled to do under any such Leases, and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the rents to the payment and performance of the obligations under the Loan Documents. If Lender gives notice of default to Borrower, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to take the foregoing actions and enter into the foregoing modifications, extensions, terminations and leases on behalf of Borrower if Borrower fails to do so within five (5) days of written demand by Lender.

(b)   **Assignment of Rents.** Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all the rents and revenues ("**Rents**") paid or accruing, of the Property, regardless of to whom the Rents of the Property are payable. Borrower shall not otherwise assign, transfer or encumber in any manner the Leases or the Rents or any portion thereof. Notwithstanding the foregoing, Borrower shall have a license to collect and use the Rents as the same become due and payable and to exercise all rights of the landlord under or with respect to the Leases, until Lender has given Borrower notice of default, at which time the license granted in this Section 28(b) shall be automatically revoked. Borrower shall not collect any Rents more than thirty (30) days in advance of the date the same become due. The assignment in this Section 28(b) shall constitute an absolute and present assignment of the Rents, and not an assignment for security, and the existence or exercise of Borrower's conditional license to collect the Rents shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Lender of any of its rights or remedies under this Section 28(b) shall not be deemed or construed to make Lender a mortgagee-in-possession.

(c)   **Appointment of a Receiver, Etc.** If Lender gives notice of default to Borrower, to the extent permitted by Applicable Law, Lender shall be entitled to have a receiver, trustee, liquidator or conservator of the Property appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security for the debt and without regard to the solvency of Borrower, any Guarantor or indemnitor with respect to the debt or any Person otherwise liable for the payment of the debt or any part thereof, it being agreed that Lender shall be entitled to appointment of such receiver, trustee, liquidator or conservator as a matter of right.

(d)   **Collection of Rents.** If Lender gives notice of default to Borrower: (i) all Rents received by Borrower (whether in cash or by check or other electronic means) shall be held by

Borrower as trustee for the benefit of Lender only, and Borrower shall deliver all such rents to Lender within five (5) days of receipt thereof for application to the sums secured by this Security Instrument and (ii) Lender shall be entitled to contact each Tenant of the Property and demand payment of, collect and receive all of the Rents of the Property. Lender, Lender's agents or any receiver, trustee, liquidator or conservator of the Property shall be liable to account for only those Rents actually received.

(e)    **Lender Expenses.** If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any unreimbursed funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(f)    **No Prior Assignment.** Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this Section 28.

(g)    **Possession, Control and Maintenance of the Property.** To the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, to the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator may do so at any time after a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by this Security Instrument are paid in full.

(h)    **Application of Amounts Collected.** Lender or a judicially appointed receiver, trustee, liquidator or conservator may apply Rents and all other amounts collected with respect to the Property, including amounts collected in connection with the exercise of remedies pursuant to Section 22, to the payment of principal, interest and other amounts due under the Loan Documents as provided in Section 2.

**29. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of courtesy and dower in the Property.

[Signature Page Follows]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

TRINITY ESTATE INVESTMENTS &
DEVELOPMENT LLC
a(n) Massachusetts Limited Liability Company

By: _____

Name: Anizael Jimenez-Morales
Title: Member

**BORROWER ACKNOWLEDGES THAT THE PURPOSE OF THE LOAN CONTEMPLATED HEREBY IS FOR BUSINESS AND/OR COMMERCIAL PURPOSES ONLY AND THE LOAN IS NOT FOR PERSONAL, FAMILY OR HOUSEHOLD USE.**

Borrower's Initials: _____

**BORROWER FURTHER ACKNOWLEDGES THAT THIS SECURITY INSTRUMENT PROHIBITS THE LEASING OF THE PROPERTY TO AND OCCUPANCY BY (1) BORROWER, (2) ANY AFFILIATE OF BORROWER, (3) ANY HOLDER OF A DIRECT OR INDIRECT EQUITY INTEREST IN BORROWER OR ANY SUCH AFFILIATE, (4) ANY OFFICER, DIRECTOR, EXECUTIVE EMPLOYEE OR MANAGER OF ANY PERSON OR ENTITY DESCRIBED IN THE FOREGOING CLAUSES (1) – (3) OR (5) ANY FAMILY MEMBER (INCLUDING SPOUSE, SIBLINGS, ANCESTORS AND LINEAL DESCENDANTS) OF ANY PERSON OR ENTITY DESCRIBED IN THE FOREGOING CLAUSES (1) – (4).**

Borrower's Initials: _____

_____ [Space Below This Line For Acknowledgment] _____

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __Massachusetts__

County of __Worcester__ )

On __June 15, 2022__ before me, __Jaclyn Packard__, personally appeared __Anizael Jiminez-Morales__, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of __MA__ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____ (Seal)

JACLYN S. PACKARD
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires Mar. 16, 2023

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                  *(page 23 of 22 pages)*

## Exhibit A

the land in Worcester, on the southerly side of
Hancock Street, bounded and described as follows:

BEGINNING at a point on the southerly line of said Hancock
Street, one hundred and ninety feet southerly from the
easterly line of Main Street at a corner of land conveyed
by George W. Brady and Henry H. Stratton by deed dated May
19, 1879, recorded with the Worcester District Registry of
Deeds, Book 1055, Page 32;

THENCE southeasterly by the southerly line of said Hancock
Street to a point in a line drawn through the center of the
partition of the double house upon the lot hereby conveyed
and the lot adjoining it on the east and produced to said
Hancock Street, and being the point where said line so
produced meets the southerly line of said Hancock Street;

THENCE by said last named line through the center
of the partition wall of said double house produced
to land now or formerly of one Altar, ninety-five
(95) feet more or less;

THENCE westerly by land now or formerly of one Altar to
the easterly line of said land conveyed as aforesaid by
said Brady to said Stratton;

THENCE northeasterly by said easterly line of land
conveyed as aforesaid by said Brady to said Stratton and
measuring ninety- five (95) feet more or less to the point
of beginning, or however otherwise said premises may be
bounded, measured or described.

## SFR ENTITY BORROWER RIDER

This Entity Borrower Rider (this "Entity Rider") is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed by the undersigned (the "Borrower") in favor of Patch Lending, LLC, ("Lender") dated the same date as the date hereof (the "Security Instrument") relating to the propert(ies) located at the address(es) set forth on the signature page hereto (the "Property"). This Entity Rider, together with the Security Instrument and the related the Note and all other riders, certificates and ancillary documents given by Borrower in connection with the Loan and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

1. Representations and Warranties. Borrower represents and warrants to Lender as follows:

(a) Organization. Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is organized and the state in which the Property is located.

(b) Authority. Borrower has all necessary power and authority to (i) own the Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under the Loan Documents and (ii) to execute, deliver and perform its obligations under the Loan Documents to which it is a party. The execution, delivery and performance of the Loan Documents by Borrower will not contravene or conflict with Borrower's organizational documents.

(c) Consents. Any consent, approval, authorization, order, registration or qualification of or with any governmental authority or other person or entity that is required for the execution, delivery and performance of the Loan Documents by Borrower has been obtained and is in full force and effect.

(d) Enforceability. The Loan Documents to which Borrower is a party have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e) Certain Regulatory Matters. Borrower and each Person who owns a 10% or greater direct or indirect beneficial interest in Borrower (each, a "Relevant Party") is in compliance in all material respects with the following (the "Regulatory Requirements"): (i) all applicable United States and other export control laws, including those administered by the United States Department of Commerce and the United States Department of State, (ii) all applicable United States and other laws relating to unsanctioned foreign boycotts; and (iii) all applicable United States and other economic sanctions, anti-terrorism, anti-money laundering and related measures, including those administered by the United States Department of the Treasury, the United States Department of Commerce and the United States Department of State and including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws. In addition, no Relevant Party is a person or entity owned or controlled by, or acting for or on behalf of, countries targeted by the United States Department of the Treasury under economic sanctions, or a person or entity designated by the United States Department of the Treasury under sanctions programs that are not country-specific, or otherwise a blocked person identified as such by the United States Department of the Treasury or by officials operating other economic sanctions. Each Relevant Party has obtained all United States and other government approvals, permits or licenses that are required under the Regulatory Requirements to fulfill any of their respective pending commitments or obligations.

2. Covenants. Borrower covenants to Lender as follows:
(a) Preservation of Entity Existence. Borrower shall (i) comply with its organizational documents, (ii) maintain its existence, rights, franchises and privileges in its state of organization, (iii) qualify and remain in good standing in each other jurisdiction where the same is required under applicable law and (iv) not engage in or consent to any dissolution, liquidation or consolidation or merger with or into any other entity or otherwise terminate its existence.
(b) Regulatory Requirements. Borrower shall comply in all material respects with all Regulatory Requirements.

SLP SFR Entity Rider
WD0920

19

3. <u>Meaning of "beneficial interest in Borrower"</u>. For sake of clarity, the phrase "beneficial interest in Borrower" as used in the Security Instrument and the Note includes, without limitation all direct and indirect equity interests in Borrower, regardless of the number of tiers of ownership.

[signature page follows]

SLP SFR Entity Rider
WD0920

20

BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained this Entity Rider.

**Borrower:**
**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
**a(n) Massachusetts Limited Liability Company**

By: _____
Name: Anizael Jimenez-Morales
Title: Member
Date: _06_ _15_ _22_ , 20_22_

Property Address:

4 Hancock Street, Worcester, MA 01610

Borrower's Notice Address:

_____

_____

_____

Email: _____

## VACANT PROPERTY RIDER

This Vacant Property Rider (this "VP Rider") is made on the date set forth on the signature page hereto, and is incorporated into and shall be deemed to amend and supplement the Note by the undersigned (the "Borrower") in favor of Patch Lending, LLC ("Lender"), dated the same date as the date hereof (the "Note"). This VP Rider, together with the Note and the related Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), all other riders, all other certificates and all ancillary documents given by Borrower and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

This VP Rider is an integral part of the Note and the other Loan Documents. In the event of any conflict or inconsistency between this VP Rider and the Note or the other Loan Documents, the terms of this VP Rider shall control.

**ARTICLE 7Acknowledgement Regarding Vacancy. Borrower hereby represents and acknowledges that, as of the date hereof, the properties set forth on Exhibit A hereto (each a "Vacant Property") are not occupied by an Eligible Tenant pursuant to an Eligible Lease.**

**ARTICLE 8Interest Rate Increase. Borrower agrees that if the Leasing Conditions (as defined below) are not satisfied for all Vacant Properties by the date that is ninety (90) days from date of the Note, then an additional two percent (2.0%) *per annum* shall thereafter be added to the interest rate that would otherwise be in effect under the Note (the "Interest Rate Step Up"). The Interest Rate Step Up will cease when the Leasing Conditions are satisfied for all Vacant Properties.**

**ARTICLE 9Leasing Conditions. The "Leasing Conditions" means the following:**

(a) Borrower shall have entered into an Eligible Lease for each Vacant Property with an Eligible Tenant and delivered to Lender a fully-executed copy of such Eligible Lease; and
(b) Borrower shall have delivered to Lender written evidence of payment of (i) the first month rent under such Eligible Lease or (ii) for an Eligible Lease with an initial term of less than six (6) months, three months of rent under such Eligible Lease. Written evidence of payment must be satisfactory to Lender and may include one or more cancelled checks that have cleared the applicable tenant's bank account or bank records showing receipt by Borrower of an Automated Clearing House (ACH) payment from the applicable tenant.

[Signature Page Follows]

SLP Vacant Property Rider
WD0920

1

***BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained this VP Rider.***

**Borrower:**
**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
**a(n) Massachusetts Limited Liability Company**

By: _____

Name: Añizael Jimenez-Morales
Title: Member

Date: __06|15_____, 20 __YY__

Property Address:

4 Hancock Street, Worcester, MA 01610

Borrower's Notice Address:

_____

_____

_____

Email: _____

SLP Vacant Property Rider
WD0920

2

## EXHIBIT A

## VACANT PROPERTY ADDRESS(ES)



SLP Vacant Property Rider
WD0920

3

ATTEST: WORC. Kathryn A. Toomey, Register

# EXHIBIT C

## CONTRACT TO PURCHASE REAL ESTATE #501
*(With Contingencies)*

**(Binding Contract. If Legal Advice Is Desired, Consult An Attorney.)**


**MASSACHUSETTS ASSOCIATION of REALTORS®**

From: BUYER(S):
Name(s): *Jessica Reyes lambrt*
Address: *4 Nuttal Lane*

To:   OWNER OF RECORD ("SELLER"):
Name(s): *Trinity Estate*
Address: *Investments + Dev. LLC*
*108 Beacon St.*
*Worc. MA. 0168*

**The BUYER offers** to purchase the real property described as _*6 Hancock St. Worc. MA.*_

together with all buildings and improvements thereon (the "Premises") to which I have been introduced by _*Jose Encarnecion*_ upon the following terms and conditions:

1. **Purchase Price:** The BUYER agrees to pay the sum of $ _*400,000.00*_ to the SELLER for the purchase of the Premises, due as follows:
    i. $ _*100,000.00*_ as a deposit to bind this Offer;
    ii. $ _____ as an additional deposit upon executing the Purchase And Sale Agreement;
    iii. Balance by bank's, cashier's, treasurer's or certified check or wire transfer at time for closing.

2. **Duration Of Offer.** This Offer is valid until _*9Am*_ a.m./p.m. on _*June 30, 2022*_ by which time a copy of this Offer shall be signed by the SELLER, accepting this Offer and returned to the BUYER, otherwise this Offer shall be deemed rejected and the money tendered herewith shall be returned to the BUYER. Upon written notice to the BUYER or BUYER'S agent of the SELLER'S acceptance, the accepted Offer shall form a binding agreement. Time is of the essence as to each provision.

3. **Purchase And Sale Agreement.** The SELLER and the BUYER shall, on or before _*9 Am*_ a.m./p.m. on _*Sept 15, 2022*_ execute the Standard Purchase and Sale Agreement of the MASSACHUSETTS ASSOCIATION OF REALTORS® or substantial equivalent which, when executed, shall become the entire agreement between the parties and this Offer shall have no further force and effect.

4. **Closing.** The SELLER agrees to deliver a good and sufficient deed conveying good and clear record and marketable title at _____ a.m./p.m. on _____ at the _____ County Registry of Deeds or such other time or place as may be mutually agreed upon by the parties.

5. **Escrow.** The deposit shall be held by _____, as escrow agent, subject to the terms hereof. Endorsement or negotiation of this deposit by the real estate broker shall not be deemed acceptance of the terms of the Offer. In the event of any disagreement between the parties concerning to whom escrowed funds should be paid, the escrow agent may retain said deposit pending written instructions mutually given by the BUYER and SELLER. The escrow agent shall abide by any Court decision concerning to whom the funds shall be paid and shall not be made a party to a pending lawsuit solely as a result of holding escrowed funds. Should the escrow agent be made a party in violation of this paragraph, the escrow agent shall be dismissed and the party asserting a claim against the escrow agent shall pay the agent's reasonable attorneys' fees and costs.

6. **Contingencies.** It is agreed that the BUYER'S obligations under this Offer and any Purchase and Sale Agreement signed pursuant to this Offer are expressly conditioned upon the following terms and conditions:
    a. **Mortgage.** *(Delete If Waived)* The BUYER'S obligation to purchase is conditioned upon obtaining a written commitment for financing in the amount of $ _*275,000*_ at prevailing rates, terms and conditions by _*Dec. 31, 2022*_. The BUYER shall have an obligation to act reasonably diligently to satisfy any condition within the BUYER'S control. If, despite reasonable efforts, the BUYER has been unable to obtain such written commitment the BUYER may terminate this agreement by giving written notice that is received by 5:00 p.m. on the calendar day after the date set forth above. In the event that notice has not been received, this condition is deemed waived. In the event that due notice has been received, the obligations of the parties shall cease and this agreement shall be void; and all monies deposited by the BUYER shall be returned. In no event shall the BUYER be deemed to have used reasonable efforts to obtain financing unless the BUYER has submitted one application by _____ and acted reasonably promptly in providing additional information requested by the mortgage lender.
    b. **Inspections.** *(Delete If Waived)* The BUYER'S obligations under this agreement are subject to the right to obtain inspection(s) of the Premises or any aspect thereof, including, but not limited to, home, pest, radon, lead paint, septic/sewer, water quality, and water drainage by consultant(s) regularly in the business of

Form No. 501


**MASSFORMS™**
Statewide Standard Real Estate Forms

© 2007 MASSACHUSETTS ASSOCIATION OF REALTORS®
Page 1 of 2

Form generated by: TrueForms™ from REVEAL® SYSTEMS, Inc. 800-499-9612


EQUAL HOUSING OPPORTUNITY

conducting said inspections, of BUYER'S own choosing, and at BUYER'S sole cost within _____ days after SELLER'S acceptance of this agreement. If the results are not satisfactory to BUYER, in BUYER'S sole discretion, BUYER shall have the right to give written notice received by the SELLER or SELLER'S agent by 5:00 p.m. on the calendar day after the date set forth above, terminating this agreement. Upon receipt of such notice this agreement shall be void and all monies deposited by the BUYER shall be returned. Failure to provide timely notice of termination shall constitute a waiver. In the event that the BUYER does not exercise the right to have such inspection(s) or to so terminate, the SELLER and the listing broker are each released from claims relating to the condition of the Premises that the BUYER or the BUYER'S consultants could reasonably have discovered.

7. **Representations/Acknowledgments.** The BUYER acknowledges receipt of an agency disclosure, lead paint disclosure (for residences built before 1978), Home Inspectors Facts For Consumers brochure (prepared by the Office of Consumer Affairs). The BUYER is not relying upon any representation, verbal or written, from any real estate broker or licensee concerning legal use. Any reference to the category (single family, multi-family, residential, commercial) or the use of this property in any advertisement or listing sheet, including the number of units, number of rooms or other classification is not a representation concerning legal use or compliance with zoning by-laws, building code, sanitary code or other public or private restrictions by the broker. The BUYER understands that if this information is important to BUYER, it is the duty of the BUYER to seek advice from an attorney or written confirmation from the municipality. In addition, the BUYER acknowledges that there are no warranties or representations on which BUYER relies in making this Offer, except those previously made in writing and the following : (if none, write "NONE"): _____

8. **Buyer's Default.** If the BUYER defaults in BUYER'S obligations, all monies tendered as a deposit shall be paid to the SELLER as liquidated damages and this shall be SELLER'S sole remedy.

9. **Additional Terms.**

_This is a Seller Financing Purchase and the House is currently in a Renovation Plan by Seller to deliver to buyer completely Remodeled prior to the Execution of the Financing Agreement_

BUYER _____  Date  BUYER _____  Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SELLER'S REPLY

SELLER(S): (check one and sign below)
☑ (a) ACCEPT(S) the Offer as set forth above at __9__ a.m./p.m. on this __30th__ day of __June 2022__
☐ (b) REJECT(S) the Offer.
☐ (c) Reject(s) the Offer and MAKE(S) A COUNTEROFFER on the following terms: _____

This Counteroffer shall expire at _____ a.m./p.m. on _____ if not withdrawn earlier.

SELLER _or spouse_ _____  Date  SELLER _____  Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### (IF COUNTEROFFER FROM SELLER) BUYER'S REPLY

BUYER(S): (check one and sign below)
☐ (a) ACCEPT(S) the Counteroffer as set forth above at _____ a.m./p.m. on this _____ day of _____.
☐ (b) REJECT(S) the Counteroffer.

BUYER _____  Date  BUYER _____  Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### RECEIPT FOR DEPOSIT

I hereby acknowledge receipt of a deposit in the amount of $_____ from the BUYER this _____ day of _____ .

Form No. 501

 **MASSFORMS**™
Statewide Standard Real Estate Forms

© 2007 MASSACHUSETTS ASSOCIATION OF REALTORS®
Page 2 of 2



Form generated by: **TrueForms**™ from REVEAL® SYSTEMS, Inc. 800-499-9612

# EXHIBIT D



*Estate Investments & Development LLC*

Verification Letter of Funds

This is to certify that Jessica Reyes Lambert (The Buyer) of 4 Nuttall Lane Worcester,
Ma. 01604 in June of 2022 gave a lump sum of $100,000.00 to Trinity Estate
Investments & Development LLC (The Seller) as a deposit to her purchase of 6
Hancock St. Worcester Ma. which is currently under renovation. These funds have
been applied to the process of that real estate transaction. The total cost of the
purchase is $400,000.00 currently with a balance of $300,000.00 which will be owner
financed by Trinity Estate Investments & Development to Jessica Reyes Lambert. The
finance Agreement will be developed and agreed upon by both parties.

By signing below both parties agree to the terms and are held legally accountable to the
terms and conditions provided here to.

Once again, thank you for your business if you have any questions, please contact
me at 774-242-2691 or email me at revjoseicc@gmail.com

Sincerely

Rev. Jose Encarnacion
President of TEID


Jessica Reyes Lambert

# EXHIBIT E

*pag #2*

## STANDARD FORM
## PURCHASE AND SALE AGREEMENT

1.    PARTIES.

This agreement ("Agreement") is made effective as of this ___ day of August 2022, between Trinity Estate Investments & Development LLC, 108 Beacon Street, Worcester, MA 01608, herein referred to as SELLER, and Jessica Reyes Lambert of 4 Nuttall Lane, Worcester, MA 01604, hereinafter referred to as the BUYER.

Subject to the terms and conditions hereinafter set forth, the SELLER agrees to SELL and the BUYER agrees to BUY, the following described premises:

2.    DESCRIPTION

The land, with the buildings thereon, now known and numbered 6 Hancock St. Worcester, Massachusetts (hereinafter collectively "Premises" or "premises") and being the same premises as conveyed to the SELLER hereunder by Deed recorded at the Worcester County Registry of Deeds in BOOK 43759 PAGE 326.

3.    FIXTURES

Included in the sale as a part of said premises are the buildings, structures, and improvements now thereon, and the fixtures belonging to the SELLER and used in connection therewith including, if any, all wall-to-wall carpeting, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating equipment, oil and gas burners and fixtures appurtenant thereto, hot water heaters, plumbing and bathroom fixtures, electric and other lighting fixtures, mantels, fences, gates.

4.    TITLE DEED

Said premises are to be conveyed by a good and sufficient quitclaim deed running to the BUYER, or to the nominee designated by the BUYER by written notice to the SELLER at least seven days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

(a)    Provisions of existing building and zoning laws;
(b)    Such taxes for the then current year as are not due and payable on the date of the delivery of such deed;
(c)    Any liens for municipal betterments assessed after the date of the conveyance;
(d)    Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use and/or value of said premises for commercial purposes.

5.    REGISTERED TITLE

In addition to the foregoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the BUYER to a Certificate of Title of said premises, and the SELLER shall deliver with said deed all instruments, if any, necessary to enable the BUYER to obtain such Certificate of Title.

1

6.   PURCHASE PRICE

The agreed purchase price for said premises is Four Hundred Thousand and 00/100 Dollars ($400,000.00), of which:

| $ | 100,000.00 | have been paid as a deposit with the Contract to Purchase dated June 15, 2022 |
| $ | 5,000.00 | additional closing costs & legal fees to be paid to the Seller or the Sellers's attorney on the date of the execution of the financing documents. |
| $ | 295,000.00 | Seller financing |
| $ | 400,000.00 | TOTAL |

7.   TIME FOR PERFORMANCE; DELIVERY OF DEED

Such deed is to be delivered within 7 to 14 days upon finalizing the rehab and renovations of the premises ("Closing Date") at the office of BUYER'S attorney, namely Jaclyn S. Packard, Esq, Packard Law Office, 47 Harvard Street, Ste. 200, Worcester, Massachusetts 01609 unless otherwise agreed upon in writing, TIME BEING OF THE ESSENCE.

8.   POSSESSION and CONDITION of PREMISES

Full possession of said premises free of all tenants and occupants is to be delivered at the time of the delivery of the deed, said premises to be then in the same condition as they are as of the date of inspection post renovations of premises.

9.   INSPECTIONS

This agreement is subject to the right of the Buyer to obtain, at Buyer's own expense, an inspection of the premises and written report to include, but not be limited to, the structural condition of the dwelling(s). The Buyer's right of inspection shall expire seven (7) days from the final renovations of the premises and prior to the execution of the financing agreement. If the Buyer is not satisfied with the results of such inspection(s), this agreement may be terminated by the Buyer, at the Buyer's election, without legal or equitable recourse to either party. The parties thereby releasing each other from all liability under this agreement, and the deposit shall be returned to the Buyer, provided however, that the Buyer shall have notified the Seller, Seller's agent, and/or Seller's attorney, in writing, on or before the inspection expiration date herein above specified, of the Buyer's intention to so terminate. Inspections shall be for informational purposes only and BUYER shall not request any credits or repairs based on such inspections.

10.   EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM

If the SELLER shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then the SELLER shall use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof, as the case may be, in which event the time for performance hereof shall be extended for a period of thirty days. Seller shall not be required to expend more than $3,500 to render the premises conforming with the terms hereof.

2

11.   FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM, etc.
If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, or make the premises conform, as the case may be, all as herein agreed or the holder of a mortgage on the Premises shall refuse to permit any insurance proceeds to be used for such purpose, then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

12.   BUYER'S ELECTION TO ACCEPT TITLE
The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver to the said premises in their then condition and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against by the SELLER, then the SELLER shall at BUYER's sole election, on delivery of the deed, unless said premises have previously been restored to their former condition, pay over or assign to the BUYER all amounts recovered or recoverable by the SELLER on account of such insurance, and give the BUYER a credit against the purchase price equal to any amounts otherwise so recoverable which are retained by the holder of a mortgage on the Premises, less any amounts reasonably expended by the SELLER for any partial restoration or terminate this Agreement at which point all deposits shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

13.   ACCEPTANCE OF DEED
The acceptance and recording of a deed by the BUYER or his nominee as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

14.   USE OF PURCHASE MONEY TO CLEAR TITLE
To enable the SELLER to make conveyance as herein provided, the SELLER may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed or thereafter, as to institutional lenders, in accordance with customary Worcester County conveyance practice.

15.   INSURANCE
SELLER shall until closing continue insurance on the Premises. BUYER shall carry Residential property coverage for the premises as of the recording of the deed as further set forth in the loan documents to be provided and identify the mortgagee as loss payee on said commercial property insurance policy.

3

16. ADJUSTMENTS

Rents, security and rent deposits and any interest due thereon, taxes for the then current fiscal year and current water and sewer use charges, and operating expenses, if any, shall be apportioned, and fuel oil, if any, shall be adjusted, and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the BUYER at the time of delivery of the deed.

17. ADJUSTMENT OF UNASSESSED AND ABATED TAXES

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding fiscal year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

18. BUYER's DEFAULT; DAMAGES

If the BUYER shall fail to fulfill the BUYER's agreements herein, all deposits made hereunder by the BUYER shall be delivered to and retained by the SELLER as liquidated damages as SELLER's sole recourse at law or in equity, the parties agreeing that said sum represents a fair approximation of SELLER's damages in the event of such default.

19. LIABILITY OF TRUSTEE, SHAREHOLDER, BENEFICIARY, etc.

No trustee, officer, director, or other fiduciary or, or member, shareholder or beneficiary of SELLER shall be personally liable for any claims, liabilities, damages or actions in connection with any matter arising out of or related to the transaction contemplated by this agreement.

20. WARRANTIES AND REPRESENTATIONS

The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, by either the SELLER or anyone on behalf of SELLER. BUYER shall accept the Premises in as is condition without any warranty or representation whatsoever unless otherwise set forth in writing.

4

23.    MORTGAGE CONTINGENCY

This Agreement is contingent on the BUYER'S ability to obtain **seller financed purchase money loan in the amount of up to $300,000.00 at 4.0% fixed rate interest with 10-year amortization.** If, despite the BUYER'S diligent efforts, a commitment for such loan cannot be obtained on or before 7 to 10 days upon the completion of all renovations the BUYER shall so advise the Seller's Attorney in writing and this Agreement shall become null and void, and all payments made hereunder shall be refunded and all obligations to each other shall cease. If such written notice is not received on or before the expiration date herein above specified, the BUYER shall be bound to perform the BUYER'S obligations under this Agreement. In no event shall the BUYER be deemed to have used "diligent efforts" to obtain such commitment unless the BUYER submits a complete mortgage loan application conforming to the foregoing provisions on or before **ten (10) days from the date of the fully executed Financing Agreement.**

24.    CONSTRUCTION OF AGREEMENT

This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be cancelled, modified or amended only by a written instrument executed by both the SELLER and the BUYER. If two or more persons are named herein as BUYER, their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it.

25.    ADDITIONAL PROVISIONS

At the closing, the SELLER will sign customary closing documents such as title insurance affidavit, non-foreign certificate and tax ID certification. If requested, BUYER shall cooperate with SELLER in doing a so-called 1031 Exchange at no expense to BUYER.
SELLER makes no representations hereunder and BUYER understands that it shall rely solely on its own investigations and professionals in deciding to consummate the purchase hereunder and BUYER accepts the premises in "as is" condition as of the time of BUYER's inspections.

26. NOTICES

Any and all notices required pursuant to this Agreement shall be in writing and sent by
US Certified Mail or nationally recognized overnight carrier for next day delivery to:

If to Seller (Seller's Attorney):

If to Buyer (Buyer's Attorney):

Jaclyn S. Packard, Esq.
Packard Law Office
47 Harvard Street, Ste. 220
Worcester, MA  01609
Jpackard@packardlawoffice.com
Tel.: (508) 926-8987
Fax: (508) 519-6593

27. ADDENDUMS

Addendum A and Rent Roll attached hereto including all terms thereof is incorporated herein by
reference in its entirety.

28. ADDITIONAL PROVISIONS

SELLER shall provide copies of all lease agreements with tenants within 10 days of execution of this
Agreement.

This Agreement is executed under seal as of August __, 2022

_____

Seller: Trinity Estate Investments

& Development LLC

By: Jose Encarnacion, Manager

_____

Buyer: Jessica Reyes Lambert

By: Jessica Reyes Lambert

6

# EXHIBIT F



# Owner Financing Mortgage Contract

This agreement is entered into on the _____*14 th*_____ day of ___*December*___, 20_*23*_ between Trinity Estate Investments & Development LLC (hereinafter "Owner") and Jessica Reyes Lambert (hereinafter "Buyer") for the sale of the property located at 6 Hancock St. Worcester, Ma. 01610 (hereinafter "property").

At all times the laws of the state in which the property is located govern this contract. A separate purchase & sale agreement for the property is also executed according to the laws of the state in which the property is located.

Loan Terms

This contract establishes that Owner shall sell and Buyer shall buy the property and that Owner shall finance the balance of the purchase price for the property for Buyer after Buyer delivers a down payment. (Down Payment has already been delivered in the amount of $100,000.00 see P&S agreement.)

The purchase price of the property is $396,000.00, as agreed to by the parties to this contract. (The Owner Agrees to Finalizing the Purchase & Installation of the Windows in the Front Porch as well as repainting the Front Porch with Exterior Paint in the Spring of 2024.)

Buyer is not obtaining financing for any portion of the purchase price of the property from a third party, such as a bank. However the Buyer can choose to do so and obtaining such financing during this process.

The down payment amount of $100,000.0 has been agreed to by the parties and has been provided and deposited to Citizens Bank Account #1339619919.

The amount that Owner will finance for Buyer for the sale of the property is $296,000.00 (hereinafter "Owner finance"). Owner shall carry the promissory note for the entire mortgage term for the amount identified as Owner finance.

Financing for the mortgage is to last for a period not to exceed 5yrs without revision of potential buyer financing options and carries an interest rate of 4%. This interest rate is a fixed interest rate for the life of the loan based on a 15yr loan period.

Page 1 of 3



Payment for the mortgage is due monthly in the amount of $2,189.00 This amount does not (circle one) include taxes or other fees associated with owning the property. Should this amount include these fees and should these fees change due to changes in rates being set by the governing party, such as the state tax authority, the parties will notify each other of any changes that are brought to their attention within 30 days. Or the Owner can set up an escrow account that would include an additional $230.00 monthly to the monthly mortgage payment. If so please initial the clause below

Buyer agrees to have an additional amount of $230.00 added to the monthly mortgage amount to cover the municipal property taxes for a new monthly mortgage amount of $2,419.00.

Inusrance: The buyer is responsible to cover the insurance premium that is placed on the property by the Owner. The terms of this payment will be prearranged by the owner and the buyer.

Prepayment of all or a portion of the financing extended to Buyer is allowed and carries no penalties. (See the Amortization Schedule for payments & Interest information)

This agreement is secured by the home. Buyer's failure to pay the mortgage payment when due as described above entitles Owner to initiate foreclosure proceedings as allowed by state guidelines against Buyer. Owner has the right to repossess the property after the conclusion of foreclosure proceedings, as outlined and permitted by the laws of the state in which the property is located.

Loan Servicing

Owner will not hire a loan servicing company to draw up the mortgage documents and handle the processing of payments. The servicing of the loan will be handled directly by the Owner. Owner reserves the right to hire a servicing company at any time. Notification of the choice of servicing company will be provided by the Owner no later than 30 days before payment should be sent to the servicing company.

Owner may change servicing companies at any time without giving prior notice. However, Owner must notify Buyer or have the new servicing company notify Buyer of any changes to choice of loan servicing company at least 30 days prior to the change in mailing address for monthly payment. Any fees incurred due to the Owner's failure to provide Buyer with notice, either directly or from the service company, and the Buyer's sending payment to the incorrect address shall be paid by Owner.

This contract is full in its entirety. Any additions must be made in writing and amended to this contract.



Entered into this __14__ day of __December__, 20 23.

_____
Buyer

_____
Owner

Notarized or executed according to governing state law this _____ day of

_____, 20____.

# EXHIBIT G



**TRINITY**
Estate Investments & Development LLC

## Purchase and Sales Agreement

DATED: _12/14/2023_

1. **PARTIES AND MAILING ADDRESS**
   Trinity Estate Investments & Development hereinafter called the "Seller," agrees to sell, Jessica Reyes Lambert, hereinafter called the "Buyer," agrees to buy, upon the terms hereinafter set forth, the premises described in clause 2 below.

2. **DESCRIPTION**
   The land and the buildings thereon, hereinafter referred to as the "Premises," known as and numbered 6 Hancock St. Worcester, Massachusetts, as more particularly described in the deed recorded with the Worcester Registry of Deeds,

3. **BUILDINGS, STRUCTURES, IMPROVEMENTS, FIXTURES**
   Included in the sale as a part of said premises are the buildings, structures, and improvements now thereon, and the fixtures belonging to the Seller and used in connection therewith including, if any, all wall-to-wall carpeting, automatic garage door openers, screens, screen doors, storm windows and doors, awnings, shutters, furnaces, heaters, heating equipment, stoves, ranges, oil and gas burners and fixtures appurtenant thereto, hot water heaters, plumbing and bathroom fixtures, garbage disposals, electric and other lighting fixtures, mantels, outside television antennas, fences, gates, trees, shrubs, plants, ONLY IF BUILT IN, and ALL IN "AS IS" CONDITION after the completion of the already scheduled renovation of the home.

4. **TITLE DEED**
   Said premises are to be conveyed by a good and sufficient quitclaim deed running to the Buyer, or to the nominee designated by the Buyer by written notice to the Seller's counsel at least seven days before the deed is to be delivered as herein provided, and said deed shall convey a good and clear record and marketable title thereto, free from encumbrances, except

   (a) Provisions of existing building and zoning laws;

   (b) Existing rights and obligations in party walls which are not the subject of written agreement;

   (c) Such taxes for the then current fiscal year as are not due and payable on the date of the delivery of such deed;

   (d) Any liens for municipal betterments assessed after the date of signing this

Agreement;

(e) Utility easements affecting the premises; and

(f) Easements, restrictions and reservations of record, if any, so long as the same do not prohibit or materially interfere with the current use of said premises.

5. REGISTERED TITLE
In addition to the foregoing, if the title to said premises is registered, said deed shall be in form sufficient to entitle the Buyer to a Certificate of Title of said premises, and the Seller shall deliver with said deed all instruments, if any, necessary to enable the Buyer to obtain such Certificate of Title.

6. PURCHASE PRICE
The agreed to purchase price for said Premises is **Three Hundred Ninety Six Thousand and 00/100 Dollars**, of which

| | |
|---|---|
| $25,000.00 | already paid as a deposit on the offer |
| $75,000.00 | already paid as a deposity on this Purchase & Sales Agreement |
| 296,000.00 | to be Financed with Owner at a 4% interest rate with a 10 to 15 year term This agreement will be prepared and executed at the completion of the renovations and buyer moving into the premises of said property. |

**$396,000.00    TOTAL**

7. TIME FOR PERFORMANCE; DELIVERY OF DEED
Such deed is to be delivered **7 to 21 days after the final payment of the agreed upon owner financed Mortgage**, at the Worcester Registry of Deeds, unless otherwise agreed upon in writing. *It is agreed that time is of the essence of this agreement.*

8. POSSESSION AND CONDITION OF PREMISES
Full possession of said premises free of all tenants or occupants is to be delivered at the time of the completion of the owner financed agreement in the condition as they will be after full renovations, reasonable use and wear thereof excepted, and (b) in compliance with the provisions of any instrument referred to in clause 4 hereof.

9. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM
If the Seller shall be unable to give title or to make conveyance, or to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof, then the Seller shall use reasonable efforts to remove any defects in title.

10. USE OF MONEY TO CLEAR TITLE
To enable the Seller to make conveyance as herein provided, the Seller may, at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded simultaneously with the delivery of said deed or, in the case of mortgages granted by the SELLER to institutional lenders which are paid in full from the sale proceeds, within a reasonable time after the delivery of said deed in accordance with local conveyancing practices

## 11. INSURANCE

Until the delivery of the deed, the Seller shall maintain fire and extended insurance coverage on said premises in the amount and to the extent that the premises are presently insured.
Risk of loss shall remain with SELLER until delivery, acceptance and recording of the Deed.

## 12. ADJUSTMENTS

Real estate taxes for the then current fiscal year and water and sewer use charges shall be apportioned and fuel value shall be adjusted, as of the day of performance of this agreement and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price payable by the Buyer at the time of delivery of the deed.

## 13. ADJUSTMENT OF UNASSESSED AND ABATED TAXES

If the amount of said taxes is not known at the time of the delivery of the deed, they shall be apportioned on the basis of the taxes assessed for the preceding fiscal year, with a reapportionment as soon as the new tax rate and valuation can be ascertained; and, if the taxes which are to be apportioned shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement unless herein otherwise agreed.

## 14. NO BROKER

The Buyer and Seller represent and warrant to each other that each has not dealt with any broker or person entitled to a sales, brokerage or referral commission or fee ("commission") in connection with the purchase and sale of the premises. The Buyer and Seller agree to hold harmless and indemnify each other from and against any loss, cost, damage and expense, including attorneys' fees, incurred by either of them by reason of a breach of this representation and warranty or the assertion of a claim made by any person or entity not herein named. The provisions of this clause shall survive the delivery of the deed.

## 15. DEPOSIT

All deposits made hereunder shall be held by Seller and used for the renovation of the property to prepare to deliver to the seller.

## 16. WARRANTIES AND REPRESENTATIONS

The Buyer acknowledges that the Buyer has not been influenced to enter into this transaction and has not relied upon any warranties, representations or statements made by the Seller or any agent of the Seller not expressly set forth or incorporated in this agreement, except for the following, if any: NONE. Specifically the Buyer acknowledges that the Buyer has had ample opportunity to obtain at Buyer's cost and expense independent structural, home, insect or pest inspections (and well water and septic system inspections, if applicable) and has been afforded a reasonable period within which to obtain an inspection to determine the presence of dangerous levels of lead, radon, asbestos, or any other chemical.

17. NO BROKER

The Buyer and Seller represent and warrant to each other that each has not dealt with any broker or person entitled to a sales, brokerage or referral commission or fee ("commission") in connection with the purchase and sale of the premises. The Buyer and Seller agree to hold harmless and indemnify each other from and against any loss, cost, damage and expense, including attorneys' fees, incurred by either of them by reason of a breach of this representation and warranty or the assertion of a claim made by any person or entity not herein named. The provisions of this clause shall survive the delivery of the deed.

18. DEPOSIT

All deposits made hereunder shall be held by Seller and used for the renovation of the property to prepare to deliver to the seller.

19. WARRANTIES AND REPRESENTATIONS

The Buyer acknowledges that the Buyer has not been influenced to enter into this transaction and has not relied upon any warranties, representations or statements made by the Seller or any agent of the Seller not expressly set forth or incorporated in this agreement, except for the following, if any: **NONE.** Specifically the Buyer acknowledges that the Buyer has had ample opportunity to obtain at Buyer's cost and expense independent structural, home, insect or pest inspections (and well water and septic system inspections, if applicable) and has been afforded a reasonable period within which to obtain an inspection to determine the presence of dangerous levels of lead, radon, asbestos, or any other chemical.

The Buyer further acknowledges and agrees that it is the Buyer's sole responsibility to verify any information, facts, or assumptions that are essential or material to the Buyer's decision to purchase the premises. The Buyer shall not hold the Seller or any agent of Seller liable at law or in equity for any warranties, representations, statements or omissions by the Seller or any agent of the Seller not expressly set forth. The provisions of this clause shall survive the delivery of the deed

20. MORTGAGE CONTINGENCY CLAUSE N/A

In order to help finance the acquisition of said premises, the buyer shall receive an owner financed mortgage loan from the Seller

21. CONSTRUCTION OF AGREEMENT

This instrument, executed in multiple counterparts, is to be construed as a Massachusetts contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and enures to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Buyer. This agreement shall be interpreted without regard to any presumption or rule requiring construction against the party causing this agreement to be drafted. If a section of this agreement is deemed to be invalid, its invalidity shall not impinge on the validity of the remaining sections of this Agreement and they shall remain in full force and effect. If two or more persons are named herein as the Buyer their obligations hereunder shall be joint and several. The captions and marginal notes are used only as a matter of convenience and are not to be considered a part of this agreement or to be used in determining the intent of the parties to it. As used in this agreement, the word "clause" refers to the paragraphs that are within and follow a numbered caption. Where used in this agreement, or any rider or addendum, the word "Closing" shall refer to the time for performance specified in clause 8, as the same may be extended pursuant to the provisions hereof.

22. LEAD PAINT LAW N/A

The parties acknowledge that, under Massachusetts law, whenever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age. All related laws, rules and regulations and requirements governing the presence, removal and liability are referred to herein as "lead paint laws."Any building or structure constructed before 1978 may contain lead paint. The Buyer has the right under law to perform a lead paint inspection of the premises. The Buyer is directed to contact the Massachusetts Department of Public Health and seek advice from an attorney of the Buyer's choice for more information and a complete explanation of the Buyer's rights under law. The Buyer acknowledges that the Buyer has received and signed the Property Transfer Notification Certification and received all other notifications required by law with respect to the potential presence of lead paint on the premises. The Seller makes no statement, representation or warranty of any kind as to the presence of lead based paint or materials in any buildings or structures or on the land that comprise the "premises" being sold. The Buyer agrees that the Seller shall have no obligation to the Buyer to remove or cover any lead based paint or materials or otherwise deliver the premises in compliance with all such so-called lead paint laws. Following the delivery of the deed the Buyer agrees that Buyer shall (i) assume sole responsibility to comply with all such laws without recourse against the Seller at law or in equity, and (ii) indemnify, defend and hold the Seller harmless from any injury, loss, damage, liability, cost or expense incurred due to any claim by the Buyer or member of the Buyer's family or household against the Seller relating to the presence of lead based paint or materials in the. The provisions of this clause shall survive the delivery of the deed.

23. NOTICES

All notices given by either party to the other, pursuant to the terms of this agreement, shall be delivered in writing by hand, facsimile or email to the following contact info:

Seller: Trinity Estate Investments & Development LLC 108 Beacon St. Worcester, Ma. 01608
Email: revjoseicc@gmail.com

Owner: Jessica Reyes Lambert 6 Hancock St. Worcester, Ma. 01610
Email: jessica@worcfamiliesfeedingfamilies.org

24. BOUNDARIES, ENCROACHMENTS AND ACCESS

Without limitation of any other provisions of this Agreement, said Premises shall not be considered to be in compliance with the provisions of this Agreement with respect to title unless:

(a) All buildings, structures and improvements on the Premises, including, but not limited to, any driveway(s), garage(s), cesspool(s), well(s), septic system(s), leaching field(s), fence(s), shed(s) and all other improvements intended to be included in the sale and all means of access to and egress from the Premises shall be wholly within the lot lines of the Premises and shall not encroach upon, over or under any property not within such lot lines or property of any other person or entity, unless by recorded easement;

(b) No building, structure, improvement, including, but not limited to, any driveway(s), garage(s), cesspool(s), well(s), septic system(s), leaching field(s), fence(s), shed(s), way(s) or property of any kind encroaches upon, over or under the Premises from other premises, unless by recorded easement;

(c) The Premises abut and have vehicular and pedestrian access to a public way, duly laid out or accepted as such by the town or city in which the Premises are located and the Premises and all buildings and improvements thereon have unrestricted and unencumbered vehicular and pedestrian access to such public way;

(d) Title to the Premises is insurable, for the benefit of the BUYER, by a title insurance company reasonably acceptable to BUYER, in a fee owner's policy of title insurance, at normal premium rates, on the American Land Title Association

25. COURT ACTIONS

SELLER represents that there is no pending bankruptcy, mortgage foreclosure, litigation outstanding or threatened, any court actions, any court orders, any court decrees, any court issued injunctions, or any other legal proceeding which affects the Seller's ability to perform under this Agreement.

26. AUTOMATIC EXTENSIONS

In the event that the date for commitment, date for performance, or any other date whatsoever falls on a Saturday, Sunday or legal State or Federal holiday, as the case may be, said date shall be automatically extended to the following business day.

27. ADDITIONAL PROVISIONS

The initialed riders or addendums, if any, attached hereto, are incorporated herein by reference.
a. All municipal fees are at the Sellers expense.
b. Any and all utility expenses are buyer's expense
c. Seller to pay Closing Costs & legal fees in reference to delivery of title and deed upon closing of the owner financed mortgage agreement

**THIS IS A LEGAL DOCUMENT THAT CREATES BINDING OBLIGATIONS.**

Buyer:
**Jessica Reyes Lambert**

By: Jessica Reyes

Seller:
**Trinity Estate Investments & Development**

By: Jose Encarnacion
7 Lucian St. Worcester, Ma. 01603

# EXHIBIT H

# Worcester South District Registry of Deeds
# Electronically Recorded Document

This is the first page of the document – Do not remove

## Recording Information

| | |
|---|---|
| Document Number | : 14974 |
| Document Type | : DIS |
| Recorded Date | : February 26, 2025 |
| Recorded Time | : 09:48:15 AM |
| | |
| Recorded Book and Page | : 71675 / 232 |
| Number of Pages(including cover sheet) | : 2 |
| Receipt Number | : 1625274 |
| Recording Fee | : $105.00 |

Worcester South District Registry of Deeds
Kathryn A. Toomey, Register
90 Front St
Worcester, MA 01608
(508) 368-7000

**MASSACHUSETTS**
COUNTY OF **WORCESTER (SOUTH) (REC)**
LOAN NO.: 0677817298

WHEN RECORDED RETURN TO: FIRST AMERICAN MORTGAGE
SOLUTIONS
1795 INTERNATIONAL WAY
IDAHO FALLS, ID 83402
PH. 208-528-9895

# RELEASE OF MORTGAGE

The undersigned **NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING AS SERVICING AGENT FOR THE SUCCESSOR IN INTEREST TO OBX 2022-NQM9 TRUST**, located at **55 BEATTIE PLACE SUITE 110 MS#001, GREENVILLE, SC 29601**, the current Mortgagee of that certain Mortgage described below, does hereby release and reconvey, without recourse, representation or warranty, expressed or implied to the persons legally entitled thereto, all of its right, title, and interest in and to the real estate described in said Mortgage, forever satisfying, releasing, cancelling, and discharging the lien from said Mortgage.

Mortgage dated **JUNE 15, 2022**, executed by **TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**, Mortgagor, to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR PATCH LENDING, LLC, ITS SUCCESSORS AND ASSIGNS**, Original Mortgagee, and recorded on **JUNE 16, 2022** in Book 67761 at Page 5 as Instrument No. 2022 00065749 in the Office of the Register of Deeds for the County of **WORCESTER (SOUTH) (REC)**, State of **MASSACHUSETTS**.

PROPERTY ADDRESS: **4 HANCOCK STREET, WORCESTER, MA 01610**

LEGAL DESCRIPTION: **AS DESCRIBED IN SAID MORTGAGE REFERRED TO HEREIN**

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **FEBRUARY 24, 2025**.
**NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING AS SERVICING AGENT FOR THE SUCCESSOR IN INTEREST TO OBX 2022-NQM9 TRUST**

KIMBERLY S. SHAFER, VICE PRESIDENT

STATE OF IDAHO      COUNTY OF BONNEVILLE      ) ss.

On **FEBRUARY 24, 2025**, before me, **TRACY ALBERTSON**, personally appeared **KIMBERLY S. SHAFER** known to me to be the person whose name is signed on the preceding document and acknowledged to me that he/she signed it voluntarily for the stated purpose as the **VICE PRESIDENT** of **NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING AS SERVICING AGENT FOR THE SUCCESSOR IN INTEREST TO OBX 2022-NQM9 TRUST** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

TRACY ALBERTSON (COMMISSION EXP. 03/29/2025)
NOTARY PUBLIC

> TRACY ALBERTSON
> Notary Public - State of Idaho
> Commission Number 20190759
> My Commission Expires Mar 29, 2025

POD: 20250210
SH8070117IM - LR - MA                    Page 1 of 1                    MIN: 101655708389820228

MERS PHONE: 1-888-679-6377

ATTEST: WORC Kathryn A. Toomey, Register

# EXHIBIT I



# FRIEDMAN⬥VARTOLO

1325 Franklin Ave., Suite 160, Garden City, New York 11530
t: 212.471.5100 f:212.471.5150
friedmanvartolo.com

## NOTICE OF INTENT TO PURSUE FORECLOSURE AND DEFICIENCY AFTER FORECLOSURE OF MORTGAGE

September 25, 2025

Trinity Estate Investments & Development LLC
6 Hancock Street
Worcester, MA 01610

> RE:   Property Address: 6 Hancock Street, Worcester, MA 01610
> Loan No. 0677817272
> FV File No. 242180-7

Dear Trinity Estate Investments & Development LLC:

You are hereby notified, in accordance with the statute, of the intention of Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust, on or after November 3, 2025, to foreclose by sale under power of sale for breach of conditions therein, the mortgage held by it on the property situated at 6 Hancock Street, Worcester, MA 01610, said mortgage dated June 15, 2022, and recorded in the Worcester County Registry of Deeds in Book 67761, Page 5

Publication of the Notice of Sale will be published in the Worcester Telegram, commencing on October 13, 2025. A copy of the Notice of Sale is attached hereto, along with a copy of the promissory note and certification pursuant to 209 CMR 18.21A.(2).

This notice is also intended to notify you that you may be liable to Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust, for the whole or a part of the debt, in case of a deficiency in the proceeds of the foreclosure sale.

Sincerely,
Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust
By its attorney

Patrick Martin, Esq.

## NOTICE OF SALE

### NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

Premises: <u>6 Hancock Street, Worcester, MA 01610</u>

By virtue and in execution of the Power of Sale contained in a certain mortgage given by Trinity Estate Investments & Development LLC to Mortgage Electronic Registration Systems, Inc., as nominee for Patch Lending, LLC, dated June 15, 2022, and recorded with the Worcester County (Worcester District) Registry of Deeds in Book 67761 at Page 5, as affected by an assignment of mortgage from Mortgage Electronic Registration Systems, Inc., as nominee for Patch Lending, LLC to OBX 2022-NQM9 Trust C/O Wilmington Savings Fund Society, FSB, dated June 14, 2024, and recorded with said Registry in Book 70659 at Page 331, of which mortgage the undersigned is the present holder by assignment, for breach of the conditions of said mortgage and for the purpose of foreclosing the same will be sold by Public Auction at 12 o'clock PM on the 3rd day of November, 2025 at the mortgaged premises located at 6 Hancock Street, Worcester, MA 01610, Worcester County, Massachusetts, all and singular the premises described in said mortgage,

To wit:

A certain tract or parcel of land with the buildings thereon situated in Worcester, in the County of Worcester, Massachusetts on the southerly side of Hancock Street bounded and described as follows:

BEGINNING at a point on the southerly line of said Hancock Street, two hundred and fifty six (256) feet easterly from the easterly line of Main Street at a corner of land conveyed by Lyman Drury to George W. Brady by deed dated May 12, I 879, and recorded in the Worcester District Registry of Deeds, Book 1055, Page 31;

THENCE southwesterly by land now or formerly of said Brady and measuring ninety-five (95) feet more or less to land now or formerly of one Alton;

THENCE northwesterly by land formerly of Alton to a point in a line drawn through the center of the partition wall of the double house upon the lot hereby conveyed and the lot adjoining it on the west and produced to the line of land now or formerly of said Alton, and being the point where said line so produced meets the bounds of said land now or formerly of said Alton;

THENCE northeasterly by said last named line through the center of the partition wall of said double house produced to the southerly line said Hancock Street;

THENCE southeasterly by the southerly line of said Hancock Street to the point of beginning, or however otherwise said premises may be bounded, measured or described

Said premises are conveyed subject to and with the benefit of easements and restrictions of record, if any, insofar as the same may now be in force and applicable.

Firm File No. 242180-7

Premises to be sold and conveyed subject to and with the benefit of all rights, rights of way, restrictions, easements, covenants, liens or claims in the nature of liens, improvements, public assessments, any and all unpaid taxes, tax titles, tax liens, water and sewer liens and any other municipal assessments or liens or existing encumbrances of record which are in force and are applicable, having priority over said mortgage, whether or not reference to such restrictions, easements, improvements, liens or encumbrances is made in the deed.

TERMS OF SALE: A deposit of Ten Thousand Dollars ($10,000.00) by certified or bank check will be required to be paid by the purchaser at the time and place of sale. High bidder to sign written memorandum of sale upon acceptance of the high bid. The balance of the purchase price is to be paid by certified or bank check at Friedman Vartolo LLP, 1325 Franklin Avenue, Suite 160, Garden City, New York 11530 within thirty (30) days from the date of the sale. Deed will be provided to purchaser for recording upon receipt in full of the purchase price. In the event of an error in this publication, the description of the premises contained in said mortgage shall control.
Other terms, if any, to be announced at the sale.

Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust
Present holder of said mortgage
By its Attorneys,
Friedman Vartolo LLP
1325 Franklin Ave, Suite 160
Garden City, NY 11530

Firm File No. 242180-7

solely as Owner Trustee of OBX 2022-NQM9 Trust. When the foreclosure was started, Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust was the holder of the note and had been assigned the mortgage.

b. The current owner of the note is: Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust
A copy of the note, including any indorsements and/or allonges, if any, is attached to this certification as Exhibit A.

c. Pursuant to my review of Shellpoint Mortgage Servicing's business records, the information contained in the records of the Worcester County Registry of Deeds and the title search information described above, the full name of the current holder of the mortgage is Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust.

6. Pursuant to my review of the relevant business records and/or the records of the county recorder where the subject property is located and/or the title report, the following is the (i) date, (ii) assignor, and (III) assignee of each recorded assignment of the subject mortgage, if any, from the date the subject mortgage was first recorded:

| Recorded Date | Name of Assignor | Name of Assignee |
|---|---|---|
| June 21, 2024 | Mortgage Electronic Registration Systems, INC(MERS) | OBX 2022-NQM9 Trust C/O Wilmington Saving Funds Society, FSB |
| | | |
| | | |

NewRez LLC d/b/a Shellpoint Mortgage Servicing, as attorney-in-fact for, Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 Trust

By: _____

Name: Adrian Echeverria

Title: Document Verification Specialist

Date: 08/29/25

{30335407;1}

3

MA 209 CMR 18.24(2)(c)

P/ATTY   Book: DE 2723 Page: 2870 - 2873          4 Pgs
June 28, 2024  11:00:45 AM
Rec: $25.00
E-FILED IN GREENVILLE COUNTY, SC          2024037647

PREPARED BY, RECORDING
REQUESTED BY & AFTER
RECORDING RETURN TO:
NewRez LLC
d/b/a Shellpoint Mortgage Servicing
Attn: Jennifer Korn
75 Beattie Place, Suite 300
Greenville, SC 29601

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee of OBX 2022-NQM9 TRUST, formed and existing under the laws of the State of Delaware and having its principal place of business at c/o Wilmington Savings Fund Society, 500 Delaware Avenue, 11th Floor, Wilmington, Delaware, 19801, Attention: Corporate Trust Administration – OBX 2022-NQM9 Trust, as Owner ("Owner") pursuant to the Servicing Agreement between Owner and NewRez LLC d/b/a Shellpoint Mortgage Servicing, having an office at 75 Beattie Place, Suite 300, Greenville, South Carolina 29601, dated as of December 8, 2022 (as amended, supplemented or restated from time to time, the "Agreement"), hereby constitutes and appoints NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Servicer") , by and through the Servicer's authorized officers, as the Owner's true and lawful attorney-in-fact (the "Attorney-in-Fact"), in Owner's name, place and stead and for the Owner's benefit, in connection with all mortgage loans and REO properties subject to the terms of the Agreement for the purpose of performing the acts and executing the documents described herein in the name of the Owner as may be customarily and reasonably necessary and appropriate in respect of any of the mortgages, deeds of trust, deeds to secure debt, and other forms of security instruments (the "Security Instruments") and promissory notes secured thereby (the "Mortgage Notes") for which the undersigned is the Owner (whether the undersigned is named therein as mortgagee or beneficiary or has become mortgagee by virtue of endorsement of the Mortgage Note secured by any such Security Instrument) and for which the Servicer is performing servicing activities all subject to the terms of the Agreement.

This appointment shall apply only to the following enumerated transactions with respect to the Security Instruments, Mortgage Notes, and related real property:

1.      To execute, acknowledge, seal and deliver any and all documents, deeds, transfers, tax declarations, certificates, assignments, allonges, modifications, affidavits, subordinations, endorsements, short sales, and any other documents or instruments whatsoever which are necessary, appropriate, or required to transfer, sell, or convey real property, to correct or clear title to the related real property, and to negotiate, approve and accept funds for the short sales of real property.

2.      To initiate and take such actions, and to execute, acknowledge, seal and deliver any and all documents or instruments whatsoever, which are necessary, appropriate, or required, in connection with the foreclosure or acceptance of a deed in lieu of foreclosure (including without limitation the completion of judicial or non-judicial foreclosure or the termination, cancellation or

Savings Fund Society, FSB but is made and intended for the purpose of binding only the Issuer, (c) nothing in the Agreement or herein contained shall be construed as creating any liability on Wilmington Savings Fund Society, FSB, individually or personally, to perform any covenant, either expressed or implied, contained in the Agreement or herein of the Owner Trustee of the Issuer, all such liability, if any, being expressly waived by the Attorney-in-Fact and any person relying on this Limited Power of Attorney and by any person claiming by, through or under the Attorney-in-Fact or such person, (d) Wilmington Savings Fund Society, FSB in its individual capacity has not made and will not make any investigation as to the accuracy or completeness of any representations and warranties made in the Agreement or herein, (e) under no circumstances shall Wilmington Savings Fund Society, FSB be personally liable for the payment of any indebtedness, indemnities or expenses of the Owner Trustee or Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Owner Trustee or Issuer under the Agreement, this Limited Power of Attorney or any other related documents as to all of which recourse shall be had solely to the assets of the Trust Estate, and (f) Wilmington Savings Fund Society, FSB shall have the rights, indemnities, privileges and immunities hereunder as are set forth in the Trust Agreement.

Notwithstanding anything herein to the contrary, this Limited Power of Attorney does not, and is not intended to, and will not be construed to, grant any authority to the Attorney-in-Fact to (i) expand, increase, incur, or otherwise impose any duties, liabilities or obligations of or on the Owner Trustee, as trustee or in its individual capacity, or (ii) provide any guaranty, indemnity or property of the Owner Trustee, as trustee or in its individual capacity, for any reason whatsoever.

*[Remainder of this page intentionally left blank.]*

Limited Power of Attorney – Page 3                                    Shellpoint

After Recording Return To:

Patch Lending, LLC
15000 Ventura Blvd. #300
Sherman Oaks, CA 91403
Attention: Closing Department



Bk: 67760 Pg: 370
Page: 1 of 80  06/16/2022 01:33 PM  WD

_____ [Space Above This Line For Recording Data] _____

## MORTGAGE MIN: 101655708394920229

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in other sections of this Security Instrument.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated June 15, 2022, together with all Riders to this document.

(B)    "Borrower" is TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC, a Massachusetts Limited Liability Company.  Borrower is the mortgagor under this Security Instrument.

(C)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)    "Lender" is Patch Lending, LLC.  Lender is a Limited Liability Company organized and existing under the laws of Delaware.  Lender's address is 15000 Ventura Blvd. #300, Sherman Oaks, CA 91403.  Lender is the mortgagee under this Security Instrument.

(E)    "Note" means the promissory note signed by Borrower and dated June 15, 2022.  The Note states that Borrower owes Lender One Hundred Sixty Two Thousand and 00/100 Dollars (U.S. $162,000.00) (the "Initial Principal Amount") plus interest and other amounts secured by this Security Instrument.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2052.

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 1 of 22 pages)*

which currently has the address of **6 Hancock Street, Worcester, MA, 01610** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.

Without limitation, the property shall include the following items now or hereafter attached to the Property to the extent they are fixtures: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, including replacements and additions thereto.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. Dollars by auto-debited Automated Clearing House (ACH) payment in accordance with the written instructions provided by Lender to Borrower from time to time, unless a different payment method is approved in writing by Lender.

Payments are deemed received by Lender when cleared funds are irrevocably delivered to Lender's account or if payment by check or money order is approved in writing by Lender, when such check or money order is received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                    *(page 3 of 22 pages)*

14-3

Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount sufficient to permit Lender to apply the Funds to the payment of Escrow Items. The amount of Funds Lender may collect in any calendar month shall not exceed an amount sufficient to pay all applicable Escrow Items by the 30th day prior to the date such Escrow Items become due, assuming equal subsequent monthly collections of Funds. If at any time Lender determines that the Funds will not be sufficient to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a deficiency exists and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to make up the deficiency. If at any time Lender determines that the Funds held by Lender plus subsequent monthly collections of Funds will exceed the amount necessary to pay Escrow Items as aforesaid, Lender shall notify Borrower in writing that a surplus exists (or will occur) and adjust the amount of Funds collected to an amount that Lender estimates is sufficient to eliminate the surplus. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in a banking institution selected by Lender. Lender shall apply the Funds to pay Escrow Items prior to the date any Escrow Items become delinquent. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for property taxes not yet due and payable) unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement or (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded. If Lender determines that any part of the Property is subject to a lien that attaches to the Property after the date hereof or that was not disclosed in Lender's title insurance policy for the Loan (other than a lien for

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 5 of 22 pages)*

All insurance policies and renewals of insurance policies required by the Loan Documents shall be (i) in the form and with the terms required by Lender; (ii) in such amounts, with such maximum deductibles and for such periods required by Lender; and (iii) issued by insurance companies satisfactory to Lender. Borrower acknowledges that Lender's insurance requirements may change from time to time.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Lender shall determine whether insurance proceeds shall be applied (i) to restoration or repair of the Property or (ii) to the sums secured by this Security Instrument. If Lender determines to apply insurance proceeds to the restoration or repair of the Property, then during such restoration or repair. Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If Lender determines to apply insurance proceeds to the sums secured by this Security Instrument, such insurance proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Operation of the Property.** Borrower at all times shall continuously (i) engage in the businesses of ownership, leasing, maintenance, management and operation of the Property, (ii)

representation or warranty made by Borrower or any Guarantor in any Loan Document is false, incorrect or misleading in any material respect. Material representations include, but are not limited to, representations concerning the operation of the Property as a rental property and the occupancy of the Property by Prohibited Persons.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien on the Property; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920



Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. If Lender determines to apply Miscellaneous Proceeds to the sums secured by this Security Instrument, such Miscellaneous Proceeds shall be applied to such sums in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, in such order and priority as determined by Lender, whether or not the sums are then due, with the excess, if any, paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

For purposes of determining the fair market value of the Property pursuant this Section 11, value shall be given only to "real property, permanent structures and the components of permanent structures" within the meaning of Treas. Reg. § 1.856-3(d) and no value shall be given to any other property no matter how labeled under local law.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in

mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any direct or indirect legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any direct or indirect Interest in the Property is sold or transferred (or if Borrower is not a natural person and a direct or indirect beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. No Right to Reinstate.** Borrower hereby waives any and all rights of reinstatement to the fullest extent permitted by Applicable Law.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer and the address to which payments should be made. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer

Loan Documents. To the extent permitted by Applicable Law, Borrower hereby waives presentment, demand, protest or notice of any kind whatsoever. The Loan shall be accelerated and shall become immediately due and payable automatically upon the occurrence of any default described in clause (e) of Section 26.

Without limiting the generality of the foregoing, upon and at all times following the occurrence of any default under the Loan Documents Lender shall have all rights and remedies available to it pursuant to the Loan Documents, and pursuant to Applicable Law, and Lender may take any action that Lender elects to protect and enforce its rights against Borrower or any Guarantor and in and to the Property and other collateral for the Loan, including but not limited to the following actions (in each case, to the extent permitted by Applicable Law): (a) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any Applicable Law, in which case the Property, or any interest therein, may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner as Lender shall elect in its sole discretion; (b) institute proceedings for the partial foreclosure of this Security Instrument for the portion of the debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the debt, unimpaired and without loss of priority; (c) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (d) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (e) exercise any or all of Lender's rights and remedies under Section 28 and (f) apply any Funds or other amounts then deposited or held in escrow or otherwise by or on behalf of Lender pursuant to this Security Instrument or any other Loan Document to the payment of the principal, interest and other amounts due and payable in any order determined by Lender in its sole discretion.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Each of the rights, powers and remedies of Lender under the Loan Documents and Applicable Law and at equity shall be cumulative and not exclusive of any other such right, power or remedy. Lender's rights, powers and remedies may be pursued independently, singly, successively, together or otherwise, at such times and from time to time and as often and in such order as Lender may determine, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting any of the other such rights, powers and remedies of Lender. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

therein that is not an Eligible Lease. Borrower shall not grant to any tenant an option or other right to purchase an Interest in the Property, whether in the lease or another document or instrument.

(e)   **Tenants.** Each Eligible Lease for the Property, or a rental unit therein, is with a bona fide third-party lessee who satisfies each of the following criteria (an "**Eligible Tenant**"): (i) Borrower has verified, based on bona fide written documentation, that the tenant has sufficient financial resources to satisfy its obligations under such lease, (ii) the tenant is not subject to an ongoing bankruptcy or other insolvency proceeding as such date of initial screening of the tenant prior to its execution of the lease (or if not so initially screened, as of the date hereof) and (iii) the tenant is not a Prohibited Person. No person or entity (other than Borrower) has any possessory interest in the Property or any rental unit therein or right to occupy the same except for Eligible Tenants under and pursuant to Eligible Leases. Borrower shall not enter into any lease (including any renewal or extension of any existing lease) for the Property or a rental unit therein or permit the occupancy of the Property or any unit therein by any person or entity that is not an Eligible Tenant.

(f)   **Security Deposits.** Borrower maintains or causes to be maintained and shall continue to maintain or cause to be maintained security deposits for the Property in accordance with Applicable Law in all material respects. Upon Lender's written request during a default or upon any foreclosure of the Property or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Loan; provided, that to the extent any security deposits are forfeited by the applicable tenant pursuant to the terms of the applicable lease, Lender may apply such amounts against Borrower's obligations under the Loan Documents.

(g)   **Property Taxes, Insurance, Etc.** Borrower is not delinquent and shall remain, at all times, current in the payment of any taxes, assessments, charges, fines, impositions, Community Association Dues, Fees, and Assessments or insurance premiums attributable to the Property.

(h)   **Utilities and Public Access.** The Property has, and Borrower shall take all steps necessary to ensure that the Property continues to have rights of access to public ways and is served by electricity, water, sewer or septic system and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property, and all roads necessary for the use of the Property for its intended purposes have been completed and dedicated to public use and accepted by the applicable governmental authorities.

(i)   **Ownership.** Borrower owns fee simple title to the Property and the Property is not subject to any ground lease. Borrower has not granted to any person any option or other right to purchase an Interest in the Property.

(j)   **Litigation.** Except as disclosed in writing to Lender, there are no orders, injunctions, decrees, judgments, actions, suits or proceedings (including proceedings regarding fair housing, anti-discrimination, or equal opportunity) at law or in equity by or before any court or other governmental authority pending or, to Borrower's knowledge, threatened, against or affecting Borrower, any Guarantor or the Property. All information with respect to the same that has been provided to Lender by Borrower is true and complete in all material respects.

(k)   **Bankruptcy.** Neither Borrower nor any Guarantor is (i) the subject of or a party to any pending bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation; (ii) preparing or intending to be the subject of any such proceeding or

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920                                                                          *(page 17 of 22 pages)*

(b)      any failure by Borrower or any Guarantor to pay when due any amount (other than as set forth in the foregoing clause (a)) required to be paid by it under any Loan Document and such failure shall continue for fifteen (15) days;

(c)      if Borrower or any Guarantor fails to perform any of its non-monetary obligations under any Loan Document and such failure shall continue for thirty (30) days;

(d)      any failure by Borrower to maintain the insurance coverage required by Lender;

(e)      if any proceeding for bankruptcy, reorganization, receivership or other insolvency proceeding or any dissolution or liquidation shall commence with respect to Borrower or any Guarantor;

(f)      if any Loan Document or any lien granted thereunder shall (except in accordance with its terms or pursuant to Lender's written consent), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the parties thereto;

(g)      the commencement of a forfeiture action or other similar proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's interest in, or the value or operation of, the Property; or

(h)      if Borrower or any of its affiliates breaches or defaults under any note, instrument or agreement relating to a loan owned by Note Holder, then such breach or default shall be a default under the Loan Documents.

27. **Debt Secured.**  The debt secured by this Security Instrument shall include the entire unpaid principal amount of the Note plus (a) accrued but unpaid interest at the rate specified in the Note, including interest charged at the Default Rate specified in the Note, (b) any additional advances made by Lender to protect or preserve the Property or the lien or security interest created hereby on the Property including, but not limited to, payments on prior liens and repairs to the Property, (c) late charges, (d) prepayment fees and premiums, (e) taxes, charges or assessments which may be imposed upon the Property, (f) premiums on insurance policies covering the Property, (g) costs, fees and expenses incurred in enforcing the lien of this Security Instrument or the performance of Borrower's obligations hereunder or under the other Loan Documents, including, but not limited to, the expenses of any litigation to prosecute or defend the rights and liens created by this Security Instrument or any of Borrower's obligations hereunder or under the other Loan Documents, all fees and expenses incurred in connection with the foreclosure of this Security Instrument, the cost of taking control of and managing the Property and collecting the Rents, including amounts described in Section 22, (h) any amount, costs or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, (i) interest at the Default Rate specified in the Note on any judgment obtained by Lender and (j) all other amounts due from Borrower under this Security Instrument, the Note or any other Loan Document.

28.      **Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)      **Collateral Assignment of Leases.**  In addition to the Property described in the grant of security above, the following items are added to the Property description, and shall also constitute the Property covered by this Security Instrument: all leases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any person or entity is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every modification, amendment or other agreement relating to such leases or other

SLP SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

*(page 19 of 22 pages)*

Borrower as trustee for the benefit of Lender only, and Borrower shall deliver all such rents to Lender within five (5) days of receipt thereof for application to the sums secured by this Security Instrument and (ii) Lender shall be entitled to contact each Tenant of the Property and demand payment of, collect and receive all of the Rents of the Property. Lender, Lender's agents or any receiver, trustee, liquidator or conservator of the Property shall be liable to account for only those Rents actually received.

(e)     **Lender Expenses.** If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any unreimbursed funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(f)     **No Prior Assignment.** Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this Section 28.

(g)     **Possession, Control and Maintenance of the Property.** To the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, to the extent permitted by Applicable Law, Lender, or Lender's agents or a judicially appointed receiver, trustee, liquidator or conservator may do so at any time after a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by this Security Instrument are paid in full.

(h)     **Application of Amounts Collected.** Lender or a judicially appointed receiver, trustee, liquidator or conservator may apply Rents and all other amounts collected with respect to the Property, including amounts collected in connection with the exercise of remedies pursuant to Section 22, to the payment of principal, interest and other amounts due under the Loan Documents as provided in Section 2.

**29. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of courtesy and dower in the Property.

[Signature Page Follows]

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of  Massachusetts

County of  Worcester                )

On  June 15, 2022  before me,  Jaclyn Packard                , personally appeared
  Anizael Jiminez-Morales                    , who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of  MA         that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____ (Seal)

JACLYN S. PACKARD
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires Mar. 16, 2023

SLF SECURITY INSTRUMENT – MASSACHUSETTS
WD0920

(page 23 of 22 pages)

## SFR ENTITY BORROWER RIDER

This Entity Borrower Rider (this "Entity Rider") is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed by the undersigned (the "Borrower") in favor of Patch Lending, LLC, ("Lender") dated the same date as the date hereof (the "Security Instrument") relating to the propert(ies) located at the address(es) set forth on the signature page hereto (the "Property"). This Entity Rider, together with the Security Instrument and the related the Note and all other riders, certificates and ancillary documents given by Borrower in connection with the Loan and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

1. Representations and Warranties. Borrower represents and warrants to Lender as follows:

(a) Organization. Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is organized and the state in which the Property is located.

(b) Authority. Borrower has all necessary power and authority to (i) own the Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under the Loan Documents and (ii) to execute, deliver and perform its obligations under the Loan Documents to which it is a party. The execution, delivery and performance of the Loan Documents by Borrower will not contravene or conflict with Borrower's organizational documents.

(c) Consents. Any consent, approval, authorization, order, registration or qualification of or with any governmental authority or other person or entity that is required for the execution, delivery and performance of the Loan Documents by Borrower has been obtained and is in full force and effect.

(d) Enforceability. The Loan Documents to which Borrower is a party have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e) Certain Regulatory Matters. Borrower and each Person who owns a 10% or greater direct or indirect beneficial interest in Borrower (each, a "Relevant Party") is in compliance in all material respects with the following (the "Regulatory Requirements"): (i) all applicable United States and other export control laws, including those administered by the United States Department of Commerce and the United States Department of State, (ii) all applicable United States and other laws relating to unsanctioned foreign boycotts; and (iii) all applicable United States and other economic sanctions, anti-terrorism, anti-money laundering and related measures, including those administered by the United States Department of the Treasury, the United States Department of Commerce and the United States Department of State and including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws. In addition, no Relevant Party is a person or entity owned or controlled by, or acting for or on behalf of, countries targeted by the United States Department of the Treasury under economic sanctions, or a person or entity designated by the United States Department of the Treasury under sanctions programs that are not country-specific, or otherwise a blocked person identified as such by the United States Department of the Treasury or by officials operating other economic sanctions. Each Relevant Party has obtained all United States and other government approvals, permits or licenses that are required under the Regulatory Requirements to fulfill any of their respective pending commitments or obligations.

2. Covenants. Borrower covenants to Lender as follows:

(a) Preservation of Entity Existence. Borrower shall (i) comply with its organizational documents, (ii) maintain its existence, rights, franchises and privileges in its state of organization, (iii) qualify and remain in good standing in each other jurisdiction where the same is required under applicable law and (iv) not engage in or consent to any dissolution, liquidation or consolidation or merger with or into any other entity or otherwise terminate its existence.

(b) Regulatory Requirements. Borrower shall comply in all material respects with all Regulatory Requirements.

SLP SFR Entity Rider
WD0920

19

BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained this Entity Rider.

**Borrower:**
**TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC**
a(n) Massachusetts Limited Liability Company

By: _____

Name: Anizael Jimenez-Morales

Title: Member

Date: _06/15_____, 20_22_

Property Address:

6 Hancock Street, Worcester, MA 01610

Borrower's Notice Address:

_____

_____

_____

Email: _____

SLP SFR Entity Rider
WD0920

21

**MASSACHUSETTS**
COUNTY OF WORCESTER (SOUTH) (REC)
LOAN NO.: 0677817272

WHEN RECORDED MAIL TO: FIRST AMERICAN MORTGAGE
SOLUTIONS
1795 INTERNATIONAL WAY
IDAHO FALLS, ID 83402
PH. 208-528-9895

# ASSIGNMENT OF REAL ESTATE MORTGAGE

FOR VALUE RECEIVED, receipt of which is hereby acknowledged, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR PATCH LENDING, LLC, ITS SUCCESSORS AND ASSIGNS, located at P.O. BOX 2026, FLINT, MICHIGAN 48501-2026, Assignor, does hereby assign, transfer, set over, grant, and convey unto OBX 2022-NQM9 TRUST C/O WILMINGTON SAVINGS FUND SOCIETY, FSB, located at 500 DELAWARE AVE. 11TH FLOOR, WILMINGTON, DE 19801, Assignee, its successors and assigns forever, that certain Mortgage described below. Said Mortgage dated JUNE 15, 2022, executed by TRINITY ESTATE INVESTMENTS & DEVELOPMENT LLC, A MASSACHUSETTS LIMITED LIABILITY COMPANY, Mortgagor, to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR PATCH LENDING, LLC, ITS SUCCESSORS AND ASSIGNS, Original Mortgagee, and recorded on JUNE 16, 2022 in Mortgage Book 67760 at Page 370 as Document No. 2022 00065746 in the Office of the Register of Deeds for the County of WORCESTER (SOUTH) (REC), State of MASSACHUSETTS.
Property Address: 6 HANCOCK STREET, WORCESTER, MA 01610
TOGETHER with all rights accrued or to accrue under said Mortgage.
IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed on **JUN 1 4 2024**.
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR PATCH LENDING, LLC, ITS SUCCESSORS AND ASSIGNS

TIFFANY LEE KLIMKOWSKI, VICE
PRESIDENT

STATE OF SOUTH CAROLINA COUNTY OF GREENVILLE, ) ss.
On **JUN 1 4 2024**, before me, **Jennifer Korn** personally appeared TIFFANY LEE KLIMKOWSKI known to me to be the person whose name is signed on the preceding document and acknowledged to me that he/she signed it voluntarily for the stated purpose as the VICE PRESIDENT of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS MORTGAGEE, AS NOMINEE FOR PATCH LENDING, LLC, ITS SUCCESSORS AND ASSIGNS the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

Jennifer Korn (COMMISSION EXP.
NOTARY PUBLIC                    **JUN 1 3 2029**

> JENNIFER KORN
> Notary Public, State of South Carolina
> My Commission Expires 06/13/2029

SH80701171M - AM - MA                    Page 1 of 1

MIN: 101655708394920229

MERS PHONE: 1-888-679-6377

ATTEST: WORC Kathryn A. Toomey, Register

1. **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay the Principal Amount, plus interest, to the order of the Lender. I agree to make all payments under this Note by auto-debited Automated Clearing House (ACH) payment in accordance with the written instructions provided by Lender to me from time to time, unless a different payment method is approved in writing by Lender.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. **INTEREST**

Interest will be charged on unpaid principal until the full Principal Amount has been paid. I will pay interest at the Interest Rate.

For so long as any default under this Note, the Security Instrument (as defined below) or any related document (collectively, the "Loan Documents") is continuing, the outstanding principal balance of this Note, interest due and payable and any other amounts due and payable under the Loan Documents, will accrue interest at a rate per annum equal to the lesser of (a) thirteen percent (13%) above the interest rate otherwise provided for in this Note and (b) the maximum rate permitted by law (the "Default Rate"). I will pay interest at the foregoing default rate immediately upon demand, which demand may be made as frequently as the Note Holder determines. Interest at the Default Rate will be payable in addition to the late charge described in Section 6(A) of this Note.

Interest at the rates provided for in this Note will be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed during the period for which interest is calculated. I acknowledge and agree that the calculation of interest on the basis described in the immediately preceding sentence will result in the accrual and payment of interest in amounts greater than those that would be payable if interest were calculated on the basis of a three hundred sixty-five (365) day year.

Solely for the purpose of computing interest, a monthly payment received by the Note Holder within thirty (30) days prior to the date it is due will be deemed to be paid on such due date. All other payments received by the Note Holder will be applied as of the date the payment is received by the Note Holder.

3. **PAYMENTS**

(A) **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the Monthly Payment Date beginning on the Initial Payment Date. I will make these payments every month until I have paid all of the principal and interest and any other charges that I may owe under this Note and the other Loan Documents. Each monthly payment will be applied to interest, principal and other amounts due under the Loan Documents as provided in the Security Instrument. If, on the Maturity Date, I still owe amounts under this Note and the other Loan Documents, I will pay those amounts in full on that date.

I will make my monthly payments at the Address for Payments or at a different place if required by the Note Holder.

(B) **Amount of My Monthly Payments**

My monthly payment will be in the Monthly Payment Amount.

(C) **Escrow Items**

In addition to the payment of principal and interest described above, each month until this Note is paid in full, I will make escrow payments for taxes, assessments, insurance and other items as described in the Security Instrument.

4. **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal before it is due is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

The Note Holder will apply my Prepayments as provided in the Security Instrument. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

On the date on which a Prepayment, voluntary or mandatory, is made (including any amounts collected by the Note Holder after the acceleration of the loan), I will pay to the Note Holder (a) the accrued and unpaid interest on the amount of principal being prepaid through and including the date of such Prepayment and (b) any applicable Prepayment Premium (as defined below). Notwithstanding the foregoing, no Prepayment Premium will be payable on a Prepayment that is required to be made as a result of a casualty to or the taking by eminent domain of the Property or as set forth in Section 5 of this Note. The "Prepayment Premium" on any Prepayment in full of the Note will be an amount equal to the applicable Prepayment Premium Percentage multiplied by the outstanding principal balance of the Note immediately prior to the Prepayment. The "Prepayment Premium" on

## 11. INDEMNIFIED TAXES

Any payments by or on account of any of my obligations under any Loan Document will be made without deduction or withholding for any tax; provided, however, that if any law requires deduction or withholding of a tax, such tax shall be deducted and withheld from such payment and paid to the relevant governmental authority in accordance with applicable law and the amount payable shall be increased so that after such deduction or withholding (including deductions or withholdings applicable to additional amounts payable under the Loan Documents) the Note Holder receives an amount equal to the sum it would have received had no such deduction or withholding been made; provided, further, that such additional amounts shall not include any taxes measured by net income (however denominated) or franchise taxes imposed on the Note Holder. I will promptly indemnify the Note Holder for all such non-excluded taxes (including interest and additions to tax) and related expenses. I will promptly deliver evidence satisfactory to the Note Holder of any payments made pursuant to this Section 11. I will also pay all documentary, recording, filing or similar taxes that arise with respect to the Security Instrument.

## 12. REDUCTION OF PRINCIPAL

In the event this Note is secured by more than one property and Borrower is not in Default or an Event of Default has not occurred under any of the Loan Documents, Borrower may, from time to time, request that Lender approve, in its sole and absolute discretion, the sale of one or more such properties referenced herein. Prior to the final payoff of the Loan, the payoff amount owed to Lender at the closing of any approved property sale shall, in no circumstance, be less than 120% of the day-one LTV multiplied by the appraised value as of the date of funding, based on Lender's prior determination of the appraised value ("Minimum Payoff Amount"), plus any additional outstanding interest, costs and fees. Prior to the final payoff of the Loan, upon the sale or refinance of one or more of the properties, and no later the twenty-four (24) hours after closing or completion of such sale or refinance, the Borrower shall pay or cause to be paid, and Lender shall receive, a Minimum Payoff Amount in accordance with the following chart:

| Property Address | Minimum Payoff Amount |
|---|---|
| 6 Hancock Street, Worcester, MA, 01610 | |

**REMIC Savings Clause.** Notwithstanding anything to the contrary in this Agreement, if the Loan is held by a "real estate investment conduit" (a "REMIC") within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended (the "Code"), and following the release of any Real Property Collateral the ratio of the value of the Real Property Collateral securing the loan is greater than 125% (based solely on the value of the real property and excluding personal property or going concern value, if any, as determined by Lender in its sole discretion, using any commercially reasonable method permitted to a REMIC under the Code) to the outstanding principal balance of the Loan (such amount, the "REMIC LTV"), then Borrower shall pay down the principal balance of the Loan by an amount equal to the greater of (A) the amount of principal required to be paid pursuant to this Section and (B) the least of the following amounts: (1) if the released Real Property Collateral is sold in an arm's length transaction with an unrelated third party, the net proceeds of such sale; (2) the fair market value of the released Real Property Collateral at the time of the release, as determined by Lender in its sole discretion using any commercially reasonable method permitted to a REMIC under the Code; and (3) an amount such that the REMIC LTV does not increase due to the release.



# EXHIBIT J

25CV022422-400

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

JACQUELINE BATAMULIZA and
CHARLOTTE FURAHA,

        Plaintiffs,

v.

JOSE A. ENCARNACION and TRINITY
REAL ESTATE DEVELOPMENT, LLC,
d/b/a TRINITY REAL ESTATE
INVESTMENT GROUP, LLC,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

COMPLAINT

NOW COMES, the Plaintiffs, Jacqueline Batamuliza and Charlotte Furaha, collectively, by and through their undersigned counsel, complaining of the Defendants, and does allege, aver, and says as follows:

1. Plaintiff Jacqueline Batamuliza (hereinafter "Plaintiff Batamuliza" or "Plaintiff") is a citizen and resident of Guilford County, North Carolina, and has been for at least six (6) months preceding the institution of this action.

2. Plaintiff Charlotte Furaha (hereinafter "Plaintiff Furaha" or "Plaintiff") is a citizen and resident of Guilford County, North Carolina, and has been for at least six (6) months preceding the institution of this action.

3. Upon information and belief, Defendant Trinity Real Estate Development, LLC d/b/a Trinity Real Estate Investment Group, LLC (hereinafter "Defendant Trinity Real Estate") is limited liability company and/or other business entity, organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 3 Blithewood Avenue, Apartment 901, Worcester, Massachusetts 01604 and, upon information and belief, at all times relevant hereto owned, operated, managed, controlled, and maintained the Property.

4. Upon information and belief, Defendant Jose A. Encarnacion (hereinafter "Defendant Encarnacion") is a citizen and resident of Worcester County, Massachusetts, and has been for more than six (6) months preceding the institution of this action.

Page 1 of 17

5. Upon information and belief, Defendant Encarnacion is the sole member of Trinity Real Estate Development, LLC d/b/a Trinity Real Estate Investment Group, LLC.

6. Upon information and belief, Trinity Real Estate Development, LLC d/b/a Trinity Real Estate Investment Group, LLC is a mere instrumentality of Jose A. Encarnacion who is its sole member.

7. At all times relevant hereto, Defendants collectively and/or individually, jointly and severally, owned, operated, managed, controlled and maintained the investment Properties.

8. At all times relevant hereto, Defendants acted by and through their respective employees, agents, and workers acting within the course and/or scope of their employment or agency.

9. On or about June 28, 2023, Plaintiff Batamuliza entered into an Investment Verification Contract (hereinafter the "Batamuliza Contract") with Jose A. Encarnacion, with the Trinity Real Estate Development, LLC, d/b/a and with the Trinity Real Estate Investment Group, LLC letterhead, verifying Plaintiff Batamuliza invested a total of one hundred thousand dollars and zero cents ($100,000.00). Such "investment" would be returned to Plaintiff Batamuliza with a fifty-five percent (55%) "interest increase." The total return to Plaintiff Batamuliza would be one hundred and fifty-five thousand dollars and zero cents ($155,000.00). A true and correct copy of Plaintiff Batamuliza's Investment Verification Contract is attached hereto as **Exhibit "A"** and fully incorporated herein.

10. Per Plaintiff Batamuliza's Contract, the funds would be available to Plaintiff on December 28, 2024.

11. On or about September 18, 2023, Plaintiff Furaha entered into an Investment Verification Contract (hereinafter the "Furaha Contract") with Jose A. Encarnacion, with the Trinity Real Estate Development, LLC, d/b/a and with the Trinity Real Estate Investment Group, LLC letterhead, verifying Plaintiff Furaha invested a total of one hundred and five thousand and thirty dollars and zero cents ($105,030.00). Such "investment" would be returned to Plaintiff Furaha with a sixty percent (60%) "interest increase." The total return to Plaintiff Furaha would be one hundred and sixty-eight thousand and forty-eight dollars and zero cents ($168,048.00). A true and correct copy of Plaintiff Furaha's Investment Verification Contract is attached hereto as **Exhibit "B"** and fully incorporated herein.

12. Per Plaintiff Furaha's first contract, the funds would be available to Plaintiff beginning November 16, 2024 and the Final Commercial Tax Free Payment made on January 31, 202[5].

13. Further, on or about September 1, 2024, Plaintiff Furaha entered into an Investment Verification Letter (hereinafter the "Furaha Second Contract") with Jose A. Encarnacion, with the Trinity Real Estate Development, LLC, d/b/a and with the Trinity Real Estate Investment Group, LLC letterhead, verifying Plaintiff Furaha invest a total of thirty

thousand dollars and zero cents ($30,000.00). Such "investment" will be returned to Plaintiff Furaha with a fifty percent (50%) "interest increase." The total return to Plaintiff Furaha would be forty-five thousand dollars and zero cents ($45,000.00). A true and correct copy of Plaintiff Furaha's Second Investment Verification Contract is attached hereto as **Exhibit "C"** and fully incorporated herein.

14. Pursuant to Plaintiff Furaha's contract, the funds are due to be made available to Plaintiff Furaha on November 3, 2025. However, Plaintiff Furaha reasonably anticipates that she will once again be deprived of the benefit of the bargain under the Second Furaha Contract, as occurred previously.

15. Defendants, individually or collectively, traveled to North Carolina for the purpose of collecting payment from Plaintiffs.

16. Defendants, individually or collectively, have not remitted payment to Plaintiffs.

## PLAINTIFFS' FIRST CAUSE OF ACTION
*Piercing the Corporate Veil*

17. The allegations contained in Paragraphs 1 through 15 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

18. Upon information and belief, Defendant Encarnacion exercised total domination and control over the business and financial affairs of Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC, to include, but not limited to, exercising the exclusive control over the subject contracts between Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC, Defendant Encarnacion, and Plaintiffs, which is subject of this lawsuit as between the parties.

12. Additionally, upon information and belief, Defendant Encarnacion exercised the exclusive ability to control the actions and disposition of the assets of Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC and the ability to direct the transfer of assets and contracts of Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC and other obligations and exercising the exclusive ability to control when, where, and how Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC performs its positive legal duties to others.

13. Upon information and belief, Defendant Encarnacion has solely and exclusively directed the business and financial operations of Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC to the financial detriment of the Plaintiffs by exclusively directing Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC to fail to perform its positive legal duties toward the Plaintiffs, individually or collectively, by and failing to transfer all assets or interfering with the herein described contracts and consummating the herein described acts to the detriment of the Plaintiffs.

Page 3 of 17

14. Upon information and belief, Defendant Encarnacion exercises such dominion and control over the entity, observes such little corporate formality, keeps the entity thinly capitalized, and comingles funds with Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC, such that the company is a mere alter ego of the individual and should have no corporate veil.

15. The acts and omissions of Defendant Encarnacion, as more fully set forth herein, have operated to the severe financial detriment of Plaintiffs by reason of which Plaintiffs are entitled to an Order of this Court "piercing the corporate veil" of Defendant Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC, such that liability to Plaintiffs, as more fully set forth herein, becomes the personal obligation of Defendant Encarnacion.

## PLAINTIFFS' SECOND CAUSE OF ACTION
*Breach of Contract*

16. The allegations contained in Paragraphs 1 through 15 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

17. At all times relevant hereto, there existed a valid and enforceable contract between Plaintiff Batamuliza and Defendants. Further, the Plaintiff Batamuliza and Defendants have a legally binding contract between them.

18. At all times relevant hereto, there existed a valid and enforceable contract between Plaintiff Furaha and Defendants. Further, the Plaintiff Furaha and Defendants have a legally binding contract between them.

19. The contract, among other things, required Defendants to remit payment to each Plaintiff, including their full investment and applicable interest.

20. The Defendants have failed to perform under the terms of the respective contracts.

21. Without just cause, Defendants have breached the terms of the respective contracts, to which they voluntarily entered into.

22. As a proximate result of the Defendants' failure to honor the contract with the Plaintiffs, Plaintiffs are entitled to recover compensatory damages in the amount of greater than two hundred and fifty thousand dollars ($250,000.00) with the exact amount to be proven at trial herein, plus the costs of this action, with interest thereon at the legal rate from the date this action was instituted until the date of judgment and thereafter at the legal rate of 8% per annum until paid in full, pursuant to N.C. Gen. Stat. § 24-5, plus the costs of Plaintiffs'

reasonable attorney's fees pursuant to N.C. Gen. Stat. § 6-21.2, over and above all credits, setoffs, payments, causes of action, or counterclaims.

## PLAINTIFFS' THIRD CAUSE OF ACTION
*Quantum Meruit*

23. The allegations contained in Paragraphs 1 through 22 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

24. Plaintiffs and Defendants, by virtue and manifestation of their conduct, entered into a binding and enforceable contracts to the extent alleged hereinabove.

25. The valuable consideration furnished by Plaintiff Batamuliza to Defendants, was worth a total of one hundred thousand dollars and zero cents ($100,000.00), in addition to the fifty-five percent (55%) "interest increase," which was not returned to Plaintiff Batamuliza.

26. The valuable consideration furnished by Plaintiff Furaha to Defendants, was worth a total of one hundred and five thousand and thirty dollars and zero cents ($105,030.00), in addition to the sixty percent (60%) "interest increase," which was not returned to Plaintiff Furaha.

27. The valuable consideration furnished by Plaintiff Furaha to Defendants in the second installment, was worth a total of thirty thousand dollars and zero cents ($30,000.00), in addition to the fifty percent (50%) "interest increase," which was not returned to Plaintiff Furaha.

28. Defendants knowingly and voluntarily accepted Plaintiffs' valuable considerations.

29. Plaintiffs did not provide this consideration gratuitously, but rather with the expectation that Plaintiffs would be conferred the benefit of the bargain.

30. Plaintiffs' expectations were reasonable, and Defendants voluntarily accepted the contract with the knowledge, or reasonable expectancy, that Defendants had to perform said under said contracts.

31. Plaintiffs have become damaged in a sum in excess of at least two hundred and fifty thousand dollars ($250,000.00), in a final amount to be proven at trial.

## PLAINTIFFS' FOURTH CAUSE OF ACTION
*Fraud/Intentional Misrepresentation*

32. The allegations contained in Paragraphs 1 through 31 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

Page 5 of 17

33. Defendants fraudulently induced Plaintiffs to enter into their contracts with regard to the investment properties.

34. Defendants fraudulently dispossessed Plaintiffs of their monetary property by intentionally misrepresenting that the investment, plus interest, would be remitted back to Plaintiffs.

35. The Plaintiffs reasonably relied on the misrepresentations of the Defendants, that they would return their investment plus interest, and thereafter, acted on those assurances to their own detriment.

36. The Plaintiffs have suffered damages as a result of the misrepresentations of the Defendants.

37. As a result of the Defendants' conduct in engaging in intentional misrepresentation and fraud, Plaintiffs are entitled to recover compensatory damages in excess of twenty-five thousand dollars ($25,000.00), and the costs of this action, including but not limited to a reasonable attorney's fee, pursuant to N. C. Gen. Stat. §§ 6-18, 6-20, and 75-16.1, and any other applicable North Carolina law.

## PLAINTIFFS' FIFTH CAUSE OF ACTION
### *Negligent Misrepresentation*

38. The allegations contained in Paragraphs 1 through 37 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

39. The Defendants misrepresented to the Plaintiffs that they would act in accordance with the herein described contracts.

40. The Defendants failed to exercise reasonable care or competence and failed to perform with regard to the Plaintiffs and in accordance with the contract.

41. The Plaintiffs reasonably, justifiably, and detrimentally relied on the statements of the Defendants that they would repay the Plaintiffs' investment, including interest.

42. The Defendants knew or should have known that their representations concerning the investments and subsequent return would reasonably induce the Plaintiffs to proceed under the terms of the contract.

43. The Defendants breached their duty to the Plaintiffs by misrepresenting the return of their investment plus interest.

44. The Defendants' conduct has caused substantial damage to the Plaintiffs and has made the Defendants liable for the damages incurred and for the cost that the Plaintiffs have paid.

45. The Defendants' conduct is the direct and proximate cause of the Plaintiffs' damages, including attorney's fees and costs incurred in prosecution of this action.

46. As a result of the Defendants' conduct, the Plaintiffs are entitled to recovery of compensatory damages in the amount to be determined at trial, and the Plaintiffs' reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 6-18, 6-20, 6-21.1, and any other relevant North Carolina law.

## PLAINTIFFS' SIXTH CAUSE OF ACTION
*Unfair and Deceptive Trade Practices and Acts - N.C. Gen. Stat. § 75-1, et seq.*

47. The allegations contained in Paragraphs 1 through 46 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

48. Upon information and belief, and prior to entering into the contracts with the Plaintiffs, the Defendants represented to the Plaintiffs that they would use their investments for real estate projects and that there would be a substantial return on their investments.

49. The Plaintiffs relied on the representations of the Defendants and agreed to conduct business with the Defendants.

50. Upon information and belief, the Defendants engaged in the previously mentioned acts by making intentional and/or negligent misrepresentations of material fact, including but not limited to overstating his credentials and his intentions to honor Plaintiffs investments.

51. The Defendants purposefully and intentionally induced the Plaintiffs to enter into their respective Investment Contracts.

52. The Defendants' conduct is direct violations of public policy and was willful, wanton, and malicious, deceitful and reprehensible, performed in bad faith and was conducted for concealment of dilatory motives.

53. The Defendants' conduct as alleged herein constitute unfair and deceptive trade acts and practices which have unlawfully disrupted the flow of commerce in North Carolina pursuant to N.C. Gen. Stat. § 75-1.1.

54. Because of the Defendants' unfair and deceptive trade acts and practices, as well as their fraudulent, deceitful and reprehensible conduct, bad faith, concealment of dilatory motives, and willful and wanton conduct, the Plaintiffs are entitled to recover damages in excess of twenty-five thousand dollars ($25,000.00).

55. As a result of the Defendants' unfair and deceptive trade acts and practices, the Plaintiffs are entitled to treble damages assessed in this case.

56. The Plaintiffs are entitled to an Order requiring the Defendants to pay their reasonable costs and attorney's fees incurred and the necessary expenses pursuant to N.C. Gen. Stat. § 75-

16.1, and any other relevant North Carolina law, both *pendent lite* and at the hearing on the final merits of this action.

## PLAINTIFFS' SEVENTH CAUSE OF ACTION
*Punitive Damages – N.C. Gen. Stat. § 1D*

57. The allegations contained in Paragraphs 1 through 56 of the Plaintiffs' Complaint are incorporated herein by reference as though fully set forth.

58. Defendants' conduct as alleged herein is aggravated by elements of fraud, malice, willful, frivolous, and wanton conduct and is egregious and wrongful in a manner entitling Plaintiffs to punitive damages pursuant to N.C. Gen. Stat. § 1D.

59. Defendants' actions and conduct are the actual and proximate cause of damages to Plaintiffs.

60. Because of Defendants conduct, the Plaintiffs is entitled to punitive damages in excess of twenty-five thousand dollars ($25,000.00) pursuant to N.C. Gen. Stat. § 1D, and the costs of this action, including but not limited to a reasonable attorney's fee, pursuant to N. C. Gen. Stat. § 1D-45, and any other applicable North Carolina law.

**WHEREFORE,** the Plaintiffs respectfully pray the Court for the following relief:

1. That the Plaintiffs have and recover of the Defendants, jointly and severally, a judgment at least two hundred and fifty thousand dollars ($250,000.00) on their claim for breach of contract, plus the costs of this action, with interest thereon at the legal rate from the date this action was instituted until the date of judgment and thereafter at the legal rate of 8% per annum until paid in full, pursuant to N.C. Gen. Stat. § 24-5, plus the costs of Plaintiffs' reasonable attorney's fees, and costs, pursuant to N.C. Gen. Stat. §§ 6-19, 6-20, 6-21, 75-1, 1D, and any other relevant North Carolina law, over and above all credits, setoffs, payments or counterclaims;

2. That in the alternative, Plaintiffs recover a judgement against Defendants, jointly and severally, in excess of Twenty-Five Thousand Dollars ($25,000.00) on their claim for quantum meruit, with the exact amount to be proved at trial herein, plus the costs of this action, with interest thereon at the legal rate from the date this action was instituted until the date of judgment and thereafter at the legal rate of 8% per annum until paid in full, plus the costs of Defendants' reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 6-19, 6-20, 6-21, 75-1, 1D, and any other relevant North Carolina law, over and above all credits, setoffs, payments or counterclaims;

3. That the Plaintiffs have and recover judgment against the Defendants, jointly and severally, a judgment in excess of Twenty-Five Thousand Dollars ($25,000.00), on their claim for Negligent Misrepresentation and Fraud/Intentional Misrepresentation, with the exact amount to be proved at trial herein, plus the costs of this action, with interest

thereon at the legal rate from the date this counterclaim was instituted until the date of judgment and thereafter at the legal rate of 8% per annum until paid in full, plus the costs of Plaintiffs' reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 6-19, 6-20, 6-21, 75-1, and any other relevant North Carolina law, over and above all credits, setoffs, payments or counterclaims;

4. That the Plaintiffs have and recover judgment against the Defendants, jointly and severally, a judgment in excess of Twenty-Five Thousand Dollars ($25,000.00) on their claim for Unfair and Deceptive Trade Practices and Acts, with the exact amount to be proved at trial herein, plus the costs of this action, with interest thereon at the legal rate from the date this counterclaim was instituted until the date of judgment and thereafter at the legal rate of 8% per annum until paid in full, plus the costs of Defendants' reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 6-19, 6-20, 6-21, 75-1, 1D, and any other relevant North Carolina law, over and above all credits, setoffs, payments or counterclaims;

5. That the Plaintiffs be awarded treble damages and attorney's fees pursuant to N.C. Gen. Stat. § 75-16, and any other relevant North Carolina law;

6. That the Court attach the Defendants' financial accounts to recover any amounts awarded in favor of the Plaintiffs;

7. That the Court enter an Order of this Court "piercing the corporate veil" of Trinity Real Estate Development, LLC, d/b/a Trinity Real Estate Investment Group, LLC, such that liability of Defendant as more fully set forth herein becomes the personal obligation of Defendant Jose A. Encarnacion;

8. That Defendants, jointly and severally, be ordered to pay the Plaintiffs' costs, reasonable attorney's fees, and expenses in the maximum amount authorized by law pursuant to N.C. Gen. Stat. §§ 6-19, 6-20, 6-21, 75-1, and any other relevant North Carolina law;

9. A trial by jury; and

10. For such other and further relief as the Court may deem just and proper.

This the ___8___ day of September, 2025.

Thomas P. Roupas, Jr.
*Attorney for Plaintiffs*
Roupas Law Firm, PLLC
119 N. Greene Street, Suite 100
Greensboro, NC  27401
Phone: (336) 272-7272
Fax: (336) 275-0999

Page **9** of **17**

# EXHIBIT A

DocuSign Envelope ID: CEF741E0-5BA3-4CA9-91A5-8B598BB514F7



**Trinity
Real Estate
Investment Group**

Investment Verification Contract

This is to certify that Jacqueline Batamuliza of 609 Charter St. High Point, NC 27260 has invested a total amount of $100,000.00 into real estate Project #200132 with Rev. Jose Encarnacion of 7 Lucian St. Worcester, Ma. 01603 and Trinity Estate Investments & Development LLC with an expected return of there investment to include a 55% interest increase totaling $55,000.00. The return of the initial investment along with the 55% interest totaling $155,000.00 will be made available to Jacqueline Batamuliza on December 28, 2024 upon closing of the real estate project and clearing of the profit funds through it tax exempt process. Jacqueline has completed this investment with a rollover of profit from a previous project totaling the $100,000.00.

By signing below and receiving the funds invested both parties agree to the terms and will be held legally accountable to the terms and conditions provided here to.

Once again, thank you for your business if you have any questions please contact me at 774-242-2691 or email me at revjoseicc@gmail.com

Sincerely

Rev. Jose Encarnacion
President of TREI Group

Jacqueline Batamuliza
Investor

Gabriel Gapasi
Beneficiary

Faustin Ndayisaba
Beneficiary

# EXHIBIT B

**10:27**

Docusign Envelope ID: A01F716F-0753-4C7A-07F5-8B0092422131B



## Trinity
## Real Estate
## Investment Group

### Investment Disbursement Letter

This is to certify that **Charlotte Furaha** of 203 Hoskins St. High Point, NC 27260 has invested a total amount of **$105,030.00** into real estate Project #772214 with Rev. Jose Encarnacion of 7 Lucian St. Worcester, Ma. 01603 and Trinity Estate Investments & Development LLC with an expected return of the investment to include a 60% interest increase totaling $63,018.00. The return of the initial investment along with the 60% interest totaling $168,048.00, Charlotte Furaha has chosen to cash out a portion of her principal and profit totaling $68,000.00 of her investment through the tax process protecting her funds from the real estate commercial tax rate. Below is the disbursement schedule that will comply with the state guidelines as a process that will begin November 16, 2024 and will end January 30, 2024. A total of $30,000.00 was already disbursed early in June of 2024. The balance of $70,000.00 will be reinvested into 2 projects.

• Wire Transfers within **15 business day** increments not to exceed $15,000.00
• Confirmed Schedule: Group Batch Wire Transfers begin on September 30, 2024
*see schedule below*

- Nov. 16th - **$15,000.00** – Nov. 30th - $15,000.00
- Dec. 18th - **$15,000.00** – January. 18th - $15,000.00
- Jan. 31st - **$8,000.00** – Final Commercial Tax Free Payment

ATTENTION: Special Authorization: I Charlotte Furaha give authorization to have my investment disbursement schedule above be transferred to my brother Nsengiyumva Claude.

Rev. Jose Encarnacion
President of TREI Group

ATTENTION: Special Notification: These wire transfers are initiated through the Attorney's office via email to the bank and then the bank has a 24hr to 72hr window to begin the process of the wire. Keeping that in mind the dates offered are when the process initiates however that deposit of funds can take up to 3 to 5 days or 7 days in the case of international wire transfers.

# EXHIBIT C

**10:26**

Docusign Envelope ID: 9AD9AF7A-38A1-4E82-AAA6-BDA09F00E233



## Trinity
## Real Estate
## Investment Group

Investment Verification Letter

This is to certify that **Charlotte Furaha** of 203 Hoskins St. High Point, NC 27260 has invested a total **amount of $30,000.00** into real estate Project #868213 with Rev. Jose Encarnacion of 7 Lucian St. Worcester, Ma. 01603 and Trinity Estate Investments & Development LLC with an expected return of the investment to include a 50% interest increase totaling **$15,000.00.** The return of the initial investment along with the 50% interest totaling **$45,000.00** will be made available to Charlotte Furaha on November 3, 2025 upon closing of the investment project and clearing through the state mandated commercial tax process. Charlotte Furaha completed this investment by rolling over principal and profits totaling $30,000.00 from project #772214 and also recieved a balance of **$15,000.00** from that project in cash funds.

By signing this contract together with the transfer of funds validates the terms of it and at the same time it becomes a legal document with binding obligations for all parties involved.

Thank You for your business, if you have any questions you can contact me at (774)242-2691 or by email at revjosoicc@gmail.com

Rev. Jose Encarnacion
President of TEID

Charlotte Furaha
Investor

Christian Byiringiro & Divine Murisa
Beneficiaries'

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

JACQUELINE BATAMULIZA and
CHARLOTTE FURAHA,

Plaintiffs,

v.

JOSE A. ENCARNACION and TRINITY
REAL ESTATE DEVELOPMENT, LLC,
d/b/a TRINITY REAL ESTATE
INVESTMENT GROUP, LLC,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

VERIFICATION

I, JACQUELINE BATAMULIZA, being first duly sworn, deposes and says:

That the undersigned is the Plaintiff in this action and, as such, is qualified to make this verification; that the Plaintiff has read the foregoing *Complaint* and knows the contents thereof and that the same is true of their own knowledge, save and except those matters and things therein state upon information and belief and as to those matters, he believes them to be true.

This the 31st day of August 2025.

_____
JACQUELINE BATAMULIZA

STATE OF NORTH CAROLINA

GUILFORD COUNTY

Affirmed to and subscribed to before me by JACQUELINE BATAMULIZA, being personally known to me or having produced a state-issued Driver's License, or other government-issued documentation, as evidence of identification, this the 31 day of August 2025.

_____
Vicki L. Powe , Notary Public

My commission expires: 8/31/25

Page 16 of 17

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

JACQUELINE BATAMULIZA and
CHARLOTTE FURAHA,

        Plaintiffs,

v.

JOSE A. ENCARNACION and TRINITY
REAL ESTATE DEVELOPMENT, LLC,
d/b/a TRINITY REAL ESTATE
INVESTMENT GROUP, LLC,

        Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

**VERIFICATION**

I, CHARLOTTE FURAHA, being first duly sworn, deposes and says:

That the undersigned is the Plaintiff in this action and, as such, is qualified to make this verification; that the Plaintiff has read the foregoing *Complaint* and knows the contents thereof and that the same is true of their own knowledge, save and except those matters and things therein state upon information and belief and as to those matters, he believes them to be true.

This the 31 day of August 2025.

                                                     CHARLOTTE FURAHA

STATE OF NORTH CAROLINA

GUILFORD COUNTY

Affirmed to and subscribed to before me by CHARLOTTE FURAHA, being personally known to me or having produced a state-issued Driver's License, or other government-issued documentation, as evidence of identification, this the 31 day of ____August____ 2025.

                                             , Notary Public

My commission expires: 4/15/26

Page 17 of 17